## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| L.C., a minor child, by and through her father MASSIMILIANO CALI, | ) CASE NO: 1:26-cv-00688 |
| | ) |
| MASSIMILIANO CALI, | ) |
| | ) |
| *Plaintiffs*, | ) **COMPLAINT** |
| | ) |
| *v.* | ) |
| | ) |
| DONALD J. TRUMP, President of the United States 1600 Pennsylvania Avenue NW Washington, DC 20500, | ) DATE: February 25, 2026 |
| | ) |
| PAMELA BONDI, United States Attorney General, 950 Pennsylvania Avenue NW Washington, DC 20530, | ) |
| | ) |
| SCOTT BESSENT, Secretary of the Treasury, 1500 Pennsylvania Avenue NW Washington, DC 20220, and | ) |
| | ) |
| MARCO RUBIO, Secretary of State, 2201 C Street NW Washington, DC 20451, | ) |
| | ) |
| *Defendants*. | ) |

---

### NATURE OF THE CASE

1.      Plaintiff, L.C., is a United States citizen and the minor daughter of Plaintiff, Massimiliano Cali ("Max"), and Francesca Albanese ("Francesca"). Max and Francesca are Italian citizens with significant ties to the United States. They lived, worked, and participated in community groups in the United States for many years, raised a child here, bought and continue

to own a home here, and have cultivated over a decade of professional and academic relationships. They are part of the national community and have developed sufficient connections with this country to be considered part of its community. Nevertheless, Defendants have designated Francesca as a Specially Designated National ("SDN") under Executive Order 14203 ("EO 14203") *solely* for exercising her First Amendment rights. That action is unlawful and has done irreparable harm to the constitutional rights of Plaintiffs' family and of the American public.

2.    Francesca is a world-renowned human rights law scholar, Middle East expert, and author who currently serves as the "Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967," a prestigious independent expert position to which she was appointed by the United Nations Human Rights Council ("UNHRC") in April 2022.

3.    President Trump promulgated EO 14203 on February 6, 2025, under the putative authority of the International Emergency Economic Powers Act ("IEEPA"). EO 14203 purports to address the threat that the International Criminal Court ("ICC") may pursue certain "protected persons" (*i.e.*, nationals of the United States and non-consenting allies), and it sanctions foreign persons deemed to have "directly engaged in" or assisted the ICC's pursuit of such "protected persons." Francesca does not work for or have any authority over or within the ICC. But she has made statements, written reports, and engaged in correspondence endorsing the work of the ICC in the course of performing her duties as a Special Rapporteur.

4.    Francesca's expression of her views about the facts as she has found them in the Israeli-Palestinian conflict and about the work of the ICC is core First Amendment activity. It is also activity that IEEPA forbids the government from regulating or punishing with sanctions. Yet, Defendants have issued crushing sanctions against Francesca, the burdens of which have also fallen on her family, under an overbroad executive order authorizing sanctions against the ICC and

any "foreign persons" that have "directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute" nationals of the United States and some of its allies.

5.     Max and Francesca co-own a home in Washington, D.C., where they lived for years and brought a daughter into the world. The sanctions against Francesca include a block on this property that bars Plaintiffs' from enjoying it or its value indefinitely, constituting an unreasonable seizure under the Fourth Amendment.

6.     L.C., Max, and Francesca also continue to face irreparable harms to their Fifth Amendment due process rights. Max and Francesca's spousal relationship, and their parental relationship with L.C., has effectively been turned into criminal activity. Both Max and Francesca's chosen professions have been, and continue to be, impaired through the termination of longstanding relationships, canceling of professional opportunities, and limitations on their ability to engage fully in their professional lives.

7.     At its heart, this case concerns whether Defendants can sanction a person — ruining their life and the lives of their loved ones, including their citizen daughter — because Defendants disagree with their recommendations or fear their persuasiveness. Sanctions, used appropriately, are a powerful tool to disrupt and undermine the activities of terrorists, criminals, and authoritarian regimes. Sanctions are abused, however, when they seek to silence disfavored points of view and to violate the constitutional rights of people the government does not like.

8.     Plaintiffs file this suit to challenge Defendants' imposition of overbroad and *ultra vires* sanctions that violate First, Fourth, and Fifth Amendment rights and that exceed the statutory limits that Congress has imposed on the President's use of sanctions and agency action. On those bases, Plaintiffs ask this Court to declare that EO 14203 violates the First Amendment on its face and is *ultra vires*, declare that Francesca's designation violates IEEPA, as well as the First, Fourth,

and Fifth Amendments as applied, to set aside Francesca's designation as an SDN, to set aside all

rules, regulations, and agency actions taken pursuant to EO 14203, and to enjoin any action against

Plaintiffs or Francesca.

## JURISDICTION & VENUE

9.      This Court has subject matter jurisdiction to grant the relief requested pursuant to

5 U.S.C. § 702; 28 U.S.C. §§ 2201, 2202, & 1331; and the Court's inherent equitable powers.

10.      Venue is proper pursuant to 28 U.S.C. § 1391(e)(1).

## THE PARTIES

11.      L.C. is a citizen of the United States and the minor daughter of Massimiliano Cali

and Francesca Albanese. L.C. asserts her claims through her father and guardian, pursuant to

Federal Rule of Civil Procedure 17(c).

12.      Plaintiff Massimiliano Cali is a citizen of Italy, spouse to Francesca Albanese,

father and guardian of L.C., and along with Francesca Albanese, joint owner of real property

located in the District of Columbia. He brings this lawsuit on his own behalf as well as on behalf

of his wife, who is barred from bringing claims in her own name by a United Nations policy that

precludes her from contesting the sanctions imposed on her.

13.      Defendant, Donald Trump, is a citizen of the United States and serves as the

President of the United States. Mr. Trump is being sued in his official capacity to declare unlawful

actions beyond his authority and in violation of the constitution and laws of the United States.

14.      Defendant, Pamela Bondi, is a citizen of the United States and serves as the

Attorney General. Ms. Bondi is being sued in her official capacity to enjoin actions beyond her

authority and in violation of the constitution and laws of the United States.

15.     Defendant, Scott Bessent, is a citizen of the United States and serves as the Secretary of the Treasury. Mr. Bessent is being sued in his official capacity to enjoin actions beyond his authority and in violation of the constitution and laws of the United States.

16.     Defendant, Marco Rubio, is a citizen of the United States and serves as the Secretary of State. Mr. Rubio is being sued in his official capacity to enjoin actions beyond his authority and in violation of the constitution and laws of the United States.

