# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| L.C., a minor child, by and through her father MASSIMILIANO CALI, | ) ) ) | CIVIL ACTION |
| | ) | |
| MASSIMILIANO CALI, | ) | No. 1:26-cv-00688 |
| *Plaintiffs*, | ) ) | |
| | ) | |
| *v.* | ) ) | DATE: February 25, 2026 |
| DONALD J. TRUMP, *et al.*, | ) | |
| *Defendants*. | ) ) | |
| | ) ) | |
| | ) | |

---

# MEMORANDUM OF POINTS AND AUTHORITIES
# IN SUPPORT OF PLAINTIFFS' MOTION FOR
# A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 6

I.      The Cali Family ........................................................................................ 6

II.     The United States' relationship to the International Criminal Court ("ICC") ................... 9

III.    Executive Order 14203 and the designation of Francesca Albanese ............................... 13

ARGUMENT .......................................................................................................... 17

I.      Legal Standard ......................................................................................... 17

II.     Plaintiffs are likely to succeed on the merits. ...................................................... 17

        A.      EO 14203 Violates the First Amendment. ................................................ 18

                1.      Defendant's conduct is subject to strict scrutiny. ........................... 18

                2.      Defendants' conduct fails strict scrutiny. ..................................... 21

        B.      EO 14203 violates the Berman Amendments. ........................................... 24

        C.      EO 14203 violates § 1701(b) and is precluded by subsequent legislation. ......... 26

III.    Plaintiffs will suffer irreparable harm without an injunction. .................................... 32

IV.     The Balance of Equities and the Public Interest Favor Injunctive Relief ...................... 37

CONCLUSION ........................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis,*
    600 U.S. 570 (2023)................................................................................................19

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004)................................................................................................18

*Biden v. Nebraska,*
    600 U.S. 477 (2023)................................................................................26, 27, 31, 32

*Borough of Duryea, Pa. v. Guarnieri,*
    564 U.S. 379 (2011)................................................................................................20

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969)................................................................................................22

*Brown & Williamson,*
    529 U.S. ................................................................................................................32

*Brown v. Ent. Merchs. Ass'n,*
    564 U.S. 786 (2011)................................................................................................21

*Citizens United v. FEC,*
    558 U.S. 310 (2010)..................................................................................................5

*CityFed Fin. Corp. v. Off. of Thrift Supervision,*
    58 F.3d 738 (D.C. Cir. 1995)..................................................................................17

*Colindres v. U.S. Dep't of State,*
    575 F. Supp. 3d 121, 138 (D.D.C. 2021), 71 4th 1018 (D.C. Cir. 2023)................36

*Edwards v. District of Columbia,*
    755 F.3d 996 (D.C. Cir. 2014)................................................................................23

*FDA v. Brown & Williamson Tobacco Corp.,*
    529 U.S. 120 (2000)....................................................................................26, 30, 31

*Franz v. United States,*
    707 F.2d 582, 594-95 (D.C. Cir. 1983), suppl. op., 712 F.2d 1428 (D.C. Cir.
    1983) ................................................................................................................36, 37

ii

*Frederick Douglass Found. Inc. v. District of Colubmia*,
    82 F.4th 1122 (D.C. Cir. 2023)................................................................19, 20

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006)................................................................................31

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010).....................................................................................20

*In re Any & all funds or other assets in Brown Bros. Harriman & Co. Acct. No.
    8870792 in the name of Tiger Eye Invs. Ltd.*, Civ. A. No. 08-mc-0807, 2009
    WL 613717 (D.D.C. Mar. 10, 2009), *aff'd*, 613 F.3d 1122 (D.C. Cir. 2010).........38

*Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*,
    319 F. Supp. 3d 491, 499 (D.D.C. 2018)...................................................36

*Kalantari v. NITV, Inc.*,
    352 F.3d 1202 (9th Cir. 2003) .................................................................24

*Karem v. Trump*,
    960 F.3d 656 (D.C. Cir. 2020)..............................................................32, 37

*Lamont v. Postmaster*,
    381 U.S. 301 (1965).................................................................................20

*Learning Resources, Inc. v. Trump*,
    Nos. 24-1287, 25-250, 2026 WL 477534 (U.S. Feb. 20, 2026)
    ......................................................................................4, 26, 28, 30, 31

*Legal Servs. Corp. v. Velazquez*,
    531 U.S. 533 (2001).................................................................................20

*Little v. Barreme*,
    2 Cranch 170 (1804) ................................................................................31

*Mahoney v. Babbitt*,
    105 F.3d 1452 (D.C. Cir. 1997) ...............................................................20

*Marland v. Trump*,
    498 F.Supp.3d 624 (E.D. Pa. 2020) .....................................................24, 25

*McCullen v. Coakley*,
    573 U.S. 464 (2014).................................................................................21

*Mills v. District of Columbia*,
    571 F.3d 1304 (D.C. Cir. 2009) ...............................................................32

*NAACP v. Button*,
    371 U.S. 415 (1963) ...................................................................................20

*Nat'l Council of Nonprofits v. OMB*,
    763 F. Supp. 3d 36 (D.D.C. 2025) ............................................................17

*NFIB v. OSHA*,
    595 U.S. 109 (2022) ...................................................................................32

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................37

*NRA v. Vullo*,
    602 U.S. 175 (2024) ...................................................................................19

*OSJI v. Trump*,
    510 F. Supp. 3d 198 (S.D.N.Y. 2021) ....................................3, 17, 19, 28

*Perkins Coie v. DOJ*,
    783 F. Supp. 3d 105 (D.D.C. 2025) ....................................................19, 20

*In re Primus*,
    436 U.S. 412 (1978) ...................................................................................20

*Pursuing America's Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016) ......................................................18, 32, 37

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .............................................................37

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) .............................................................................18, 21

*Richmond Newspapers v. Virginia*,
    448 U.S. 555 (1980) ...................................................................................20

*Riley v. Nat'l Fed. of Blind of N.C., Inc.*,
    487 U.S. 781 (1988) ...................................................................................21

*Rona v. Trump*,
    797 F. Supp. 3d 278 (S.D.N.Y. 2025) ....................................3, 17, 19, 22

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
    515 U.S. 819 (1995) ...................................................................................19

*Simon & Schuster v. Members of the N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) ...................................................................................21

*Smith v. City of Cumming,*
 212 F.3d 1332 (11th Cir. 2000) ................................................................................20

*Smith v. Trump,*
 791 F. Supp. 3d 90 (D. Me. 2025) ...............................................................3, 17, 22

*TikTok v. Garland,*
 145 S. Ct. 57 (2025).................................................................................................29

*TikTok v. Garland,*
 604 U.S. 56 (2025)...................................................................................................25

*TikTok v. Trump,*
 507 F. Supp. 3d 92 (D.D.C. 2020) .........................................3, 17, 24, 25, 28, 31

*United States v. Playboy, Ent. Grp., Inc.,*
 529 U.S. 803 (2000).............................................................................................18, 22

*United Transp. Union v. State Bar of Mich.,*
 401 U.S. 576 (1971).................................................................................................20

*West Virginia v. EPA,*
 597 U.S. 697 (2022)............................................................................................30, 32

*Winter v. NRDC,*
 555 U.S. 7 (2008).....................................................................................................17

*Youngstown Sheet & Tube Co. v. Sawyer,*
 343 U.S. 579 (1952).................................................................................................31

*Ziglar v. Abbasi,*
 582 U.S. 120 (2017)............................................................................................31, 32

**Statutes**

22 U.S.C. §7422(c) .........................................................................................................12, 27

22 U.S.C. § 7427 ............................................................................................................12, 22, 27

22 U.S.C. § 7433 ...........................................................................................................12, 27

50 U.S.C. § 1701 ...............................................................................................4, 13, 18, 26, 30

50 U.S.C. § 1702(a)(1)(B) ....................................................................................................14

50 U.S.C. § 1702(b) .................................................................................................3, 17, 24

50 U.S.C. § 1705............................................................................................................14

**Rules and Regulations**

Fed. R. Civ. P. 65 .................................................................................................... 1

EO 14022, Termination of Emergency with Respect to the International Criminal
  Court, 86 Fed. Reg. 17895 (Apr. 1, 2021) .......................................................... 29

Imposing Sanctions on the International Criminal Court, 90 Fed. Reg. 9369 § 1
  (Feb. 6, 2025) ....................................................................................................... 1

**Legislative and Congressional Materials**

American Servicemembers' Protection Act, 116 Stat. 899 (codified at 22 U.S.C.
  §§ 7421, *et seq.*) ...................................................................................... 12, 22, 26

Darfur Peace and Accountability Act of 2006, Pub. L. No. 109-34, 120 Stat. 1869
  (2006) .................................................................................................................. 27

Department of State Rewards Program Update and Technical Corrections Act of
  2012, Pub. L. No. 112-282, 126 Stat. 2492 (2013) ............................................. 27

div. K, title VII,   7073(b), Pub. L. No. 117-328, 136 Stat. 4459, 5092 (2022) ........... 13

Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, § 525(c), Pub.
  L. No. 103-236, 108 Stat. 382 (1994) ................................................................. 24

Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat.
  460, 793 (2024) ................................................................................................... 27

Further Consolidated Appropriations Act, 2024, § 7034(r), Pub. L. No. 118-47,
  138 Stat .460, 793 (2024) .................................................................................... 30

National Defense Authorization Act for Fiscal Year 2008, 122 Stat. 3, § 1212,
  Pub. L. No. 110-181, 122 Stat. 3, 371 (2008) ..................................................... 27

Omnibus Trade and Competitiveness Act, § 2502(b), Pub. L. No. 100-418, 102
  Stat. 1107 (1988) ................................................................................................. 24

Thornberry National Defense Authorization Act for Fiscal Year 2021, §§ 1263,
  1276, 1267, Pub. L. No. 116-283, 134 Stat. 3388, 3968, 3971 (2021) ................ 27

171 Cong. Rec. S410 (2025) .................................................................................... 13

H.R. Conf. Rep. No. 103-482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398 .......... 25

Illegitimate Court Counteraction Act, H.R. 23, 119th ............................................... 30

The Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. § 3 (2025) .............. 13

S. Cong. Res. 16, 110th Cong., 153 Cong. Rec. S2540 (2007) ....................................27

S. Res. 90, 113th Cong., 159 Cong. Rec. S2853 (2013) ...............................................27

S. Res. 144, 113th Cong.,159 Cong. Rec. S5302 (2013) ..............................................27

S. Res. 188, 116th Cong., 165 Cong. Rec. S4736 (2019) .............................................27

S. Res. 546, 117th Cong., 168 Cong. Rec. S1180 (2022) .............................................27

S. Res. 546, 117th Cong., 169 Cong. Rec. S1180 (2002) .............................................29

**International Materials**

Convention on the Privileges and Immunities of the U.N. § 18(a) (1946) .....................5