## FACTUAL BACKGROUND

### A. The Plaintiffs and their relationship to Francesca Albanese.

17.     Plaintiff Massimiliano Cali and his spouse Francesca Albanese are Italian citizens. Max is an economist with the World Bank, and Francesca is an international legal scholar and recognized expert in areas of human rights and the Middle East. She has held multiple prominent positions in her field of work, including as a human rights officer for the Office of the UN High Commissioner for Human Rights and as a legal officer in the international legal department of the UN Relief and Work Agency for Palestine Refugees.

18.     In 2012, Max relocated to the World Bank's headquarters in Washington, D.C., where he and Francesca became residents of the District of Columbia. They opened a U.S. bank account with Bank Fund Staff Federal Credit Union and purchased a residence that same year, which they still own, in the District of Columbia with a mortgage from Bank Fund Staff Federal Credit Union. L.C. was born in the District of Columbia in 2013 and received a United States passport that same year.

19.     During the years they resided in the United States, Max, Francesca, and L.C. thoroughly integrated into the local community. While on maternity leave, Francesca volunteered as a yoga instructor at a local homeless shelter. L.C. enrolled at the local pre-school, and English is her first language. In 2014, Francesca started a position with the D.C. office of Project Concern

International, a human rights NGO based in the United States that focuses on humanitarian assistance and disaster risk management. In 2015, Francesca traveled to Liberia on a humanitarian mission for Project Concern International at the height of the Ebola pandemic. Later that year, she joined Georgetown University's Institute for the Study of International Migration ("ISIM") as an Affiliated Scholar, and with university support, began her first book, *Palestinian Refugees in International Law* (Oxford University Press 2020).

20.     In 2015, the World Bank relocated Plaintiffs' family to Jakarta, and then to Tunisia in 2021. During this time, L.C. enrolled in the local American schools and Plaintiffs' family maintained their connections to the District of Columbia. They kept their District of Columbia residence, Francesca remained an Affiliated Scholar with Georgetown's ISIM, and both Francesca and Max routinely traveled to the United States.

21.     In spring 2022, the United Nations Human Rights Council ("UNHRC") appointed Francesca as an independent expert to monitor and report on human rights issues affecting the Occupied Palestinian Territories ("OPT")[1] as "Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967."[2] This position was created by a 1993 resolution of the UN Committee on Human Rights (predecessor to the UNHRC).[3] The mandate calls on the Special Rapporteur:

> (A) To investigate Israel's violations of the principles and bases of international law, international humanitarian law and the Geneva Convention relative to the

---

[1] This is a widely used term to refer to areas including the West Bank, Gaza Strip, and East Jerusalem. *See, e.g.*, U.S. Dep't of State, *Israel 2016 International Religious Freedom Report-Executive Summary* (2016), https://www.state.gov/wp-content/uploads/2019/01/Israel.pdf.

[2] Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967, UNHR, https://www.ohchr.org/en/special-procedures/sr-palestine (last visited Feb. 20, 2026).

[3] U.N. Comm'n on Human Rights, *Question of the violation of human rights in the occupied Arab territories, including Palestine*, E/CN.4/RES/1993/2 (Feb. 19, 1993), https://www.refworld.org/legal/resolution/unchr/1993/en/10874.

Protection of Civilian Persons in Time of War, of 12 August 1949, in the Palestinian territories occupied by Israel since 1967;

(B) To receive communications, to hear witnesses, and to use such modalities of procedure as he may deem necessary for his mandate;

(C) To report, with his conclusions and recommendations, to the Commission on Human Rights at its future sessions, until the end of the Israeli occupation of those territories.

22.    Francesca began her mandate on May 1, 2022, and hers is one of fifty-two such independent expert positions, appointed by the United Nations, whose tasks are to report on specific human rights situations to the UN Human Rights Council in Geneva and to the UN General Assembly in New York. Other special rapporteurs and experts include those for "persons with disabilities," "the right to education," and "the rights of Indigenous Peoples."

23.    In her role, Francesca has become a highly visible public figure and widely recognized voice in public discourse on Palestine, the Palestinian population, and the Israeli-Palestinian conflict. She is published, has taught and spoken at institutions and gatherings across the globe, and is sought out for her commentary and thoughts by individuals and groups from across all sectors of civil society. To give but a few examples, in recent years, Francesca has spoken at the University of Oxford, London School of Economics, Columbia University, and Princeton University; given the Nelson Mandela Foundation Lecture, the Edward Said Memorial Lecture, the inaugural Dries van Agt Lecture at The Hague; and was awarded the prestigious Dries van Agt award by The Rights Forum. She has received honorary doctorates from three European universities. Her official X (formerly Twitter) account has close to 570,000 followers and her Instagram account has over 1.3 million followers. Media from as broad a range as the *New York Times*, *El Pais*, *Le Monde*, *Reuters*, *The Guardian*, *CNN,* and the *BBC*, as well as *Jacobin* (which describes itself as "a leading voice of the American left"), and the *Tucker Carlson Show* (whose

7

discussion with Francesca has garnered over 1.1 million views online) have interviewed or profiled her in recent years.

24.    In 2025, a documentary focusing on Francesca's work (titled "Disunited Nations") was broadcast by the French-German broadcaster Arte. Francesca has written two additional books on the Israeli-Palestinian conflict since 2022, both in Italian. Her most recent, published in 2025, was a bestseller in Italy and has been translated into fifteen languages. The English edition is to be published in the United States in early 2026. Francesca has also contributed forewords and endorsements to books of renowned authors, including well-known Israeli scholar and Oxford history professor Avi Shlaim. Three separate books were published in 2025 containing her reports as Special Rapporteur.

25.    In short, Francesca's work is her voice. To be sure, the topics on which she speaks are controversial. But what she does — and what Defendants have sanctioned her for doing — is speak on matters of pressing public concern.

**B.  The International Criminal Court**

26.    The ICC is a permanent international institution headquartered in The Hague, The Netherlands. It was created by the 1998 Rome Statute of the International Criminal Court, which was the culmination of a decades-long effort to create a permanent transnational forum in which victims of the gravest international crimes can seek justice. Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90, 37 I.L.M. 999 (entered into force July 1, 2002) ("Rome Statute").

27.    The movement for international criminal justice emerged from the aftermath of the Holocaust, and the United States was a driving force behind the effort to hold Nazi-era war criminals to account through the Nuremberg Trials. Throughout the latter half of the 20th century, as unspeakable horrors unfolded in Cambodia, the former Yugoslavia, Rwanda, Sierra Leone, and

other conflict zones, the United States supported the creation of international criminal tribunals to address atrocity crimes committed in those jurisdictions. When President Clinton signed the Rome Statute in 2000, he noted the United States' "long history of commitment to the principle of accountability, from our involvement in the Nuremberg tribunals that brought Nazi war criminals to justice, to our leadership in the effort to establish the International Criminal Tribunals for the former Yugoslavia and Rwanda." Statement on the Rome Treaty on the International Criminal Court, 37 Weekly Comp. Pres. Doc. 4, Dec. 31, 2000.