Special Procedures Thematic Mandates, UN Office of the High Commissioner for
    Human Rights,
    https://spinternet.ohchr.org/ViewAllCountryMandates.aspx?Type=TM (last
    visited Feb. 23, 2026)............................................................................................8

U.N. Charter art. 105 (1945) ..........................................................................................5

U.N. Comm'n on Human Rights, Question of the violation of human rights in the
    occupied Arab territories, including Palestine, E/CN.4/RES/1993/2 (Feb. 19,
    1993), https://www.refworld.org/legal/resolution/unchr/1993/en/10874 ...............39

U.N. Treaty Collection,
    https://treaties.un.org/Pages/ViewDetailsViewDetails.aspx?src=TREATYTRE
    ATY&mtdsg_no=XVIII-10&chapter=18&clang=_en ...........................................10

Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S.
    90, 37 I.L.M. 999 (entered into force July 1, 2002) ........................................9, 10

**Other Authorities**

Agreements Research Guide,
    https://guides.ll.georgetown.edu/c.php?g=363527&p=2456099 (last time
    visited Feb. 23, 2026)..........................................................................................28

Albanese Application for Special Rapporteur (Nov. 23, 2001),
    https://www.ohchr.org/sites/default/files/2021-
    12/ALBANESE_Francesca_form.pdf ...................................................................6

Alice Speri, *Maine university pulls support from conference on Palestine, citing
    Trump sanctions*, The Guardian (Feb. 25, 2026),
    https://www.theguardian.com/us-news/2026/feb/25/university-southern-
    maine-palestine-conference-trump .......................................................................33

Allan Kaval, Benjamin Barthe & Madjid Zerrouky, *Francesca Albanese, a critical Western voice on Gaza*, Le Monde (Sept. 16, 2025), https://www.lemonde.fr/en/international/article/2025/09/16/francesca-albanese-a-critical-western-voice-on-gaza_6745458_4.html ..................................................8

ArtE.tv Documentary, *Disunited Nations: The UN and The Middle East*, YouTube (Dec. 31, 2025), https://www.youtube.com/watch?v=k9ArvNBCkR8 ............................................................9

Carl Campanile, *Andrew Cuomo joins high-powered legal team to defend Netanyahu against ICC's war crime claims*, N.Y. Post (Nov. 25, 2024), https://nypost.com/2024/11/25/us-news/andrew-cuomo-joins-high-powered-legal-team-to-defend-netanyahu-against-icc.................................................19

Francesca Albanese (@francesca.albanese.unsr.opt), Instagram, https://www.instagram.com/francesca.albanese.unsr.opt/?hl=en (last visited Feb. 23, 2026) ....................................................................................................8

Francesca Albanese (@FranceskAlbs), X, https://x.com/franceskalbs?lang=de (last visited Feb. 23, 2026)....................................................................................8

*Francesca Albanese*, UN Office of the High Commissioner for Human Rights, https://www.ohchr.org/en/special-procedures/sr-palestine/francesca-albanese (last visited Feb. 23, 2026)......................................................................................6

Imogen Foulkes, *UN expert calls for companies to stop doing business with Israel*, BBC (Jul. 2, 2025), https://www.bbc.com/news/articles/cx2039xpv87o......................8

Íñigo Domínguez, *The Complicated Life of Francesca Albanese*, El País (Dec. 27, 2025), https://english.elpais.com/international/2025/12-28/the-complicated-life-of-francesca-albanese-a-rising-figure-in-italy-but-barred-from-every-bank-by-trumps-sanctions.html ....................................................................8

Jacobin, *About*, https://jacobin.com/about (last visited Feb. 23, 2026) .......................8

Jeffrey Gettleman, *Team on the Way to Collect Congo War Crimes Suspect*, N.Y. Times, March 21, 2013 ....................................................................................11

John Bolton, *The Risks and Weaknesses of the International Criminal Court from America's Perspective*, 64 Law and Contemporary Problems 167 (2001).............................12

John Bolton, *Unsign That Treaty*, Wash. Post, Jan. 2, 2001 .......................................12

M. Gessen, *Her Optimism Has Won Her Some of the Most Powerful Enemies in the World*, N.Y. Times (Oct. 16, 2025) .......................................................................8

*Nato Member Countries,* NATO, https://www.nato.int/en/about-us/organization/nato-member-countries ..........................................................................10

OFAC Sanctions List Service, https://sanctionslist.ofac.treas.gov/Home/SdnList
(last visited Feb. 23, 2026)..................................................................................33

*Picks, What We're Reading*, Publishers Weekly,
https://www.publishersweekly.com/978-1-63542-603-8 (last visited Feb. 23,
2026) .......................................................................................................................7

President Bill Clinton, Statement on Signature of the International Criminal Court
Treaty, Washington, DC, December 31, 2000 ......................................................28

*Prominent Jewish civil rights group demands Amazon block payments tied to
Francesca Albanese's anti-Israel book*, N.Y. Post (Jan. 1, 2026),
https://nypost.com/2026/01/01/business/national-jewish-advocacy-center-
demands-amazon-block-payments-tied-to-francesca-albaneses-anti-israel-
book/ ....................................................................................................................34

*Report of the Special Rapporteur to the Human Rights Council: From Economy of
Occupation to Economy of Genocide* 27 (Jul. 2, 2025),
https://docs.un.org/en/A/HRC/59/23 ....................................................................15

Richard Drake, *Francesca Albanese and the Palestinian Fight For Survival*,
Jacobin, https://jacobin.com/2025/11/francesca-albanese-palestine-
international-law (last visited Feb. 23, 2026) ...........................................................8

SDN List, https://www.treasury.gov/ofac/downloads/sdnlist.pdf (last visited Feb.
23, 2026)................................................................................................................33

Sophia N. Ramcharitar, *Correcting Course: How Congress Can Streamline U.S.
Engagement with the International Criminal Court*, 2025 Cardozo L. Rev. de
novo 23 (2025)......................................................................................................10

Statement on the Rome Treaty on the International Criminal Court, 37 Weekly
Comp. Pres. Doc. 4, Dec. 31, 2000......................................................................10

Tucker Carlson, *Why are We Defending Mass Murder in Gaza?*, YouTube (Dec.
10, 2025 starting at 51:00), https://www.youtube.com/watch?v=qd_LN4fDf6s.......9

U.S. Dep't of State, Current Reward Offers, https://2021-2025.state.gov/global-
criminal-justice-rewards-program/current-reward-offers/ (last visited Feb. 23,
2026) .....................................................................................................................11

U.S. Dep't of State, *Israel 2016 International Religious Freedom Report*-
Executive Summary (2016), https://www.state.gov/wp-
content/uploads/2019/01/Israel.pdf........................................................................7

U.S. Dep't of State, Past Reward Offers, https://2021-2025.state.gov/global-
criminal-justice-rewards-program/past-reward-offers/ (last visited Feb. 23,
2026) .....................................................................................................................11

*UN should consider suspending Israel over 'genocide' against Palestinians, says special rapporteur*, Guardian, https://www.theguardian.com/world/2024/oct/31/un-should-consider-suspending-israel-over-genocide-against-palestinians-says-special-rapporteur (last visited Feb. 23, 2026) ................................................................................................................8

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 65 and LCvR 65.1, Plaintiffs L.C. and Massimiliano Cali ("Max") move for a preliminary injunction prohibiting Defendants from enforcing Executive Order 14203.[1]

Since July of last year, Defendants have turned the full machinery of the United States sanctions power on a 12-year-old U.S. citizen, her father ("Max") (an economist with the World Bank), and her mother ("Francesca"), the United Nations Special Rapporteur for Palestine (collectively, the "Cali family"). The reason? Defendants disagree with what Francesca has said about the Israeli-Palestinian conflict.

Pursuant to the International Emergency Economic Powers Act ("IEEPA"), Defendant Marco Rubio imposed sanctions on Francesca of the kind typically levied against terrorists, organized crime bosses, genocidal military leaders, oppressive dictators, and Russian oligarchs. Sanctions like these, which scholars describe as akin to "civil death," are meant to devastate and intimidate. That is exactly what they continue to do to the Cali family.

The Cali family's residence in Washington, D.C., and other assets are blocked. Francesca is debanked, has no health insurance coverage, and has lost her positions with United States academic institutions, as well as professional relationships built over years. Max has been forced to be the sole breadwinner for his family, is prohibited from traveling to his employer's headquarters in Washington, D.C., and runs the risk of being prosecuted and sanctioned himself for engaging in the most ordinary routines of family life with his wife and daughter. L.C. functionally cannot travel to the United States without fear of felony prosecution and has had her

---

[1] Imposing Sanctions on the International Criminal Court, 90 Fed. Reg. 9369 § 1 (Feb. 6, 2025) ("EO 14203"), attached to Compl. (Dkt. 1) as Ex. A.

relationship with her mother regimented to a transactional arrangement under which officials working for the United States government assume the power to decide, wielding the threat of twenty years imprisonment, what family routines are "ordinarily incident and necessary" to her upbringing.

The putative authority under which Defendants have imposed these sanctions is Executive Order 14203 ("EO 14203"). This Executive Order purports to impose IEEPA sanctions against those working with or for the International Criminal Court ("ICC"), an international organization with which Francesca has no formal or informal role, but which is presently investigating international crimes perpetrated in the context of the war in Gaza. On July 9, 2025, Defendant Rubio designated Francesca as a Specially Designated National ("SDN") under EO 14203 because she had "recommend[ed] that the ICC … issue arrest warrants [for certain Israeli officials]" and she "recommend[ed] the ICC pursue investigations and prosecutions" of certain American companies and executives. *Sanctioning Lawfare that Targets U.S. and Israeli Persons*, Press Statement, Marco Rubio (July 9, 2025) ("Rubio Press Statement"), attached to Compl. (Dkt. 1) as Ex. B.

A preliminary injunction is warranted and is in the interests of justice. The Cali family is likely to prevail on the merits on at least three independent grounds. They will continue to suffer irreparable harm if the enforcement of EO 14203 and the designation of Francesca specifically are not enjoined. The government will suffer no significant and legally cognizable harm. And the public interest strongly favors an injunction.

The Cali family is likely to prevail on the merits for three independently sufficient reasons that flow directly from binding precedent.

*First*, on its face, EO 14203 targets speech and violates the First Amendment. EO 14203 has already been held unconstitutional or likely unconstitutional by two federal district courts for violating the First Amendment. *Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025) (unconstitutional on merits); *Smith v. Trump*, 791 F. Supp. 3d 90 (D. Me. 2025) (likely unconstitutional on preliminary injunctive relief analysis). EO 14203 has only one precedent, a nearly identical executive order issued by President Trump in the final year of his first term that was also preliminarily enjoined by a federal district court for violating the First Amendment. *OSJI v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021).