28.    As of the date of this filing, 125 countries are party to the Rome Statute. Of the 32 members of NATO, 30 are party to the Rome Statute. The United States signed the Rome Statute, but the Senate has not ratified it.

29.    The ICC has "the power to exercise its jurisdiction over persons for the most serious crimes of international concern." Rome Statute, art. 1. These include genocide, crimes against humanity, war crimes, and the crime of aggression. *Id*. art. 5. The ICC's jurisdiction is limited to crimes committed from July 1, 2002 onward within the territory of a member state, by nationals of a member state after that state's accession to the Rome Statute, at the member state's election, or upon referral by the United Nations Security Council. *Id*. art. 11(1).

30.    Following its recognition as a non-member observer state by the United Nations General Assembly in 2012, the State of Palestine acceded to the Rome Statute in 2015. In 2021, the ICC asserted jurisdiction over crimes committed in Palestine, which is the legal equivalent of opening an investigation. In November 2024, the Prosecutor of the ICC issued charges against three leaders of Hamas, Mohammed Deif, Yahya Sinwar, and Ismail Haniyeh, and two leaders of the Israeli government, Benjamin Netanyahu and Yoav Gallant, for war crimes and crimes against humanity perpetrated in the territory of Palestine.

31.     Francesca, for her part, has no formal or informal role with the ICC. She has no ability to direct or otherwise control or dictate ICC activity or messaging. Her relationship with the ICC is limited to outside advocacy. That has included a July 3, 2025 report Francesca delivered to the UNHRC addressing corporate actors and international law in the Israeli-Palestinian conflict in which Francesca stated: "The Special Rapporteur urges the International Criminal Court … to investigate and prosecute corporate executives and/or corporate entities for their part in the commission of international crimes and laundering of the proceeds from those crimes." In other words, even in her official capacity as Special Rapporteur, Francesca's capacity to influence the work of the ICC extends only to the persuasiveness of her advocacy.

### C.  The United States' relationship to the ICC

32.     Despite its general support for the ICC, the United States has long opposed the ICC's exercise of jurisdiction over U.S. citizens. When President Clinton signed the Rome Statute in 2000, he recommended that the Senate defer ratification until the Rome Statute was amended to guarantee certain procedural due process rights and exemptions for American citizens. 22 U.S.C. § 7421(6)-(7).

33.     John Bolton, who would go on to serve as the Bush Administration's UN Ambassador, wrote an op-ed the week after President Clinton signed the Rome Statute, objecting that it threatened the autonomy of U.S. political leaders. John Bolton, *Unsign That Treaty*, Wash. Post, Jan. 2, 2001. In a subsequent law review article elaborating his objections, Bolton warned:

> A fair reading of the treaty, for example, leaves the objective observer unable to answer with confidence whether the United States was guilty of war crimes for its aerial bombing campaigns over Germany and Japan in World War II. . . . This is intolerable and unacceptable. The list of ambiguities goes on and on. How will these vague phrases be interpreted? Who will advise a President that he is unequivocally safe from the retroactive imposition of criminal liability if he guesses wrong? Is even the defensive use of nuclear weapons a criminal violation? . . .

> Moreover, there is no doubt that Israel will be the target of a complaint concerning conditions and practices by the Israeli military in the West Bank and Gaza. The United States, with continuous bipartisan support for many years, has attempted to minimize the disruptive role that the United Nations has all too often played in the Middle East peace process. We do not now need the ICC interjecting itself into extremely delicate matters at inappropriate times. Israel, therefore, was one of the few governments that voted with the United States against the statute.

John Bolton, *The Risks and Weaknesses of the International Criminal Court from America's Perspective*, 64 Law and Contemporary Problems 167, 170–71 (2001).

34.     In 2002, while serving as Undersecretary of State in the Bush Administration, Bolton submitted a letter to the UN Secretary General stating that "the United States does not intend to become a party to the [Rome Statute]. Accordingly, the United States has no legal obligations arising from its signature on December 21, 2002." John Bolton, Letter to the Secretary General of the United Nations, May 6, 2002.

35.     In June 2002, the Congressional Research Service summarized the Rome Statute's "Political Implications" as follows:

> Perspectives differ on the impact of the ICC on U.S. interests, once it begins operation. Some see the ICC as a fundamental threat to the U.S. armed forces, its political leaders, and U.S. defense and foreign policy. Others see it as a valuable foreign policy tool for defining and deterring crimes against humanity, a step forward in the decades-long U.S. effort to end impunity for egregious mass crimes.

*CRS Report for Congress, RL31437, International Criminal Court: Overview and Selected Legal Issues* CRS-42 (June 5, 2002).

36.     Two months later, Congress enacted the American Servicemembers' Protection Act ("ASPA"), 116 Stat. 899 (2002) (codified at 22 U.S.C. §§ 7421, *et seq.*), to address the risk of U.S. persons "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court." 22 U.S.C. § 7427. In enacting this law, Congress found "the Rome Statute creates a risk that the President and other senior elected and appointed officials of the United States

Government may be prosecuted by the International Criminal Court. . . . No less than members of the Armed Forces of the United States, senior officials of the United States Government should be free from the risk of prosecution by the International Criminal Court, especially with respect to official actions taken by them to protect the national interests of the United States." 22 U.S.C. § 7421(9).

37.     While the ASPA broadly regulates the United States' relationship to the ICC to advance this purpose, Congress also permitted the United States to support ICC activities under certain circumstances. *Id*. § 7422(c);); 22 U.S.C. § 7433. Section 7433, for its part, provides statutory protection for many activities supporting the ICC's efforts:

> Nothing in this subchapter shall prohibit the United States from rendering assistance to international efforts to bring to justice Saddam Hussein, Slobodan Milosovic [sic], Osama bin Laden, other members of Al Queda [sic], leaders of Islamic Jihad, and other foreign nationals accused of genocide, war crimes or crimes against humanity, or from rendering assistance to the International Criminal Court to assist with investigations and prosecutions of foreign nationals related to the Situation in Ukraine.

38.     The United States has provided direct support to the work of the ICC in multiple situations as consistent with its foreign policy interests. This support has transcended party lines, as both Democratic and Republican administrations have assisted several prominent ICC investigations and prosecutions.