The reason for these decisions is plain. EO 14203 broadly prohibits the exercise of core First Amendment activities in a content-based and view-point discriminatory way. And as applied to Francesca, it flagrantly violates the First Amendment and the constitutional rights of the Cali family, as well as the American public at large, by imposing ruinous sanctions whose sole purpose is to silence a disfavored speaker for the "recommendations" she has advocated. Plaintiffs are likely to prevail on the merits because, on its face and as applied, EO 14203 flagrantly violates the First Amendment.

*Second*, EO 14203, on its face, and as applied to Francesca for making non-binding "recommendations," violates IEEPA's own express limits on the use of sanctions to target speech. 50 U.S.C. §§ 1702(b)(1), (b)(3). The so-called Berman Amendments to IEEPA prohibit the use of sanctions to inhibit the free flow of information abroad. *See TikTok v. Trump*, 507 F. Supp. 3d 92, 103 (D.D.C. 2020). Plaintiffs are likely to prevail on the merits because targeting Francesca for the "recommendations" she has made violates the plain terms of, and the most germane precedents interpreting, the Berman Amendments.

*Third*, as the Supreme Court held just last week, IEEPA is not a blank check. *Learning Resources, Inc. v. Trump*, Nos. 24-1287, 25-250, 2026 WL 477534 (U.S. Feb. 20, 2026). IEEPA's limits are just as central to its statutory scheme as are its authorities. And IEEPA expressly limits the President's sanctions authority to confronting an "unusual and extraordinary threat," which IEEPA describes as a "new threat." 50 U.S.C. § 1701(b).

The risk that the ICC might investigate and even seek to prosecute nationals from the United States or its allies — the threat EO 14203 purports to address — is neither new nor extraordinary. It has been specifically addressed by Congress since the ICC's establishment a quarter century ago. Congress has repeatedly considered and rejected proposals to grant the President authority to impose sanctions on the ICC and its personnel, most recently in January 2025. Congress has also passed legislation supporting the work of the ICC in various contexts, as well as enacting other legislation to address the threat posed by the prosecution of nationals from the United States and its allies. "When Congress grants the power to [take action against the ICC]," in other words, "it does so clearly and with careful constraints." *Learning Resources*, 2026 WL 477534, at *11. "And until now no President has read IEEPA to confer such power." *Id*. at *13. Plaintiffs are likely to succeed on the merits because if IEEPA's substantive limits mean anything, they preclude the President from using broad emergency economic sanctions authorities to address a threat that has been the subject of policy debates and tailored legislation over the course of half of IEEPA's existence until now.

The irreparable harm to the Cali family from these sanctions is substantial. The violation of the Cali family's First Amendment rights is irreparable harm per se and directly causes other harms to the Cali family's fundamental constitutional rights to property and family integrity. The government cannot arbitrarily impose burdens and restrictions on family relationships, effectively

hollowing them out and degrading the ability of spouses, parents, and children to enjoy one another's companionship and experience the normal incidents of family life.

The government will suffer no legally cognizable harms if EO 14203 is temporarily enjoined. Defendants have no lawful interest in suppressing speech on matters of public concern. If Defendants find Francesca's speech harmful to the interests of the United States, an injunction leaves Defendants free to contest her findings, challenge her conclusions, and use the full megaphone of the U.S. government to persuade the public to disregard her. But when the "Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves." *Citizens United v. FEC*, 558 U.S. 310, 356 (2010).

Finally, over and above the public's strong interest in ensuring the federal government complies with the law, and the strong public interest in a free marketplace of ideas on matters of public concern, the President's use of sanctions against a UN official for carrying out her UN duties is unprecedented. The UN Charter, which the United States principally drafted and the Senate ratified, specifically guarantees that UN officials, such as Francesca, "enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization." U.N. Charter art. 105 (1945); *see also* Convention on the Privileges and Immunities of the U.N. § 18(a) (1946) (UN officials "shall be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity."). The public has a strong interest in ensuring that the Executive Branch respects the country's international obligations and the Congressional laws implementing those obligations.

The preliminary injunction should therefore be GRANTED.

## STATEMENT OF FACTS

**I.    The Cali Family**

Francesca Albanese is an Italian citizen, international legal scholar, and widely recognized expert on human rights and the Middle East. *Francesca Albanese*, UN Office of the High Commissioner for Human Rights.[2] Prior to her current role as an independent expert with the UN, she spent nearly two decades working in various facets of the international human rights system. In 2006, Francesca became a human rights officer with the UN Office of the High Commissioner for Human Rights where she advised national human rights bodies on international standards and interactions with multilateral human rights institutions. *See* Albanese Application for Special Rapporteur (Nov. 23, 2001) at 13.[3]  She later worked as a legal officer for the UN Agency for Palestine Refugees, facilitating human rights efforts for and within the population of Palestinian refugees spread throughout parts of the Middle East. *Id.* at 12. In 2014, she took a position with Project Concern International, a human rights NGO based in the United States that focuses on humanitarian assistance. Compl. (Dkt. 1) ¶ 19. While working for Project Concern, Francesca's primary effort was the response to the Ebola crisis in Liberia. *Id.*

Aside from her work on the ground and within human rights organizations, Francesca is an international human rights law scholar. She has an Italian law degree and an L.L.M. in International Human Rights Law from the School of Oriental and African Studies, London. Albanese Application for Special Rapporteur (Nov. 23, 2001) at 10.  From 2015 until 2025, she was an Affiliated Scholar with the prestigious Institute for the Study of International Migration at Georgetown University and participated in debates and lectures at institutions including the

---

[2] https://www.ohchr.org/en/special-procedures/sr-palestine/francesca-albanese (last visited Feb. 23, 2026).

[3] https://www.ohchr.org/sites/default/files/2021-12/ALBANESE_Francesca_form.pdf.

American University of Beirut, Fordham University, Princeton, Harvard, Oxford, and the University of Bologna, among others. *Id*. at 4; Compl. ¶¶ 18, 23. She has authored or co-authored multiple books, including the 2020 book *Palestinian Refugees in International Law* (Oxford University Press) and the 2025 book *When the World Sleeps: Stories, Words, and Wounds of Palestine*, which is a bestseller in Italy, has been translated into fifteen languages, and has received a starred review from Publisher's Weekly for being an "indispensable, at times deeply sickening, overview of the situation on the ground in Palestine." Compl. ¶¶ 20, 24; *Picks, What We're Reading*, Publishers Weekly.[4] Francesca has also contributed forewords and endorsements to books of renowned authors, including well-known Israeli scholar and Oxford history professor Avi Shlaim. Compl. ¶ 24

Though her expertise and experience range across a broad spectrum of human rights issues and work, Francesca is especially regarded and known for her work on Palestine and Israel. It is for this reason that, in April 2022, the United Nations Human Rights Council ("UNHRC") appointed Francesca as the first woman to serve as the "United Nations Special Rapporteur on the situation of human rights in the Palestinian territory occupied since 1967." Compl. ¶ 2. In this capacity, Francesca regularly reports to the UNHRC and the UN General Assembly and generally works to raise awareness and advocate on human rights issues in the Occupied Palestinian Territories.[5] Francesca is one of dozens of such UN independent experts across a variety of mandates, including "the rights of persons with disabilities," "the right to education," and "the

---

[4] https://www.publishersweekly.com/978-1-63542-603-8 (last visited Feb. 23, 2026).

[5] This term is widely used to refer to areas including the West Bank, Gaza Strip, and East Jerusalem. *See, e.g.*, U.S. Dep't of State, *Israel 2016 International Religious Freedom Report*-Executive Summary (2016), https://www.state.gov/wp-content/uploads/2019/01/Israel.pdf.

rights of Indigenous Peoples." *Special Procedures Thematic Mandates*, UN Office of the High

Commissioner for Human Rights; Soditi Decl. ¶ 8, attached as Ex. A.[6]

    As the Special Rapporteur for what is possibly the single most charged issue of our time,

Francesca's mandate is politically fraught. She is highly visible within the global debate regarding

Palestine and Israel. Her official X (née Twitter) account has nearly 570,000 followers;[7] her

Instagram account has over 1.3 million followers;[8] and media from as broad a range as the *New*

*York Times*,[9] *El País*,[10] *Le Monde*,[11] *The Guardian*,[12] *BBC*,[13] *Jacobin*[14] (which describes itself as

---

[6] https://spinternet.ohchr.org/ViewAllCountryMandates.aspx?Type=TM (last visited Feb. 23, 2026).

[7] Francesca Albanese (@FranceskAlbs), X, https://x.com/franceskalbs?lang=de (last visited Feb. 23, 2026).

[8] Francesca Albanese (@francesca.albanese.unsr.opt), Instagram, https://www.instagram.com/francesca.albanese.unsr.opt/?hl=en (last visited Feb. 23, 2026).

[9] M. Gessen, *Her Optimism Has Won Her Some of the Most Powerful Enemies in the World*, N.Y. Times (Oct. 16, 2025), https://www.nytimes.com/2025/10/16/opinion/palestinians-united-nations-francesca-albanese.html.

[10] Íñigo Domínguez, *The Complicated Life of Francesca Albanese*, El País (Dec. 27, 2025), https://english.elpais.com/international/2025-12-28/the-complicated-life-of-francesca-albanese-a-rising-figure-in-italy-but-barred-from-every-bank-by-trumps-sanctions.html.

[11] Allan Kaval, Benjamin Barthe & Madjid Zerrouky, *Francesca Albanese, a critical Western voice on Gaza*, Le Monde (Sept. 16, 2025), https://www.lemonde.fr/en/international/article/2025/09/16/francesca-albanese-a-critical-western-voice-on-gaza_6745458_4.html.

[12] Patrick Wintour, *UN should consider suspending Israel over 'genocide' against Palestinians, says special rapporteur*, The Guardian (Oct. 31, 2024) https://www.theguardian.com/world/2024/oct/31/un-should-consider-suspending-israel-over-genocide-against-palestinians-says-special-rapporteur.

[13] Imogen Foulkes, *UN expert calls for companies to stop doing business with Israel*, BBC (Jul. 2, 2025), https://www.bbc.com/news/articles/cx2039xpv87o.

[14] Richard Drake, *Francesca Albanese and the Palestinian Fight For Survival*, Jacobin, https://jacobin.com/2025/11/francesca-albanese-palestine-international-law (last visited Feb. 23, 2026); Jacobin, *About*, https://jacobin.com/about (last visited Feb. 23, 2026).