39.     On March 31, 2005, for example, the UN Security Council referred the situation in Darfur, Sudan, to the ICC for prosecution. U.N.S.C. Res. 1593 U.N. Doc. S/RES/1593, (Mar. 31, 2005). The United States contributed to the drafting of the resolution and acceded to its passage. In stating the reasons for its position, the Ambassador to the United Nations stated that the United States preferred the creation of an ad hoc tribunal, but acceded to the Security Council's referral of the situation to the ICC's jurisdiction, notwithstanding the fact that Sudan was not a party to the

Rome Statute, "because of the need for the international community to work together in order to end the climate of impunity in Sudan, and because the resolution provides protection from investigation or prosecution for U.S. nationals and members of the armed forces of non-state parties." Explanation of Vote on the Sudan Accountability Resolution, USUN Press Release #055 (05) (Mar. 31, 2005).

40.     On October 31, 2006, Congress endorsed the ICC's Darfur prosecution and authorized the President to impose blocking sanctions against "any individual who the President determines is complicit in, or responsible for, acts of genocide, war crimes, or crimes against humanity in Darfur." Darfur Peace and Accountability Act of 2006, P. L. No. 109-344, 120 Stat. 1869 (2006). President Bush implemented these sanctions the same day. Blocking Property of and Prohibiting Transactions With the Government of Sudan, EO 13412, 71 Fed. Reg. 61369, 61369 (Oct. 13, 2006).

41.     Over the intervening two decades, Congress has supported the ICC's Darfur investigation and prosecution through resolutions. *See*, *e.g.*, S. Res. 188, 116th Cong., 165 Cong. Rec. S4736 (2019) (Senate resolution approving of the work of the ICC in prosecuting former Sudanese president Al-Omar Al-Bashir); William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, §§ 1263, 1267, Pub. L. No. 116-283, 134 Stat. 3388, 3968, 3971 (2021).). The most recent resolution was in November 2024, which the House passed by super-majority voice vote. H.R. Res. 1328, 118th Cong. (2024). And every administration from the George W. Bush Administration to the present administration has supported the prosecution of those culpable for genocide, war crimes, and crimes against humanity in Darfur before the ICC. *See*, *e.g.*, Remarks by Ambassador Dorothy Shea, Chargé d'Affaires ad interim, at a UN Security

Council Briefing by the ICC Prosecutor for Sudan, January 27, 2025.[4] And the State Department has offered a reward of "up to $5 million for information leading to [the] arrest [of Ahmad Mohammad Harun], transfer to the ICC, or conviction." U.S. Department of State's Global Criminal Justice Rewards Program.[5]

42.    In 2011, the United States voted with the UN Security Council to refer the situation in Libya to the ICC for investigation and specifically urged "all States and concerned regional and other international organizations to cooperate fully with the Court and the Prosecutor." U.N.S.C. Res. 1700, ¶¶ 4-5, U.N. Doc. S/RES/1970 (Feb. 26, 2011). The United States Ambassador to the United Nations celebrated this resolution, saying, "for the first time ever, the Security Council has unanimously referred an egregious human rights situation to the International Criminal Court." U.N.S.C. 6491st mtg. at 33, U.N/ Doc. S/PV.6491 (Feb. 26, 2011).

43.    In 2013, the United States turned Bosco Ntaganda over to the ICC for prosecution for war crimes committed in the Democratic Republic of the Congo after he sought refuge in the U.S. Embassy in Rwanda. Jeffrey Gettleman, *Team on the Way to Collect Congo War Crimes Suspect*, N.Y. Times, Mar. 21, 2013, at A6. This action was unanimously endorsed in a resolution of the Senate. S. Res. 144, 113th Cong., 159 Cong Rec. S5302 (2013).

44.    In 2015, the United States transferred Dominic Ongwen, who had been taken into custody by the U.S. military, to the ICC. The State Department publicly "welcome[d] the transfer of Dominic Ongwen by Central African authorities to the International Criminal Court." U.S.

---

[4] *Remarks by Ambassador Dorothy Shea, Chargé d'Affaires ad interim, at a UN Security Council Briefing by the ICC Prosecutor for* Sudan, USUN (Jan. 27, 2025), https://usun.usmission.gov/remarks-by-ambassador-dorothy-shea-charge-daffaires-ad-interim-at-a-un-security-council-briefing-by-the-icc-prosecutor-for-sudan/ (last visited Feb. 23, 2026).

[5] U.S. Dep't of State, *Current Reward Offers*, https://2021-2025.state.gov/global-criminal-justice-rewards-program/current-reward-offers/ (last visited Feb. 23, 2026).

Dep't of State, Press Statement, Statement, Transfer of Dominic Ongwen to the International Criminal Court, Jan. 20, 2015.

45.    In 2008, Congress authorized military assistance to state parties of the ICC. National Defense Authorization Act for Fiscal Year 2008, § 1212, Pub. L. No. 110-181, 122 Stat. 3, 371 (2008). Congress has also appropriated funds and empowered the State Department to offer monetary rewards to individuals who provide information to facilitate the arrest of foreign individuals wanted by the ICC. Department of State Rewards Program Update and Technical Corrections Act of 2012, Pub. L. No. 112-282, 126 Stat. 2492 (2013).

46.    Congress has endorsed the work of the ICC in several joint and chamber-specific resolutions. *See*, *e.g.*, S. Res. 90, 113th Cong., 159 Cong. Rec. S2853 (2013) (Senate resolution "call[ing] on the Government of Kenya to respect commitments to seek justice for the victims of political violence, including by honoring its obligations under the Rome Statute to cooperate fully with the International Criminal Court."); S. Con. Res. 16, 110th Cong. 153 Cong. Rec. S2540 (2007) (Joint resolution citing the ICC's work to condemn the Lord's Resistance Army in Uganda); S. Res. 402, 112th Cong. 158 Cong. Rec. S6007 (2012) (reiterating the Senate's support for the prosecution of Joseph Kony).

47.    In 2022, the Senate unanimously passed a resolution relating to the ICC's investigation of Russian crimes in Ukraine, stating "the [ICC] is an international tribunal that seeks to uphold the rule of law, especially in areas where no rule of law exists, by investigating and trying individuals charged 'with the gravest crimes of concern to the international community: genocide, war crimes, crimes against humanity and the crime of aggression,'" and resolved to "encourage[] member states to petition the ICC or other appropriate international tribunal to take any appropriate steps to investigate war crimes and crimes against humanity committed by the

Russian Armed Forces and their proxies and President Putin's military commanders, at the direction of President Vladimir Putin." A resolution expressing the sense of the Senate condemning the Russian Federation, President Vladimir Putin, members of the Russian Security Council, the Russian Armed Forces, and Russian military commanders for committing atrocities, including alleged war crimes, against the people of Ukraine and others, S. Res. 546, 117th Cong., 169 Cong. Rec. S1180 (2022).