"a leading voice of the American left"), and Tucker Carlson[15] (whose December 2025 discussion with Francesca has garnered 1.1 million views in less than three months) have interviewed or profiled Francesca in recent years. In 2025, a documentary on Francesca's work was broadcast in Europe by Arte.[16]

In addition to being a prominent authority on international law, human rights, and the Israeli-Palestinian conflict, Francesca is a wife and mother. Her husband Max, also an Italian citizen, is an economist with the World Bank, and her minor daughter L.C., is 12 years old and a United States citizen. Compl. ¶ 17-18. The family lived in the United States from 2012 to 2015 and put down roots. They purchased a residence in the District of Columbia (which they still own), opened a bank account and took out a mortgage with the World Bank's federal credit union in Washington, D.C. *Id*. ¶¶ 18-20. When Francesca took time away from work after having L.C., she volunteered at D.C.-area homeless shelters as a yoga instructor. *Id*. ¶ 19. L.C., for her part, attended a D.C. pre-school, carries a U.S. passport, and speaks English as her first language. Compl. ¶¶ 18-19. As the Cali family has had to relocate around the world for Max's job with the World Bank, L.C. has enrolled in local American schools. *Id*. ¶ 20.

## II.    The United States' relationship to the International Criminal Court ("ICC")

The International Criminal Court ("ICC") was established by the 1998 Rome Statute, a multilateral treaty the United States played a key role in drafting. Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90, 37 I.L.M. 999 (entered into force July 1, 2002) ("Rome Statute"). The creation of the ICC was the culmination of a decades-long push by the

---

[15] Tucker Carlson, *Why are We Defending Mass Murder in Gaza?*, YouTube (Dec. 10, 2025 starting at 51:00), https://www.youtube.com/watch?v=qd_LN4fDf6s.

[16] ArtE.tv Documentary, *Disunited Nations: The UN and The Middle East*, YouTube (Dec. 31, 2025), https://www.youtube.com/watch?v=k9ArvNBCkR8.

United States and other countries for a permanent mechanism to provide international criminal justice. *See generally* Sophia N. Ramcharitar, *Correcting Course: How Congress Can Streamline U.S. Engagement with the International Criminal Court*, 2025 Cardozo L. Rev. de novo 23, 29 (2025). When President Clinton signed the Rome Statute in 2000, he noted the United States' "long history of commitment to the principle of accountability, from our involvement in the Nuremberg tribunals that brought Nazi war criminals to justice, to our leadership in the effort to establish the International Criminal Tribunals for the former Yugoslavia and Rwanda." Statement on the Rome Treaty on the International Criminal Court, 37 Weekly Comp. Pres. Doc. 4, Dec. 31, 2000.

The ICC has "the power to exercise its jurisdiction over persons for the most serious crimes of international concern," including genocide, crimes against humanity, war crimes, and the crime of aggression. Rome Statute, art. 1, 5. The ICC's jurisdiction is limited to crimes committed within the territory of a member state or by nationals of a member state, or upon a member state's election or a referral by the United Nations Security Council ("UNSC"). *Id*. art. 11(1). Today, 125 countries are parties to the Rome Statute, including thirty of NATO's thirty-two members. *Compare Rome Statute of the International Criminal Court*,[17] (listing parties to Rome Statute) *with Nato Member Countries*[18] (listing NATO countries).

The ICC's Office of the Prosecutor ("OTP") is responsible for investigating and prosecuting individuals alleged to have committed crimes within the ICC's jurisdiction, and U.S. support for the OTP's work has transcended party lines. As one of the five permanent members of the UNSC, the United States has extended the ICC's jurisdiction to non-member states via UNSC

[17] U.N. Treaty Collection, https://treaties.un.org/Pages/ViewDetailsViewDetails.aspx?src=TREATYTREATY&mtdsg_no=XVIII-10&chapter=18&clang=_en (last visited Feb. 23, 2026).

[18] NATO, https://www.nato.int/en/about-us/organization/nato-member-countries (last visited Feb. 23, 2026).

referral. In 2005, the Bush administration assented to the referral of the situation in Darfur to the ICC. U.N.S.C. Res. 1593 U.N. Doc. S/RES/1593 (Mar. 31, 2005). The Obama administration went further and voted with the Security Council in 2011 to refer the situation in Libya to the ICC, urging "all States and concerned regional and other international organizations to cooperate fully with the Court and the Prosecutor." U.N.S.C. Res. 1970, ¶¶ 4–5. U.N. Doc. S/RES/1970 (Feb. 26, 2011).

The United States has also directly aided the ICC's prosecutorial efforts. In 2013, the United States turned Bosco Ntaganda over to the ICC for prosecution for alleged war crimes committed in the Democratic Republic of Congo after he sought refuge in the U.S. Embassy in Rwanda. Jeffrey Gettleman, *Team on the Way to Collect Congo War Crimes Suspect*, N.Y. Times, March 21, 2013, at A6. In 2015, the United States similarly transferred Dominic Ongwen to the ICC for prosecution as an alleged Lord's Resistance Army commander who committed atrocity crimes in Uganda. *See* U.S. Dep't of State, Press Release, Transfer of Dominic Ongwen to the International Criminal Court, Jan. 20, 2015. Since 2013, the United States has also offered million-dollar rewards for the apprehension and transfer of no less than five accused international criminals to ICC custody. U.S. Dep't of State, Past Reward Offers;[19] U.S. Dep't of State, Current Reward Offers.[20]

The United States also has long sought to address the potential that U.S. nationals and nationals of U.S. allies would be subject to the ICC's jurisdiction, i.e., the threat the instant Executive Order 14203 seeks to counter. As far back as 2001, just a week after President Clinton

---

[19] https://2021-2025.state.gov/global-criminal-justice-rewards-program/past-reward-offers/ (last visited Feb. 23, 2026).

[20] https://2021-2025.state.gov/global-criminal-justice-rewards-program/current-reward-offers/ (last visited Feb. 23, 2026).

signed the Rome Statute, John Bolton wrote an op-ed, objecting that the ICC threatened the autonomy of U.S. political leaders. John Bolton, *Unsign That Treaty*, Wash. Post, Jan. 2, 2001. In a subsequent law review article, Bolton warned that the ICC would threaten the President with "the retroactive imposition of criminal liability" and that "Israel will be the target." John Bolton, *The Risks and Weaknesses of the International Criminal Court from America's Perspective*, 64 Law and Contemporary Problems 167, 170-71 (2001). Bolton went on to serve as the Bush Administration's UN Ambassador and the Trump Administration's National Security Advisor from 2018 to 2019.

In 2002, Congress enacted the American Servicemembers' Protection Act ("ASPA"), 116 Stat. 899 (codified at 22 U.S.C. §§ 7421, *et seq*.), to address the threat of individuals from the United States and non-consenting U.S. allies "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court." 22 U.S.C. § 7427. Congress carefully crafted the ASPA to broadly regulate the United States' relationship with the ICC to protect against these risks while permitting the United States to support ICC activities that it deemed to be in the national interest. For example, 22 U.S.C. § 7422(c) introduced a safeguard to help ensure "none of the following persons will be investigated, arrested, detained, prosecuted, or imprisoned by or on behalf of the International Criminal Court with respect to actions undertaken by them in an official capacity: (i) Covered United States persons; (ii) Covered allied persons; (iii) Individuals who were covered United States persons or covered allied persons." At the same time, the ASPA explicitly endorsed the ICC's efforts "to bring to justice Saddam Hussein, Slobodan Milosovic [sic], Osama bin Laden, other members of Al Queda [sic], leaders of Islamic Jihad, and other foreign nationals accused of genocide, war crimes or crimes against humanity." 22 U.S.C. § 7433. This section was further amended in 2022 to endorse "assistance to the International Criminal Court to assist with

12

investigations and prosecutions of foreign nationals related to the Situation in Ukraine." div. K, title VII, § 7073(b), Pub. L. No. 117-328, 136 Stat. 4459, 5092 (2022).

Congress also has considered, but not passed, legislation to authorize IEEPA sanctions on the ICC itself and its personnel. In January 2025, Congress considered a bill that would have authorized the President to issue an executive order under IEEPA "to block and prohibit all transactions in all property and interests in property of any foreign person" who:

(A) has directly engaged in or otherwise aided any effort by the International Criminal Court to investigate, arrest, detain, or prosecute a protected person,

(B) has materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of any effort by the International Criminal Court to investigate, arrest, detain, or prosecute a protected person; or

(C) is owned or controlled by, or is currently acting or purports to have acted, directly or indirectly, for or on behalf of any person that directly engages in any effort by the International Criminal Court to investigate, arrest, detain, or prosecute a protected person[.]

The Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. § 3 (2025). "Protected person" was defined in substantively the same manner as it is in EO 14203. This bill died in the Senate. 171 Cong. Rec. S410 (2025).

## III.    Executive Order 14203 and the designation of Francesca Albanese

IEEPA authorizes the President to take specific actions in response to a national emergency that constitutes an "unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a). When the President declares such an emergency, IEEPA permits the President to:

. . . Block … regulate . . . void, prevent or prohibit, any acquisition, holding, withholding, use transfer, withdrawal, . . . dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States.

*Id*. § 1702(a)(1)(B).

Individuals designated under Section 1702(a)(1)(B) are placed on the Specially Designated Nationals and Blocked Persons List ("SDN List") maintained by the Department of Treasury's Office of Foreign Assets Control ("OFAC"). Persons who engage in most transactions with an SDN are subject to penalties under IEEPA. These include civil fines in an amount equal to the greater of $377,700.17 or twice the value of a violative transaction, and criminal penalties in the form of a fine of up to $1,000,000, and, if a natural person, up to 20 years of imprisonment. 50 U.S.C. § 1705; 31 C.F.R. § 510.701.

On February 6, 2025, President Trump invoked IEEPA to issue EO 14203, determining "that any effort by the ICC to investigate, arrest, detain, or prosecute protected persons, as defined in section 8(d) of this order, constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States, and [] hereby declar[ing] a national emergency to address that threat." *See* EO 14203 pmbl. It further finds that the "ICC has, without a legitimate basis, asserted jurisdiction over and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel, . . . issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant." *Id*. It then defines "protected person" as "any United States person" or a national of an "ally of the United States," which is, in turn, defined as a NATO member state or a "major non-NATO ally." *Id*. § 8(d), (e).

To address the stated threat to "protected persons," EO 14203 imposes blocking sanctions on foreign persons who are deemed to have "directly engaged" or "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of," or were "owned or controlled by, or . . . have acted or purported to act for on behalf of, directly

14

or indirectly" the ICC's efforts to "investigate, arrest, detain or prosecute a protected person without consent of that person's country of nationality." *Id.* § 1. EO 14203 further prohibits "the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1 of this order and the receipt of any contribution or provision of funds, goods, or services from any such person." *Id*. § 3(a).