48.    In 2024, Congress appropriated funds to support the ICC directly. This included "not less than $2,500,000 as a contribution to the Trust Fund for Victims" that is associated with the ICC. An additional $2,500,000 was also appropriated for "Assistance to International Efforts" that include supporting the ICC's investigations and prosecutions of foreign nationals related to the situation in Ukraine. Further Consolidated Appropriations Act, 2024, § 7034(r), Pub. L. No. 118-47, 138 Stat. 460, 793 (2024).

49.    In October 2024, the Legal Advisor to the United States Mission to the United Nations extolled the virtues of the ICC's work to the United Nations General Assembly:

> The United States remains steadfast in its commitment to international justice and promoting accountability for violations of international humanitarian law . . . The work of the International Criminal Court is vital to this mission, and we welcome the ICC's continued efforts . . . to deliver justice in situations where atrocities have been committed with impunity, including in Ukraine, Darfur, and the Central African Republic.[6]

50.    U.S. courts have also consistently cited the Rome Statute and the work of the ICC to interpret international law, *see*, *e.g.*, *Jesner v. Arab Bank*, PLC, 584 U.S. 241, 261 (2018); *Nahl*

---

[6] Mark Simonoff, United States Mission to the UN, Remarks at a UN General Assembly Meeting on a Report of the International Criminal Court (Oct. 28, 2024), https://web.archive.org/web/20241030051845/https://usun.usmission.gov/remarks-at-a-un-general-assembly-meeting-on-a-report-of-the-international-criminal-court-2/ (last visited Feb. 23, 2026).

*v. Jaoude*, 968 F.3d 173, 188 (2d Cir. 2020) (Walker, J. concurring); *Simon v. Republic of Hungary*, 812 F.3d 127, 143 (D.C. Cir. 2016); *Hamdan v. United States*, 696 F.3d 1238, 1250 (D.C. Cir. 2012), *overruled on other grounds by Al Bahlul v. United States*, 767 F.3d 1 (D.C. Cir. 2014); *Doe v. Exxon Mobil Corp.*, 391 F. Supp. 3d 76, 90 (D.D.C. 2019), and to evaluate applications for asylum. *See*, *e.g.*, *Wanjiru v. Holder*, 705 F.3d 258, 266 (7th Cir. 2013).

### D. The International Emergency Economic Powers Act

51.    IEEPA authorizes the President to take specified actions in response to a national emergency constituting an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). Once the President has declared such an emergency, IEEPA permits the President to:

> block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id*. § 1702(a)(1)(B).

52.    The President may impose these restrictions, or "IEEPA sanctions," only to respond to the "new threat" that gave rise to the national emergency — "not for any other purpose." *Id.* § 1701(b); s*ee also* H.R. Rep. No. 95–459, at 10 (1977) (legislative history describing this limitation).

53.    IEEPA sanctions regimes are implemented by the creation of designated foreign national "lists" that are administered by the Treasury Department's Office of Foreign Assets Control ("OFAC"). Individuals subject to sanctions under IEEPA, so-called Specially Designated Nationals ("SDNs"), are said to be on "the OFAC List." Once SDNs are on the OFAC List, they

are sometimes described as being subjected to "civil death," insofar as it becomes functionally unlawful for them to be employed, to access banking services, to travel, or to engage in most commerce that is basic to modern life.[7]

54.    IEEPA makes it unlawful for anyone "to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under" the statute. 50 U.S.C. § 1705(a). The consequences of violating IEEPA sanctions can be extremely severe. Anyone who violates IEEPA sanctions, intentionally or not, may be subject to a civil penalty equaling the greater of $377,700 or twice the value of the transaction giving rise to the violation. 50 U.S.C. § 1705(b); Inflation Adjustment of Civil Monetary Penalties, 90 Fed. Reg. 3687, 3688 (Jan. 15, 2025). Anyone who willfully violates IEEPA sanctions, attempts or conspires to do so, or aids and abets a violation faces criminal fines of up to $1,000,000 and up to twenty years in prison. 50 U.S.C. § 1705(c). The government has also prosecuted people for conspiracy to commit an offense against the United States under 18 U.S.C. § 371 in connection with the planned violation of an IEEPA order.

55.    OFAC is responsible for the civil enforcement of IEEPA sanctions regimes, and it regularly imposes civil penalties on individuals and entities for IEEPA violations.[8]

56.    The Department of Justice is responsible for the criminal enforcement of IEEPA sanctions regimes, and it has frequently prosecuted persons for IEEPA violations.[9]

---

[7] See Adam M. Smith, *Dissecting the Executive Order on ICC Sanctions Scope, Effectiveness, and Tradeoffs*, Just Security (June 15, 2020), https://www.justsecurity.org/70779/dissecting-the-executive-order-on-intl-criminal-court-sanctions-scope-effectiveness-and-tradeoffs/.

[8] See U.S. Dep't of Treasury, Civil Penalties and Enforcement Information, OFAC, https://ofac.treasury.gov/civil-penalties-and-enforcement-information (last visited Feb. 20, 2026).

[9] See Summary of Major U.S. Export Enforcement, Economic Espionage, and Sanctions-Related Criminal Cases, U.S. Dep't of Justice (Nov. 2019), https://www.justice.gov/nsd/page/file /1044446/download.

57.    Thus, IEEPA orders trigger two distinct sets of consequences: (1) designation of sanctioned persons and their addition to the OFAC List, and (2) enforcement of civil and criminal penalties for dealing in blocked property or providing goods or services to or for the benefit of a designated person. The threat of such penalties deters individuals, financial institutions, and other businesses and entities from interacting with designated persons.

58.    Congress has imposed restrictions on the President's authority under IEEPA. In addition to limiting the President's authority to "unusual and extraordinary threat[s]" (50 U.S.C. § 1701), IEEPA expressly denies the President "the authority to regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials[.]" 50 U.S.C. § 1702(b). OFAC interprets this statutory limitation as applying only to information or informational materials fully created and in existence at the time of the transaction with the sanctioned person. *See, e.g.*, 31 C.F.R. § 560.210(c)(2).

59.    Only once before has a President attempted to use IEEPA to impose economic sanctions against the ICC. That attempt came in 2020 with Executive Order 13928, when President Trump imposed sanctions on the ICC Prosecutor and one of her deputies. *See* EO 13928, Blocking Property of Certain Persons Associated With the International Criminal Court, 85 Fed. Reg. 36139 (June 15, 2020). In January 2021, the U.S. District Court for the Southern District of New York preliminarily enjoined the enforcement of EO 13928 because it violated the First Amendment. *OSJI v. Trump*, 510 F. Supp. 3d 198, 212 (S.D.N.Y. 2021) ("[T]he restrictions prohibit or chill significantly more speech than even Defendants seem to believe is necessary to achieve their end, i.e., to obtain and exert leverage over [ICC personnel] so as to induce them to desist from their investigation of U.S. and allied personnel."). The Biden administration rescinded these sanctions

19

shortly after taking office, declaring that "the threat and imposition of financial sanctions against the Court, its personnel, and those who assist it are not an effective or appropriate strategy for addressing the United States' concerns with the ICC." *See* EO 14022, Termination of Emergency with Respect to the International Criminal Court, 86 Fed. Reg. 17895 (April 1, 2021).