On July 9, 2025, Defendant Secretary of State Marco Rubio designated Francesca an SDN under Section 1(a)(ii)(A) of EO 14203, which sanctions foreign persons "determined by the Secretary of State . . . to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person." Rubio Press Statement, attached to Compl. (Dkt. 1) as Ex. B. Though designated as someone who has "directly engaged" in ICC efforts, Francesca's relationship with the ICC is limited to her own advocacy respecting human rights issues, which include what she thinks the ICC should or should not do. She does not work for the ICC, nor does she serve in any role within the ICC's component organizations, formal or otherwise. Compl. ¶ 31. She has no ability to direct or otherwise control or dictate ICC activity or messaging. *Id*. And her designation for "directly engag[ing]" in ICC efforts appears tied to a July 2, 2025 official report she delivered to the UNHCR, addressing corporate actors and international law in the Israeli-Palestinian conflict, in which she stated, "The Special Rapporteur urges the [ICC] ... to investigate and prosecute corporate executives and/or corporate entities for their part in the commission of international crimes." Francesca Albanese, *Report of the Special Rapporteur to the Human Rights Council: From Economy of Occupation to Economy of Genocide* 27 (Jul. 2, 2025).[21]

---

[21] https://docs.un.org/en/A/HRC/59/23.

The only ICC-related conduct that Defendant Rubio cited when designating her under EO 14203 was Francesca's statements endorsing the work of the ICC. Rubio Press Statement, attached to Compl. (Dkt. 1) as Ex. B. The announcement stated that the reason for designating Francesca was that she "recommend[ed] that the ICC, without a legitimate basis, issue arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant," and that she "recommend[ed] the ICC pursue investigations and prosecutions of" certain American companies and their executives. *Id*. In short, Francesca's designation under EO 14203 turned solely and exclusively on her making non-binding statements expressing her point of view.

Shortly after designating Francesca an SDN, Defendants granted two limited licenses. The first allows "U.S. persons" to engage in transactions related to the upkeep or sale of the Cali family's real property in the District of Columbia (the proceeds of any such sale to remain blocked by the EO). License No. ICC-EO14203-2025-1405217-1, attached to Compl. (Dkt 1) as Ex. C. The second license allows "U.S. persons" to engage in transactions "ordinarily incident and necessary to [Francesca's] role as the parent and legal guardian of [L.C.]," such as "the purchasing, making payment for, and receiving goods, services, and funds essential to the maintenance of [L.C.], including . . . health and medical expenses . . . food, clothing." License No. ICC-EO14203-2025-1408722-1, attached to Compl. (Dkt. 1) as Ex. D.

Francesca sought permission from the United Nations to challenge or otherwise seek relief from her designation in the courts or agencies of the United States on her own behalf. On January 14, 2026, the UN Office of Legal Advisor informed Francesca that she could not proceed on her own behalf due to the United Nations interpretation of the rights and obligations associated with its institutional immunity. Letter from Elinor Hammarskjöld, Under-Secretary-General for Legal

Affairs and United Nations Legal Counsel to Francesca Albanese (Jan. 14, 2026), attached to Compl. (Dkt. 1) as Ex. E.

## ARGUMENT

### I.    Legal Standard

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). "These four considerations are factors, not elements." *Nat'l Council of Nonprofits v. OMB*, 763 F. Supp. 3d 36 (D.D.C. 2025). Therefore, "[a] district court must 'balance the strengths of the requesting party's arguments in each of the four required areas.'" *Id.* (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)).

### II.    Plaintiffs are likely to succeed on the merits.

Plaintiffs are likely to succeed on the merits for three independently sufficient reasons. *First*, EO 14203 generally, and the sanctions against Francesca specifically, violate the First Amendment by imposing content-based, viewpoint-discriminatory restrictions on expression that could be construed to benefit or support the ICC, while permitting expression that is adverse to the ICC's efforts.  *Rona*, 797 F. Supp. 3d 278 (finding EO 14203 violative of the First Amendment on the merits); *Smith*, 791 F. Supp. 3d 90 (finding EO 14203 likely violative of the First Amendment on interim injunctive relief analysis); *OSJI*, 510 F. Supp. 3d at 212 (enjoining the near-identical EO 13928 prohibiting ICC-related speech). *Second*, EO 14203 generally, and the sanctions against Francesca specifically, exceed the President's authority under IEEPA by seeking to directly regulate the communication of information. 50 U.S.C. § 1702(b); *see, e.g.*, *TikTok*, 507 F. Supp. 3d at 103. *Third*, EO 14203 generally, and the sanctions against Francesca specifically, exceed the lawful scope of IEEPA's delegated authority by targeting an ostensible threat that is neither

"unusual" nor "extraordinary," but has been preclusively addressed by Congress for a quarter century. 50 U.S.C. § 1701.

### A.    EO 14203 Violates the First Amendment.

"When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *United States v. Playboy, Ent. Grp., Inc.*, 529 U.S. 803, 816 (2000). At the preliminary injunction stage, since "the Government bears the burden of proof on the ultimate question of [First Amendment] constitutionality, [plaintiff] must be deemed likely to prevail unless the Government" carries its burden. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

Under the First Amendment, the government "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (cleaned up). Where a law is content based, it is "presumptively unconstitutional" and can only survive First Amendment review "if the government proves [it is] narrowly tailored to serve compelling state interests" (*i.e.*, strict scrutiny). *Id.*

### 1.    Defendant's conduct is subject to strict scrutiny.

EO 14203 and Francesca's designation are nakedly content-based and view-point-discriminatory. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163. This inquiry "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys." *Id.* Restrictions that "regulate[] speech by its function or purpose … are distinctions drawn based on the message a speaker conveys." *Id.* at 163-64; *see also Pursuing America's Greatness v. FEC*, 831 F.3d 500, 508 (D.C. Cir. 2016).

EO 14203 is both a content-based and a viewpoint-discriminatory restriction because it targets expression that could be construed to benefit the work of the ICC, while permitting expression adverse to the ICC. As the District Court for the Southern District of New York held

18

when permanently enjoining EO 14203, "the 2025 Order is content based because . . . the Order 'regulate[s] speech based on its function or purpose.'" *Rona*, 797 F. Supp. 3d at 288 (citation omitted) (second alteration in original); *see also OSJI*, 510 F. Supp. 3d at 211 (enjoining EO 14203's predecessor because "speech is restricted if, and only if, it has the function or purpose of benefitting [the ICC]. This is content-based restriction.").

EO 14203 also discriminates between viewpoints on its face. It prohibits First Amendment activities, such as the practice of law and reporting on the human rights situations in various parts of the world, only if done for the "benefit" of the ICC's prosecution of a "protected person." Advocating *against* the ICC's prosecution of a "protected person," even before the ICC itself, is permitted. *See*, *e.g.*, Carl Campanile, *Andrew Cuomo joins high-powered legal team to defend Netanyahu against ICC's war crime claims*, N.Y. Post (Nov. 25, 2024).[22] "Using the powers of the federal government to target lawyers for their representation of clients . . . in an overt attempt to suppress and punish certain viewpoints, however, is contrary to the Constitution, which requires that the government respond to dissenting or unpopular speech or ideas with tolerance, not coercion.'" *Perkins Coie v. DOJ*, 783 F. Supp. 3d 105, 120–21 (D.D.C. 2025) (quoting *303 Creative LLC v. Elenis*, 600 U.S. 570, 603 (2023)).

Such "viewpoint discrimination is uniquely harmful to a free and democratic society," *NRA v. Vullo*, 602 U.S. 175, 187 (2024), and "will almost always be 'rendered unconstitutional.'" *Frederick Douglass Found. Inc. v. District of Columbia*, 82 F.4th 1122, 1141 (D.C. Cir. 2023); *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("When the government targets not subject matter, but particular views taken by speakers on a subject," that

---

[22] https://nypost.com/2024/11/25/us-news/andrew-cuomo-joins-high-powered-legal-team-to-defend-netanyahu-against-icc/.

renders "the violation of the First Amendment . . . all the more blatant"). EO 14203 does precisely what the D.C. Circuit has held the First Amendment forbids: "the government has no authority to license one side to fight freestyle, while forbidding the other to fight at all." *Frederick Douglass Found., Inc.*, 82 F.4th at 1142 (quoting *Mahoney v. Babbitt*, 105 F.3d 1452, 1454 (D.C. Cir. 1997)). EO 14203 is therefore subject to strict scrutiny.

Furthermore, EO 14203 is subject to strict scrutiny because it targets the practice of law. The First Amendment protects the practice of law, which at its core entails advocacy and the collection of information in the reasoned search for the truth. *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 397 (2011); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27-28 (2010); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 545 (2001); *In re Primus*, 436 U.S. 412, 424 (1978); *United Transp. Union v. State Bar of Mich.*, 401 U.S. 576, 585 (1971); *NAACP v. Button*, 371 U.S. 415, 427-28 (1963) (legal activities "are modes of expression and association protected by the First and Fourteenth Amendments"); *Richmond Newspapers v. Virginia*, 448 U.S. 555, 576 (1980) (First Amendment right to gather information); *Lamont v. Postmaster*, 381 U.S. 301, 307 (1965); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000) ("The First Amendment protects the right to gather information about what public officials do on public property, and specifically, a right to record matters of public interest."); *Perkins Coie*, 783 F. Supp. 3d at 119-120.

The designation of Francesca specifically is also subject to strict scrutiny because it is content-based viewpoint discrimination of the most egregious kind. The government's *only* basis for sanctioning Francesca is that she "*recommend[ed]* that the ICC, without a legitimate basis, issue arrest warrants targeting [certain Israeli officials]," and that she "*recommend[ed]* the ICC pursue investigations and prosecutions of" certain American companies and their executives. Francesca does not work for the ICC. She has no official or unofficial role with the ICC. Compl.

20

¶ 31. She has no ability to direct or otherwise dictate ICC activity. *Id*. Rather, the Secretary's designation of her as someone who has "directly engaged" in ICC efforts to prosecute so-called "protected persons" turns *entirely* on her advocacy as an independent expert regarding what she "recommended" the ICC should or should not do. Such advocacy is the core of what the First Amendment protects and any effort to sanction such advocacy must survive strict scrutiny.

### 2.    Defendants' conduct fails strict scrutiny.

To survive strict scrutiny, EO 14203's restrictions and Francesca's designation must be "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163. By design, this standard is exceptionally difficult to satisfy. *See Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011) ("It is rare that a regulation restricting speech because of its content will ever be permissible.") (citation omitted). And neither EO 14203, nor Francesca's designation, are narrowly tailored to serving any legitimate governmental interest, let alone a compelling one.

Even assuming *arguendo* that the government has a compelling interest in shielding "protected persons" from ICC scrutiny, EO 14203's restrictions are not narrowly tailored to serve that interest. "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrificing speech for efficiency.'" *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988) (citation modified)).