**E.  Executive Order 14203 and Designation of Francesca as an SDN**

60.    On February 6, 2025, President Trump issued EO 14203, Imposing Sanctions on the International Criminal Court, 90 Fed. Reg. 9369 § 1 (Feb. 6, 2025).[10] EO 14203 is substantively identical to EO 13928. The President determined "that any effort by the ICC to investigate, arrest, detain, or prosecute protected persons, as defined in section 8(d) of this order, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States, and [] hereby declar[ed] a national emergency to address that threat." EO 14203 at pmbl. "Protected person" is defined as any "United States person" or national of an "ally of the United States," which is, in turn, defined as a NATO member state or a "major non-NATO ally" ("MNNA"). *Id.* § 8(d), (e). There are currently 19 countries designated as MNNAs as well as Taiwan.[11]

61.    EO 14203 imposes blocking sanctions on foreign persons who are deemed to have "directly engaged" or "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of," or were "owned or controlled by, or ... have acted or purported to act for on behalf of, directly or indirectly" the International

---

[10] Attached as Ex. A.

[11] The current MNNAs are Argentina, Australia, Bahrain, Brazil, Colombia, Egypt, Israel, Japan, Jordan, Kenya, Kuwait, Morocco, New Zealand, Pakistan, the Philippines, Qatar, South Korea, Thailand, and Tunisia.

Criminal Court's efforts to "investigate, arrest, detain or prosecute a protected person without consent of that person's country of nationality." *Id.* § 1.

62.    EO 14203 prohibits individuals from directly or indirectly providing funds, goods, or services to or for the benefit of an SDN, or receiving funds, goods, or services from an SDN. It is also unlawful to cause or conspire to cause another person to violate EO 14203 or to evade the prohibitions of EO 14203. Engaging in conduct prohibited by EO 14203 may incur civil and criminal liability. *Id.* § 3.

63.    EO 14203 also prohibits the immigrant and nonimmigrant entry of SDNs into the United States as well as that of their immediate family members. *Id.* § 4.

64.    OFAC and the Justice Department are empowered to enforce EO 14203's prohibitions. Civil liability, which can be imposed by OFAC for any violation on a strict liability basis, extends up to $377,700 per violation. Criminal liability, which can be imposed for willful violations of EO 14203, extends up to a $1,000,000 fine per violation and/or imprisonment for up to twenty years.

65.    At the time of this filing, two district courts — the only federal courts to so far opine on the lawfulness of EO 14203 — have held EO 14203 to be unconstitutional or likely unconstitutional on First Amendment grounds. *Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025) (unconstitutional on merits); *Smith v. Trump*, 791 F. Supp. 3d 90 (D. Me. 2025) (sufficiently likely to be unconstitutional to support the grant of a preliminary injunction).

66.    On July 9, 2025, Defendant Rubio designated Francesca an SDN under section 1(a)(ii)(A) of EO 14203, which sanctions foreign persons "determined by the Secretary of State . . . to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person." Ex. B at 1 (*Sanctioning Lawfare that Targets U.S. and Israeli Persons*, Press

Statement, Marco Rubio (July 9, 2025) ("Rubio Press Statement")). The only ICC-related conduct that Defendant Rubio alleged was that Francesca "recommend[ed] that the ICC, without a legitimate basis, issue arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant," and that she "recommend[ed] the ICC pursue investigations and prosecutions of" certain American companies and their executives. *Id.* at 1–2.

67.    Shortly after designating Francesca an SDN, Defendants granted two limited licenses to "U.S. persons" affected by the designation. The first of these allows "U.S. persons" to engage in transactions related to the upkeep or sale of Max and Francesca's jointly held real property in the United States (the proceeds of any such sale to remain blocked). Ex. C at 2 (License No. ICC-EO14203-2025-1405217-1). The second allows "U.S. persons" to engage in transactions "ordinarily incident and necessary to [Francesca's] role as the parent and legal guardian of [L.C.]," such as "the purchasing, making payment for, and receiving goods, services, and funds essential to the maintenance of [L.C.], including . . . health and medical expenses . . . food, clothing." Ex. D at 2 (License No. ICC-EO14203-2025-1408722-1).

68.    The impact on Plaintiffs of the sanctions on Francesca has been severe. Francesca has been fully unbanked and cannot make or receive payments through the financial system, including in Europe, as foreign banks fear secondary sanctions by the United States if they facilitate financial transactions with a sanctioned individual. That means she must use cash for any financial transaction, which categorically bars her from engaging in any commercial transactions for goods or services online.

69.    Under the explicit terms of EO 14203, neither Francesca nor Max can travel to the United States. For Max, this means he is unable to travel to the headquarters of his employer, the World Bank, which imposes direct professional and financial costs on his career prospects. For

Francesca, it means that she cannot travel to the United Nations to deliver reports under her mandate or meaningfully collaborate with U.S.-based NGOs, academics, and professionals. And for L.C., who is a minor, she is effectively barred from returning to the country of her citizenship and birth out of a fear of criminal liability.

70.    The chilling effect on Francesca's freedom of speech has been profound. Georgetown University severed its decade-old affiliation with Francesca last October, including the use of her email address, which had become her main email account. Columbia University suspended a three-year-old partnership under which students had externships with Francesca's mandate. Numerous universities and institutions, both in the United States and abroad, have cancelled her guest appearances for fear of sanctions liability. For example, the American University of Beirut and the American Lebanese University recently canceled an event with Francesca because they could not "legally invite" Francesca due to her designation as an SDN.[12] Francesca's hotel reservation in Brussels, where she was invited to speak by members of the European Parliament, was cancelled by the travel agency, American Express. The sanctions have also enabled Francesca's ideological opponents to threaten Amazon and other American booksellers with legal action if they distribute the English version of Francesca's book, which is to be published in the United States this April.

71.    For Max, the financial, personal, and legal consequences have also been significant. He is now the sole breadwinner for the family. He cannot travel to the United States with his American daughter or to visit his employer's headquarters or to supervise the upkeep of real

---

[12] *AUB responds to reports it "canceled" visit by Francesca Albanese, says decision "legal," not political*, Lorient Today (Jan. 25, 2026), https://today.lorientlejour.com/article/1492726/aub-responds-to-reports-it-canceled-visit-by-francesca-albanese-says-decision-legal-and-not-political.html.

property he has owned for over a decade. He has been deprived of the value of that property entirely, insofar as the proceeds from the sale of the property will be immediately frozen. His employer-provided health insurance from the World Bank (Aetna International) has refused to pay Francesca's health care expenses because she is sanctioned. And Max faces felony prosecution and fines in the millions of dollars if the sundry support he provides to Francesca incident to their family is deemed to be "the contribution or provision of funds, goods, or services by, to, or for the benefit of" a sanctioned individual by the Justice Department.