EO 14203 is not narrowly tailored because it is, on its face, "vastly overinclusive." *Brown*, 564 U.S. at 804; *see also Simon & Schuster v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 121-22 (1991). Taking EO 14203 at face value, the threat it seeks to counter is the possibility that the ICC would investigate or prosecute "protected persons" — *i.e.*, individuals from the United States and non-consenting allies. Yet, as echoed by at least two federal district courts, EO 14203 restricts a vast swath of First Amendment-protected activity that has nothing to

do with the investigation or prosecution of "protected persons." *Rona*, 797 F. Supp. 3d at 291 ("[EO 14203] does not withstand strict scrutiny because it is overinclusive. … it is undisputed that Plaintiffs want to engage in speech that is unrelated to the Government's interest in shielding protected persons from ICC prosecution"); *Smith*, 791 F. Supp. 3d at 97–98 ("Even assuming the importance of that government interest, [EO 14203] appears to restrict substantially more speech than necessary to further that end.").

EO 14203 is also not narrowly tailored because there are less restrictive alternatives to protect the interests that the government asserts. Under the tailoring requirement, "[i]f a less restrictive alternative would serve the Government's purpose, the [Government] must use that alternative." *Playboy*, 529 U.S. at 813. EO 14203 makes no effort to accommodate First Amendment-protected activities or to otherwise limit its sweeping prohibitions to activities that pose a threat of investigation to "protected persons." And Congress has already legislated to address this precise risk in the ASPA and provided the President with the specific authorities that it deems appropriate to that risk. 22 U.S.C. § 7427.

Nor is Francesca's designation narrowly tailored to serving the government's ostensible interests of shielding "protected persons" from ICC prosecution. Even if the ICC's investigation and prosecution of Israeli officials violated U.S. law, which it does not, "the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969). The conduct leading to Francesca's designation, on its face, fails the *Brandenburg* test.

At a minimum, a "governmental body seeking to sustain a restriction on . . . speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edwards v. District of Columbia*, 755 F.3d 996, 1003 (D.C. Cir. 2014) (omission in original) (citation omitted). "To satisfy narrow tailoring, the [Government] must prove the [sanctions] directly advance its asserted interests . . . 'There must be a direct causal link between the [sanction] imposed and the injury to be prevented'"; "mere speculation or conjecture" by the government is not sufficient. *Id.* at 1003 (citation omitted).

There is, however, no plausible way that sanctioning Francesca somehow "directly advance[s]" the government's asserted interest in preventing the prosecution of "protected persons" before the ICC. As noted above, Francesca is an academic and independent human rights law expert for the United Nations. She gathers facts relating to the Israeli-Palestinian conflict, analyzes them, reports them publicly, and makes recommendations. She discusses issues, ideas, and advocacy. She has zero control over ICC activity or messaging, and she has no formal or informal role within the ICC. The ICC is free to consider her advocacy for its persuasive force. And it is free to disregard it when making its own independent prosecutorial decisions.

Francesca is, in short, no different from any other reporter with a studied point of view on the Israeli-Palestinian conflict. And while the government clearly disagrees with her point of view, sanctioning her in the same manner as terrorists, drug kingpins, and Russian oligarchs achieves nothing but the intimidation of those with whom the government disagrees. That is not a compelling state interest. It is not a legitimate state interest. And the government cannot show that sanctioning Francesca will make any protected person any less at risk of prosecution before the ICC. She is therefore likely to prevail on the merits that EO 14203 generally, and her designation specifically, violate the First Amendment.

23

**B.      EO 14203 violates the Berman Amendments.**

IEEPA itself broadly carves-out First Amendment activities from the permissible scope of sanctions regulations. In the Berman Amendments, Congress provided:

> The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly … the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials, including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. § 1702(b)(3).[23]

"Congress itself, in enacting the Berman Amendments, created an 'IEEPA-free zone,' excluding, as relevant here, the indirect regulation of informational materials from the President's otherwise broad emergency powers." *Marland v. Trump*, 498 F.Supp.3d 624, 641 (E.D. Pa. 2020). Courts have therefore held that IEEPA precludes sanctions that target First Amendment activity, even when done for hire. *Kalantari v. NITV*, Inc., 352 F.3d 1202, 1209 (9th Cir. 2003) ("[T]he IEEPA exemption for informational materials is a general limitation on the President's authority").

In *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020), this Court held that the Berman Amendments barred the government from using IEEPA to suppress a foreign media platform on national security grounds, even though TikTok's foreign ownership presented data privacy concerns that were wholly distinct from the government's fear of Chinese influence operations. In so holding, this Court held that "Congress precluded regulations that directly target permissible

---

[23] These protections were legislated through 1988 ("Limitation on Exercise of Emergency Authorities") and 1994 ("Free Trade in Ideas") amendments to IEEPA. Omnibus Trade and Competitiveness Act, § 2502(b), Pub. L. No. 100-418, 102 Stat. 1107 (1988); Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, § 525(c), Pub. L. No. 103-236, 108 Stat. 382 (1994) (the "Berman Amendments").

objects (like business-to-business transactions) but have the goal of indirectly controlling impermissible objects (like 'personal communications' or 'informational materials')." *Id.* at 103.

This Court was not alone in rejecting the use of IEEPA to target TikTok for running afoul of the Berman Amendments. In *Marland*, the District Court for the Eastern District of Pennsylvania exhaustively reviewed the history and precedent interpreting the Berman Amendments and invalidated the use of IEEPA to regulate TikTok as an impermissible indirect regulation of information, even though the regulation targeted TikTok's ownership structure and financing, not its users. *Marland*, 498 F. Supp. 3d at 630. Though the regulation "nominally governs only 'business-to-business transactions' involving TikTok," the Court held, "the effect of the [regulation] will be to undermine the app's functionality such that U.S. users will be prevented from exchanging data on the app." *Id.* at 637.

In response, Congress did not amend IEEPA or limit the Berman Amendments. The government, for its part, did not even appeal these decisions to the circuit court level. Instead, Congress enacted narrowly tailored legislation that focused on the data privacy harms that TikTok's foreign ownership presented. And this law was sustained by the Supreme Court against a First Amendment challenge, solely on the ground that "TikTok's scale and susceptibility to foreign adversary control, together with the vast swaths of sensitive data the platform collects, justify differential treatment to address the Government's national security concerns." *TikTok v. Garland*, 604 U.S. 56, 68-69 (2025).

Congress intended the Berman Amendments' carve-out to be an explicit prohibition on the President's use of sanctions to restrict — "directly or indirectly" — "information that is protected under the First Amendment to the U.S. Constitution." H.R. Conf. Rep. No. 103-482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483. That is all EO 14203 does. The conduct that qualifies

an individual to be sanctioned is core First Amendment activity, to wit "investigat[ing]" so-called "protected persons" or otherwise doing things that might advance their prosecution before the ICC. That is as direct a regulation of "information" to the American public as much as it is to the ICC. Congress has forbidden the use of IEEPA sanctions for such purposes. And Plaintiffs are therefore likely to succeed on the merits in declaring EO 14203 unlawful.

### C.    EO 14203 violates § 1701(b) and is precluded by subsequent legislation.

EO 14203 exceeds the limits Congress has placed on the President's sanctions authority pursuant to 50 U.S.C. § 1701(b). IEEPA is explicit that the President may only invoke its sanctions "to deal with an unusual and extraordinary threat" to the foreign policy interests of the United States. *Id.* Moreover, the President must be confronting a "new threat." *Id*. And the "authorities granted to the President" to impose sanctions and to enforce those sanctions with ruinous civil and criminal penalties, "may not be exercised for any other purpose." *Id*.

As the Supreme Court confirmed last week, while IEEPA's authorities are broad, they are not unbounded. *Learning Resources*, 2026 WL 477534, at *10-11. However expansive the meaning of the words "unusual and extraordinary" might be (and they can hardly be broader than the word "regulate"), a threat that has been broadly understood and specifically addressed by Congress for a quarter century is — by definition — not "new."

"Congress is not unaware of" the possibility that the ICC might investigate, arrest, detain or prosecute nationals of the United States and its non-consenting allies. *Biden v. Nebraska*, 600 U.S. 477, 503 (2023). To the contrary, from the moment the ICC began operations a quarter-century ago, "Congress crafted a specific legislative response," *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 157 (2000), to meet the precise threat EO 14203 purports to address.

With the American Servicemembers' Protection Act, 116 Stat. 899 (codified at 22 U.S.C. §§ 7421, *et seq*.), Congress authorized the government to take certain actions to address the threat

of individuals from the United States or non-consenting allies "being detained or imprisoned by, on behalf of, or at the request of the International Criminal Court," 22 U.S.C. § 7427(a). And it has authorized a more limited set of actions, largely confined to legal assistance, when a protected person who is not in custody is being "investigated" or "prosecuted" by the ICC. *Id*. § 7427(c).

Congress provided these tailored authorities to address the precise threats that EO 14203 claims to address, while also supporting ICC activities that were in the national interest. *Id.* § 7422(c), § 7433. Congress has also enacted appropriations, findings, and resolutions supporting ICC investigations that align with the United States' policy priorities. *See*, *e.g.*, Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460, 793 (2024); William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, §§ 1263, 1276, 1267, Pub. L. No. 116-283, 134 Stat. 3388, 3968, 3971 (2021); Department of State Rewards Program Update and Technical Corrections Act of 2012, Pub. L. No. 112-282, 126 Stat. 2492 (2013); National Defense Authorization Act for Fiscal Year 2008, 122 Stat. 3, § 1212, Pub. L. No. 110-181, 122 Stat. 3, 371 (2008); Darfur Peace and Accountability Act of 2006, Pub. L. No. 109-34, 120 Stat. 1869 (2006); S. Res. 546, 117th Cong., 168 Cong. Rec. S1180 (2022); S. Res. 188, 116th Cong., 165 Cong. Rec. S4736 (2019); S. Res. 144, 113th Cong.,159 Cong. Rec. S5302 (2013); S. Res. 90, 113th Cong., 159 Cong. Rec. S2853 (2013); S. Cong. Res. 16, 110th Cong., 153 Cong. Rec. S2540 (2007).

This carefully calibrated legislation reflects a longstanding policy debate among high-level officials about the ICC, which has not been "confined to the halls of Congress." *Nebraska*, 600 U.S. at 503. When President Clinton signed the Rome Statute, he suggested that the Senate withhold ratification, noting the threat that the ICC "will not only exercise authority over personnel of states that have ratified the Treaty, but also claim jurisdiction over personnel of states that have

27

not." President Clinton, Statement on Signature of the International Criminal Court Treaty, Washington, DC, December 31, 2000.

These threats were identified also by John Bolton, a prominent national-security and foreign-policy commentator and official, in op-eds and law review articles that discussed the risk that U.S. political figures and U.S. allies, such as Israel, might be subject to ICC investigation. Compl. ¶¶ 33-34. These threats were why President Bush tasked Bolton with notifying the United Nations that the United States had no intention of ratifying the Rome Statute. John Bolton, Letter to the Secretary General of the United Nations (May 6, 2002). And they are why administrations across the partisan spectrum have insisted upon diplomatic guarantees from nearly 100 foreign countries that U.S. personnel will not be sent to the Hague,[24] while simultaneously providing direct financial, diplomatic, and other support to the ICC to advance the national interest. Compl. ¶¶ 22–38.