72.     For L.C., an American citizen and a child, the personal and legal consequences are severe. L.C.'s U.S. citizenship exposes her to per se legal liability for any "contribution or provision of funds, goods, or services by, to, or for the benefit of" her mom. While OFAC issued a license that authorizes "U.S. persons" to engage in transactions that are "ordinarily incident and necessary to [Francesca's] role as the parent and legal guardian," Ex. D at 2, the scope of this license is anyone's guess. She has no way of knowing whether federal prosecutors will consider the giving of Christmas presents, buying — or encouraging others to buy — her mother's books, traveling with her mother to public events, going with her mother on school fieldtrips, or any other of the multitudinous interactions that occur every day between a parent and a child to be "ordinarily incident *and* necessary" to the mother-daughter relationship.

73.     That ever-present risk of prosecution, as well as the economic and travel limitations inherent in being the minor daughter of a sanctioned mother, impose an enormous chilling effect on L.C.'s mental well-being and constitutional rights. If she speaks out on her mother's behalf, she runs a substantial and obvious risk of becoming the target of her mother's ideological opponents, who will have enormous leverage to silence her by lobbying for her criminal prosecution under IEEPA, just as they lobbied for the sanctioning of her mother.

74.    Francesca sought permission from the United Nations to challenge or otherwise seek relief on her own behalf from the United States government to rescind her designation. On January 14, 2026, the UN Office of Legal Advisor informed Francesca that she could not proceed on her own behalf in the courts of the United States or before U.S. agencies due to the United Nations' interpretation of the rights and obligations associated with its institutional immunity. Ex. E. (Letter from Elinor Hammarskjöld, Under-Secretary-General for Legal Affairs and United Nations Legal Counsel to Francesca Albanese (Jan. 14, 2026)).

## GROUNDS FOR RELIEF

### GROUND I
### EO 14203 Violates the First Amendment, on its face, and as applied to Plaintiffs

75.    Plaintiffs incorporate by reference paragraphs 1 – 74 *supra*.

76.    EO 14203 violates the First Amendment in at least three distinct ways. *First*, it is unlawfully overbroad by prohibiting First Amendment activities that have no relationship to the need to shield "protected persons" from investigation or prosecution before the ICC. *Second*, EO 14203 is a content-based restriction on speech that discriminates based on viewpoint by targeting only expression that could be construed as a benefit to the ICC, while permitting expression that is adverse to the ICC's efforts. *Third*, EO 14203 broadly prohibits U.S. citizens and persons that have a constitutional presence in the United States, such as Max, Francesca, and L.C., from engaging in core First Amendment protected activities, including mere public commentary on the ICC.

## GROUND II
**EO 14203 Violates 50 U.S.C. § 1702(b), on its face, and as applied to Plaintiffs**

77.    Plaintiffs incorporate by reference paragraphs 1 – 74 *supra*.

78.    IEEPA forbids the President from using its authorities to "regulate or prohibit, directly or indirectly . . . any postal, telegraphic, telephonic, or other personal communication, which does not involve a transfer of anything of value," as well as the import/export "whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds." 50 U.S.C. §§ 1702(b)(1) and (3).

79.    The so-called "Berman Amendments" were enacted by Congress to ensure that the President could not use IEEPA authorities to "prohibit or restrict directly or indirectly the import or export of information that is protected under the First Amendment to the U.S. Constitution." H.R. Conf. Rep. No. 103-482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483. To that end, the exception was "explicitly intended, by including the words 'directly or indirectly,' to have a broad scope," and to "facilitate transactions and activities incident to the flow of information and informational materials without regard to the type of information, its format, or means of transmission." *Id*.

80.    EO 14203 violates § 1702(b) and is *ultra vires* of IEEPA because it purports to regulate or prohibit, and purports to authorize Defendants to regulate or prohibit, acts that are exempt from regulation or prohibition under IEEPA, including the transmission of information and informational materials, thereby chilling the provision of such materials. EO 14203 is void, and the designation of Francesca under it is unlawful.

## GROUND III
### EO 14203 Violates 50 U.S.C. § 1701(b), on its face

81.     Plaintiffs incorporate by reference paragraphs 1 – 74 *supra*.

82.     IEEPA is explicit that the President may only invoke its sanctions "to deal with an unusual and extraordinary threat" to the foreign policy interests of the United States. 50 U.S.C. § 1701(b). Specifically, the President must be confronting a "new threat." *Id*. And the "authorities granted to the President" to impose sanctions and to enforce those sanctions with ruinous civil and criminal penalties, "may not be exercised for any other purpose." *Id*.

83.     The threat EO 14203 purports to address is not "unusual," "extraordinary," or "new." To the contrary, in the American Servicemembers' Protection Act, Congress directly spoke to the risk of U.S. persons "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court." 22 U.S.C. § 7427(a). Congress has enacted a detailed regulatory scheme to address this risk, and it has refrained from either imposing or authorizing sanctions against the ICC or its personnel — let alone third parties that merely speak to ICC-related issues. When Congress enacted this law, and made subsequent amendments, the risks to the United States and its allies were well known; indeed, they were the impetus for the law's enactment. Congress has never enacted any criminal prohibitions to enforce these mandates. And Congress has declined to pass several legislative attempts to impose sanctions on the ICC.

84.     Congress has also authorized the provision of direct support to the ICC in connection with its activities, and Congress has supported and endorsed the work of the ICC as being in the national interest. The probable and desired effect of EO 14203 is to nullify Congress' carefully crafted scheme, developed over two decades, to balance the risk that nationals of the United States and its allies might be subject to the jurisdiction of the ICC with Congress' equal recognition that the ICC performs work in the national interest.

85.    Rather than address itself to an "unusual and extraordinary threat," EO 14203 effectively criminalizes a broad range of ICC activity (including relatively non-controversial prosecutions such as for crimes against humanity in the Darfur region of Sudan), and third-party activity related to the ICC, including a UN special rapporteur's comments. Even the broad and general terms of IEEPA do not permit the President to override the specific and carefully crafted Congressional legislation respecting the ICC. EO 14203 is therefore precluded.