"It is also telling that in IEEPA's 'half century of existence' [and the ICC's quarter century of existence], no President [except President Trump] has invoked the statute to impose *any* [sanctions on the ICC] – let alone [sanctions] of this magnitude and scope." *Learning Resources*, 2026 WL 477534, at *9 (plurality op.); *see also id*. at *13. Only in the last year of President Trump's first term did any administration seek to address these long-identified threats with IEEPA sanctions against the ICC and its personnel. *See* EO 13928. Like the initial imposition of sanctions against TikTok, however, *TikTok*, 507 F. Supp. 3d at 103, EO 13928 was enjoined on free speech grounds, *OSJI*, 510 F.Supp.3d 198, and the Biden administration rescinded it shortly after taking office, declaring that "the threat and imposition of financial sanctions against the Court, its

---

[24] Georgetown Law Library, International Criminal Court - Article 98 Agreements Research Guide, https://guides.ll.georgetown.edu/c.php?g=363527&p=2456099. (last time visited Feb. 23, 2026).

personnel, and those who assist it are not an effective or appropriate strategy for addressing the United States' concerns with the ICC." *See* EO 14022, Termination of Emergency with Respect to the International Criminal Court, 86 Fed. Reg. 17895 (Apr. 1, 2021).

Unlike its response to the courts' decisions invalidating TikTok sanctions, however, Congress did not respond to the invalidation of EO 13928 with legislation to ratify the President's determination that the ICC should be treated as the legal equivalent of a foreign adversary country, a terrorist organization, or a drug cartel. *Cf. TikTok v. Garland*, 145 S. Ct. 57, 63-65 (2025). Instead, Congress continued, as it has since 2002, to balance the threats that the ICC might pose to the United States' foreign policy and national security interests with the benefits that the ICC's unique role in the world can provide in relation to those same interests.

In 2022, for example, the Senate unanimously passed a resolution stating, "the International Criminal Court (ICC) is an international tribunal that seeks to uphold the rule of law, especially in areas where no rule of law exists, by investigating and trying individuals charged 'with the gravest crimes of concern to the international community: genocide, war crimes, crimes against humanity and the crime of aggression'" and resolved to "encourage[] member states to petition the ICC or other appropriate international tribunal to take any appropriate steps to investigate war crimes and crimes against humanity committed by the Russian Armed Forces and their proxies and President Putin's military commanders, at the direction of President Vladimir Putin." A resolution expressing the sense of the Senate condemning the Russian Federation, President Vladimir Putin, members of the Russian Security Council, the Russian Armed Forces, and Russian military commanders for committing atrocities, including alleged war crimes, against the people of Ukraine and others, S. Res. 546, 117th Cong., 169 Cong. Rec. S1180 (2002). And in 2024, Congress appropriated funds to support the ICC directly, including "not less than $2,500,000 as a contribution to the Trust Fund

for Victims" associated with the ICC and $2,500,000 for the ICC's investigations and prosecutions related to the situation in Ukraine. Further Consolidated Appropriations Act, 2024, § 7034(r), Pub. L. No. 118-47, 138 Stat .460, 793 (2024).

"Congress, for better or for worse, has created a distinct regulatory scheme" to balance the precise threat EO 14203 purports to address with the unique, significant benefits that ICC investigations and prosecutions can offer in advancing the foreign policy and national security interests of the United States. *See Brown & Williamson,* 529 U.S. at 159-60. EO 14203 topples that balance and claims authorities that Congress has not given. And no matter how grave the threat an ICC investigation into the actions of U.S. nationals or non-consenting U.S. allies might be, this long history of legislative and regulatory attention shows that it is not a "new threat." 50 U.S.C. § 1701(b). It is a threat that Congress has both recognized and specifically legislated to address. EO 14203, in short, seeks to "replace the longstanding executive-legislative collaboration over [ICC] policy with unchecked Presidential policymaking." *Learning Resources*, 2026 WL 477534, at *8 (plurality op).

What is more, "Congress considered and rejected several proposals to give the [President] the authority" that EO 14203 claims to assert. *Brown & Williamson*, 529 U.S. at 147; *see also West Virginia v. EPA*, 597 U.S. 697, 731–32 (2022). Most recently, Congress considered but failed to pass the Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. (2025), from whose text most of EO 14203 is taken verbatim.

The President may not create a sanctions program that targets the ICC when Congress "has consistently rejected proposals to amend [IEEPA] to create such a program." *West Virginia*, 597 U.S. at 731–32. "Taken together, these actions by Congress over the past [twenty] years preclude an interpretation of [IEEPA] that grants" the President the discretion to use the emergency

sanctions authorities granted by IEEPA to target the ICC and its personnel. *Brown & Williamson*, 529 U.S. at 155.

Foreign policy and national security precedents dating to the Founding have consistently reaffirmed that the President must respect the express and implied limits of the authorities that Congress has granted. *See*, *e.g.*, *Learning Resources*, 2026 WL 477534 *9-10 (plurality op.); *Nebraska*, 600 U.S. at 494; *Hamdan v. Rumsfeld*, 548 U.S. 557, 623 (2006); *Little v. Barreme*, 2 Cranch 170, 177–78 (1804); *TikTok Inc.*, 507 F. Supp. 3d at 114; *see Ziglar v. Abbasi*, 582 U.S. 120, 143 (2017) ("There are limitations, of course, on the power of the Executive under Article II of the Constitution and in the powers authorized by congressional enactments, even with respect to matters of national security."). The President cannot disregard IEEPA's explicit condition that its sanctions authority may only be used to confront a "new threat" that is "unusual and extraordinary."

At bottom, this case involves a question no different than that presented in the *Steel Seizure* case, where the Supreme Court held:

> It is one thing to draw an intention of Congress from general language and to say that Congress would have explicitly written what is inferred, where Congress has not addressed itself to a specific situation. It is quite impossible, however, when Congress did specifically address itself to a problem, as Congress did to that of [the ICC], to find secreted in the interstices of legislation the very grant of power which Congress consciously withheld. To find authority so explicitly withheld is not merely to disregard in a particular instance the clear will of Congress. It is to disrespect the whole legislative process and the constitutional division of authority between President and Congress.

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J. concurring).

To find that the President has the authority to impose sanctions on the ICC and its personnel under IEEPA, "one must not only adopt an extremely strained understanding of ['unusual and

extraordinary threat'] as it is used throughout the Act—a concept central to [IEEPA's] regulatory scheme—but also ignore the plain implication of Congress' subsequent [ICC]-specific legislation. It is therefore clear, based on [IEEPA's] overall regulatory scheme and the subsequent [ICC] legislation, that Congress has directly spoken to the question at issue and precluded the [President] from" doing what EO 14203 does. *Brown & Williamson*, 529 U.S. at 160–61.

The United States and the ICC have a "unique political history" spanning a quarter century and Congress has created "a distinct regulatory scheme" to balance the threats and benefits to American foreign policy interests that have been self-evident since its inception. *Id.* at 159. EO 14203 is a naked attempt to "seiz[e] the power of the Legislature" and the President's "assertion of administrative authority has 'conveniently enabled [him] to enact a program' that Congress has chosen not to enact itself." *Nebraska*, 600 U.S. at 503 (quoting *West Virginia*, 597 U.S. at 731). The Executive Branch may not resort to such a naked "legislative work-around." *NFIB v. OSHA*, 595 U.S. 109, 122–23 (2022) (Gorsuch, J., concurring).

## III.    Plaintiffs will suffer irreparable harm without an injunction.

"In First Amendment cases, the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis." *Pursuing America's Greatness*, 831 F.3d at 511 (citation omitted). That is because the "loss of First Amendment 'freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* at 511 (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009)) (cleaned up). Similarly, ongoing due process violations constitute irreparable injury. *Karem v. Trump*, 960 F.3d 656, 667 (D.C. Cir. 2020) ("As our court has explained, 'a prospective violation of a constitutional right constitutes irreparable injury for . . . purposes' of 'seeking equitable relief.'") (omission in original) (citation omitted).

The United States government has imposed a modern form of outlawry on an acclaimed human rights and Middle East scholar, UN independent expert, wife, and mother of a U.S. citizen

alongside the likes of narcotraffickers, Russian oligarchs, high-ranking Iranian military officials, and notorious autocrats. OFAC Sanctions List Service[25] ("OFAC . . . lists individuals . . . such as terrorists and narcotics traffickers"); SDN List[26]. The SDN designation broadly prohibits Francesca from directly or indirectly receiving or giving funds, goods, or services to others; it also prohibits others from giving or receiving funds, goods, or services to Francesca. *See* EO 14203. The sanctions have caused and continue to cause irreparable harm on the Cali family in at least four legally significant ways affecting their fundamental constitutional rights.

*First*, the designation has had a broad chilling effect on Plaintiffs' First Amendment rights. Institutions and persons around the globe react with extreme caution to SDN designations for fear of violations of the sanctions and for fear of secondary sanctions on themselves, impacting not only the sanctioned individual but even broader communities. *See, e.g.*, Alice Speri, *Maine university pulls support from conference on Palestine, citing Trump sanctions*, The Guardian (Feb. 25, 2026) (University of Southern Maine revoked access to on-campus venue for conference with 300 registered participants due to planned remote appearance by Francesca).[27] Francesca's work and professional relationships have been severely hampered and even severed. To give a few examples: Georgetown University cut off its decade-old affiliation with her and blocked her from her email address (which had become her primary email account); Columbia University suspended its externship program under Francesca's mandate; universities and institutions in the United States and abroad have cancelled her as a speaker; a travel agency cancelled her itinerary to speak at the European Parliament. Compl. ¶ 70. Francesca's ideological opponents have even leveraged her

---

[25] https://sanctionslist.ofac.treas.gov/Home/SdnList (last visited Feb. 23, 2026).

[26] https://www.treasury.gov/ofac/downloads/sdnlist.pdf (last visited Feb. 23, 2026).

[27] https://www.theguardian.com/us-news/2026/feb/25/university-southern-maine-palestine-conference-trump.

SDN designation to threaten U.S. booksellers with legal action if they distribute the English-language version of her recent book. *See Prominent Jewish civil rights group demands Amazon block payments tied to Francesca Albanese's anti-Israel book*, N.Y. Post (Jan. 1, 2026).[28] All of this has had a severe suppressive effect on Francesca's speech, and the marketplace of ideas in which she has a right to participate.

*Second,* Francesca's SDN designation imposes significant burdens on the constitutionally protected sanctum of the Cali family. Financial institutions — including also in Europe — now refuse to bank with or even provide basic financial services to Francesca, effectively debanking her and making it nearly impossible to meet the needs of her daily life. Compl. ¶ 68. Max's employer-sponsored health insurer (Aetna International) has refused to pay for Francesca's health expenses (which Francesca also cannot pay for out-of-pocket without cash), significantly complicating Francesca's ability to seek medical care. Compl. ¶ 71.  And the Cali family faces not only the threat of additional sanctions, but potential felony prosecution and civil penalties for simple, everyday exchanges like buying Francesca coffee, taking a family trip, or going for a family meal.