### GROUND IV
**EO 14203 Violates the Fourth Amendment, as applied to Plaintiffs**

86.    Plaintiffs incorporate by reference paragraphs 1 – 74 *supra*.

87.    The designation of Francesca constitutes an unconstitutional seizure of real property located in Washington, D.C. and jointly owned by Francesca and Max. Although non-citizens, Max and Francesca have significant property and personal ties to the United States that bring them within the "class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 25 (D.D.C. 2012) ("the presence of property [is] the benchmark for satisfying the 'substantial connections' test, and whether a party has the ability to raise constitutional claims, at least with respect to that property.").

88.    Max and Francesca are co-owners of real property within the jurisdiction of this Court. As OFAC itself recognizes, this property is directly affected by the sanctions on Francesca, as it constitutes blocked property for which all sanctions restrictions apply. Furthermore, L.C. is a United States citizen with the right to travel to and live in this country. As a minor, she requires the care and supervision of her parents to do so, and has future interest in the property currently blocked by Francesca's designation.

89.    The blocking of Francesca and Max's property through sanctions constitutes an unreasonable seizure under the Fourth Amendment. *Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 995 (9th Cir. 2012) ("no exception applies to OFAC's warrantless seizure of [plaintiffs'] assets and the seizure is not justified under a 'general reasonableness' test"); *KindHearts for Charitable Humanitarian Dev., Inc. v. Geithner*, 647 F. Supp. 2d 857, 872 (N.D. Ohio 2009) ("[a]n OFAC block interferes with possessory rights, and is, in Fourth Amendment terms a seizure").

90.    The license provided by OFAC is insufficient to cure the unconstitutionality of its conduct, as it only partially restores Plaintiffs' control over their property, and only for explicitly limited acts still governed by the blocking sanction. Even with the license, Plaintiffs have been deprived of their constitutional right to enjoy or utilize their property, and all its economic value.

## GROUND V
### EO 14203 Violates the Fifth Amendment (Takings), as applied to Plaintiffs

91.    Plaintiffs incorporate by reference paragraphs 1 – 74 *supra*.

92.    Max and Francesca have a constitutionally protected interest in their jointly owned real property located in the United States, which is subject to the block created by EO 14203 and Francesca's arbitrary and unreasonable designation as an SDN. This constitutes an unlawful taking in violation of the Fifth Amendment.

## GROUND VI
### EO 14203 Violates the Fifth Amendment (Family Rights), as applied to Plaintiffs

93.    Plaintiffs incorporate by reference paragraphs 1 – 74 *supra*.

94.    The Fifth Amendment protects the integrity, association, and quality of fundamental relationships, such as those between spouses and parents and children, from arbitrary

government action. EO 14203 inflicts multi-faceted violations of Plaintiffs' Fifth Amendment rights.

95.    Under EO 14203, all persons are prohibited from "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of" the designated individual; all persons are also prohibited from "the receipt of any contribution or provision of funds, goods, or services from" any designated individual. Though Defendants have granted limited licenses regarding Francesca's designation, they only apply to "U.S. persons" (which do not include Max or Francesca) and cover a narrow and vaguely defined set of exceptions.

96.    EO 14203 has severely degraded and functionally severed the spousal relationship between Max and Francesca and the mother-daughter relationship between Francesca and L.C. By arbitrarily disrupting such relationships, EO 14203 violates the substantive due process rights of L.C., Max, and Francesca.

## **GROUND VII**
### **EO 14203 Violates 5 U.S.C. § 706, on its face, and as applied to Plaintiffs**

97.    Plaintiffs incorporate by reference paragraphs 1 – 74 *supra*.

98.    The Administrative Procedure Act mandates that:

to the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law.

U.S.C. § 706(2)(A–D).

99.     For the reasons set forth in the other grounds for relief, EO 14203 is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law both on its face and as applied to Francesca.

100.    EO 14203 is contrary to constitutional rights, as it violates the First Amendment on its face and the First, Fourth, and Fifth Amendments as applied to Plaintiffs.

101.    As applied to Francesca, EO 14203 is also in excess of statutory authority because IEEPA expressly prohibits the President from using its authorities to "regulate or prohibit, directly or indirectly" the communication of "any information or informational materials." 50 U.S.C. §§ 1702(b)(1) and (3).

**GROUND VIII**
**Declaratory Judgment Act (28 U.S.C. § 2201 et seq.)**

102.    Plaintiffs incorporate by reference paragraphs 1 – 74 *supra*.

103.    Under 28 U.S.C. § 2201, this Court "may declare the rights and other legal relations of any interested party seeking such declaration." As set forth above, EO 14203 on its face and as applied violates Plaintiffs' First, Fourth, and Fifth Amendment rights and authorizes government action that is *ultra vires* of IEEPA.

**PRAYER FOR RELIEF**

WHEREFORE, Max and L.C., through Max, asks this honorable court to:

1.  Enter a judgment declaring that EO 14203 violates the First Amendment on its face;

2.  Enter a judgment declaring that the designation of Francesca under EO 14203 violates the First Amendment;

3.  Enter a judgment declaring that the designation of Francesca under EO 14203 violates the Fourth Amendment;

31

4. Enter a judgment declaring that the designation of Francesca under EO 14203 violates the Fifth Amendment;

5. Enter a judgment declaring that EO 14203 violates 50 U.S.C. § 1702(b);

6. Enter a judgment declaring that EO 14203 violates 50 U.S.C. § 1701(b) because the threat the ICC poses to "protected persons" is not a "new" "unusual and extraordinary threat" within the meaning of 50 U.S.C. § 1701(b), and is precluded by more specific Congressional legislation;

7. Enter a judgment setting aside all agency actions taken under EO 14203 as arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law; contrary to constitutional right; in excess of statutory authority and limitations; and taken without observance of procedure required by law;

8. Enter a judgment ordering Defendants to remove Francesca from designation as an SDN;

9. Enter a judgment enjoining Defendants from commencing or authorizing any prosecution of Max, Francesca, or L.C. under EO 14203 or IEEPA;

10. Enter a judgment enjoining Defendants from commencing or authorizing any civil enforcement proceeding against Max, Francesca, or L.C. under EO 14203 or IEEPA;

11. Award Plaintiffs costs and reasonable attorneys' fees incurred in this action; and

12. Order other such relief as this Court deems proper.

Dated: February 25, 2026            Respectfully submitted,

                                  /s/ *Michel Paradis*
                                  Michel Paradis (D.C. Bar No. 499690)
                                  Jason Wright (D.C. Bar No. 1029983)
                                  Patrick Fields (*PHV forthcoming*)
                                  Scott Johnston (*PHV forthcoming*)

STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
mparadis@steptoe.com
jwright@steptoe.com
pfields@steptoe.com
scjohnston@steptoe.com
Telephone: (212) 506-3900
Facsimile: (202) 429-3902

*Attorneys for Plaintiffs*