*Third*, L.C. suffers significant harms to her fundamental rights as a U.S. citizen. EO 14203 makes no exceptions for minors or the citizen children of an SDN. By virtue of her U.S. citizenship, L.C. is exposed to liability as a felon if she gives or receives anything of value to her mother. To be sure, Defendants issued a limited license (essentially, an exemption) that authorizes "U.S. Persons" to engage in transactions that are "ordinarily incident and necessary to [Francesca's] role

---

[28] https://nypost.com/2026/01/01/business/national-jewish-advocacy-center-demands-amazon-block-payments-tied-to-francesca-albaneses-anti-israel-book/.

as the parent and legal guardian" of L.C. License No. ICC-EO14203-2025-1408722-1, attached to Compl. (Dkt. 1) as Ex. D.

The license is only for "U.S. Persons," however, which is a term that does not include Francesca, meaning that anything she gives her daughter would constitute blocked property subject to the executive order. And the scope of what is "ordinarily incident and necessary" is anyone's guess. Giving her mother a Christmas gift, buying her mother's books, travelling with her mother to public events, or even asking anyone else to facilitate such interactions, all present opportunities for motivated federal prosecutors and regulators to apply further pressure to the mother-daughter relationship. In effect, EO 14203 has supplanted a 12-year-old U.S. citizen's relationship with her mother with a bureaucratic regime in which only government-approved "necessities" are allowed.

*Fourth*, the Cali family's property rights are severely impaired. That includes the family residence in the District of Columbia. And because Francesca and Max are also barred from entering the United States, they cannot supervise the upkeep of their real property. The entry bar also impairs Max's professional interests, insofar as he is barred from traveling to the headquarters of his employer, the World Bank, which imposes professional and financial costs on his career prospects. Compl. ¶ 71. And these travel restrictions prevent Francesca from traveling for work or collaborating with U.S.-based NGOs, academics, or professionals, which are key aspects of Francesca's role as Special Rapporteur.

In short, the sanctions, which are designed to harm Francesca and those she cares about the most, are working as intended. Francesca's assets are blocked, she is barred from the United States, she is debanked, her professional contacts and opportunities are cut off, her ideological opponents threaten her associates, her husband cannot even buy her a coffee, and her daughter runs life-altering legal risks if she invites her mother on a school trip. Their family home has been seized,

they are unable to return to the United States, Max's professional opportunities are diminished, and they have had their intimate relationships as spouse, parent, and child stripped of everyday normalcy. Such punitive measures are usually reserved for the worst enemies of the United States, not individuals with whose public voice the Government disagrees.

Under the Constitution, the government cannot unreasonably burden and disrupt familial bonds. Some courts ground this constitutional right in the First Amendment's right of association. *See, e.g.*, *Colindres v. U.S. Dep't of State*, 575 F. Supp. 3d 121, 138 (D.D.C. 2021) ("[T]he right 'encompass[ing] the personal relationships that attend the creation and sustenance of family' . . . some courts have grounded in the First Amendment.") (citation omitted) (second alteration in original), *aff'd*, 71 4th 1018 (D.C. Cir. 2023). In the D.C. Circuit, courts more often ground the right in substantive Due Process. *Jacinto-Castanon de Nolasco v. U.S. Immigr. & Customs Enf't*, 319 F. Supp. 3d 491, 499 (D.D.C. 2018). Regardless, "[t]he nominal source of th[e] right… does not alter [the] analysis." *Colindres*, 575 F. Supp. 3d at 138 (citation omitted) (alteration in original). Whatever the constitutional basis, "[s]ubstantial governmental burdens on family integrity are subject to strict scrutiny review, and they survive only if the burden is narrowly tailored to serve a compelling state interest." *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 500.

The concept of family integrity "encompasses a wide variety of choices and activities" that are incident to family life, including marriage, childbirth, etc., and "[a]mong the most important… is the freedom of a parent and child to maintain, cultivate, and mold their ongoing relationship." *Franz v. United States*, 707 F.2d 582, 594–95 (D.C. Cir. 1983), suppl. op., 712 F.2d 1428 (D.C. Cir. 1983). This "constitutional interest in the development of parental and filial bonds free from government interference has many avatars," which include the right of a parent to direct the child's education and upbringing and the fundamental "reciprocal rights of parent and child to one

another's 'companionship.'" *Id.* at 595. At its core, the Constitution prohibits the government from arbitrarily stripping a family of the most basic incidents of their relationships and normal human connection.

The burdens on the Cali family are substantial and constitute grave, cruel, and irreparable constitutional harms that warrant injunctive relief.

## IV.    The Balance of Equities and the Public Interest Favor Injunctive Relief

Given that the defendants are U.S. government officials being sued in their official capacities, the analyses of whether the requested injunction would injure the government or be in the public interest ordinarily "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing America's Greatness*, 831 F.3d at 511 ("[T]he [government's] harm and the public interest are one and the same, because the government's interest *is* the public interest."). Those factors — examined together — overwhelmingly support granting the relief sought.

The government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015). Put differently, "enforcement of an unconstitutional law is always contrary to the public interest." *Karem*, 960 F.3d at 668; *see also Pursuing America's Greatness*, 831 F.3d at 511 ("[T]here is always a strong public interest in the exercise of free speech rights otherwise abridged by an unconstitutional regulation").

The unconstitutionality of EO 14203 is dispositive as to these factors. And even if EO 14203 had constitutional applications when applied to activities directed at "protected persons," neither Francesca's speech, work, nor the interim relief sought, bears any rational relationship — let alone are narrowly tailored to serving — EO 14203's goals of insulating "protected persons" from ICC scrutiny. In short, granting interim relief will cause no harm to the government's legitimate interests.

Furthermore, the public has a strong and compelling interest in the government's compliance with the law. The President's use of sanctions against a UN official for carrying out their UN duties is unprecedented and implicates troubling violations of the United States' international obligations. The UN Charter, which the United States helped draft and the U.S. Senate ratified, specifically guarantees that UN officials "enjoy such privileges and immunities as are necessary for the independent exercise of their functions in connection with the Organization." Charter 105; *see also* Convention on the Privileges and Immunities of the U.N. § 18(a) (1946) (UN officials "shall be immune from legal process in respect of words spoken or written and all acts performed by them in their official capacity."). Defendants' sanctioning of Francesca handicaps her ability to "independently exercise [her] functions in connection with the [UN]" and effectively vitiates the privileges and immunities that the United States has previously guaranteed to her and all UN officials. "[T]here is a significant public interest in complying with international treaty obligations." *In re Any & all funds or other assets in Brown Bros. Harriman & Co. Acct. No. 8870792 in the name of Tiger Eye Invs. Ltd.*, Civ. A. No. 08–mc–0807, 2009 WL 613717, at *1 (D.D.C. Mar. 10, 2009), *aff'd*, 613 F.3d 1122 (D.C. Cir. 2010).

Special rapporteurs such as Francesca play a unique and critical role in the infrastructure of international human rights efforts. The system of "special procedures," the general term for the UNHRC special investigative mechanism of which Francesca is a part, dates to the early 1980s, and the Special Rapporteur on the situation of human rights in the Palestinian territory occupied since 1967 dates to 1993. Sidoti Decl. ¶ 11-12. This position was created by a 1993 resolution of

the UN Committee on Human Rights (predecessor to the UNHRC). [29] The mandate calls on the

Special Rapporteur:

> (A) To investigate Israel's violations of the principles and bases of international law, international humanitarian law and the Geneva Convention relative to the Protection of Civilian Persons in Time of War, of 12 August 1949, in the Palestinian territories occupied by Israel since 1967;

> (B) To receive communications, to hear witnesses, and to use such modalities of procedure as he may deem necessary for his mandate;

> (C) To report, with his conclusions and recommendations, to the Commission on Human Rights at its future sessions, until the end of the Israeli occupation of those territories.[30]

The position is a fundamental and invaluable device by which the United Nations and the

broader human rights ecosystem investigates and monitors realities on the ground in the Israeli-

Palestinian conflict from a perspective that is beholden to no national interests. Sidoti Decl. ¶¶ 14-

16, 19. Special rapporteurs investigate, report, and speak on issues as they see fit. For this reason,

former UN Secretary-General Kofi Annan has called the special procedures roles the "'crown

jewel' of the international human rights system." *Id*. ¶ 15. Francesca's inability to enter the United

States and report to the UN General Assembly, her shunning from academic and non-academic

fora in which human rights are discussed, and the general silencing the United States has sought

to impose on her investigative and reporting functions all diminish the effectiveness of one of the

most useful tools the United Nations — an organization the United States helped found — has to

investigate and ameliorate human rights abuses around the world.

What is more, the sanctions against Francesca have not only disrupted the exercise of her

specific role as special rapporteur. They have also threatened a broader chilling effect on the efforts

---

[29] U.N. Comm'n on Human Rights, Question of the violation of human rights in the occupied Arab territories, including Palestine, E/CN.4/RES/1993/2 (Feb. 19, 1993), https://www.refworld.org/legal/resolution/unchr/1993/en/10874.

[30] *Id*.

of other human rights officials and advocates. The message the sanctions against her sends is clear: investigative and reporting activities not aligned with the present policy priorities of the present government of the United States risks sanctions, unilateral punitive action, and the near total disruption of human rights officials' ability to carry out their duties. Sidoti Decl. ¶ 17.

These are not abstract or distant interests: the United States has a profound stake in a functioning, credible, and apolitical international human rights system, and the American people have a compelling interest in government conduct that strengthens, rather than sabotages, institutions designed to prevent atrocities, support democratic values, and uphold international law. That is the judgment of Congress, who ratified the UN Charter and New York Convention. EO 14203 frustrates this interest. It weakens global norms the United States helped build, diminishes the credibility of U.S. leadership on human rights, and deprives policymakers, civil society, and the public of key reporting on high-stakes issues.

## CONCLUSION

The Court should grant Plaintiffs' motion for a preliminary injunction and enjoin Defendants from enforcing civil or criminal penalties under EO 14203 and IEEPA.

Respectfully submitted,

Dated: February 25, 2026
Washington, D.C.

/s/ *Michel Paradis*
Michel Paradis (D.C. Bar No. 499690)
Jason Wright (D.C. Bar No. 1029983)
Patrick Fields (*PHV forthcoming*)
Scott Johnston (*PHV forthcoming*)
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
mparadis@steptoe.com
jwright@steptoe.com
pfields@steptoe.com

40

scjohnston@steptoe.com
Telephone: (212) 506-3900
Facsimile: (202) 429-3902

*Attorneys for Plaintiffs*