**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| L.C., a minor child, by and through her father MASSIMILIANO CALI, | ) ) CIVIL ACTION ) |
| MASSIMILIANO CALI, | ) ) No. 1:26-cv-00688 |
| *Plaintiffs*, | ) ) |
| *v.* | ) ) |
| | ) DATE: March 12, 2026 |
| DONALD J. TRUMP, *et al.*, | ) |
| *Defendants*. | ) ) ) ) ) |

**BRIEF OF LAWYERS FOR THE RULE OF LAW AS *AMICI CURIAE***
**IN SUPPORT OF PLAINTIFFS' COMPLAINT**
**AND**
**MOTION FOR PRELIMINARY JUDGMENT**

**LAWYERS FOR THE RULE OF LAW, INC.**

**By:**
**Nancy Hollander**
**Board Member- Lawyers for the Rule of Law, Inc.**
**Bar ID: TX0061**
**5 Columbus Circle Suite 1501**
**New York New York 10019**
**917-806-0700**
**nh@fbdlaw.com**

**Counsel for Amici Curiae**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

      CASES ............................................................................................................. ii

      CODES, RULES, AND REGULATIONS ...................................................... ii

INTEREST OF AMICI CURIAE.................................................................................... 1

FACTS ............................................................................................................................ 2

THE FIRST AMENDMENT ........................................................................................ 4

CERTIFICATE OF COMPLIANCE ......................................................................... 10

# TABLE OF AUTHORITIES

## CASES

*Texas v. Johnson,* 491 U.S. 397, 415 (1989) ........................................................................ 4

*W. Virginia State Bd. of Educ. v. Barnette,* 319 U.S. 624, 642 (1943)........................................... 4

*Garrison v. State of La.,* 379 U.S. 64, 74–75 (1964) ................................................................ 5

*Connick v. Myers,* 461 U.S. 138, 145 (1983)........................................................................ 6

*Reed v. Town of Gilbert, Ariz.,* 576 U.S. 155, 163 (2015)................................................... 6&7

*Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 U.S. 819, 829 (1995) ..................... 6,7&9

*Snyder v. Phelps,* 562 U.S. 443, 452 (2011) ........................................................................ 6

*Vidal v. Elster,* 602 U.S. 286, 293 (2024)........................................................................... 6

*New York Times Co. v. Sullivan,* 376 U.S. 254, 270 (1964) ...................................................... 6

*Ashcroft v. American Civil Liberties Union,* 535 U. S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002) ...................................................................................................... 7

*Ass'n of Univ. Professors v. Rubio* 802 F. Supp. 3d 120, 166 (D. Mass. 2025) ............................ 7

*National Institute of Family and Life Advocates v. Becerra,* 585 U. S. 755, 766, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018) .................................................................................. 7

*Hale v. Exec. Office of the President,* 784 F. Supp. 3d 127, 152-53 (D.D.C. 2025) ...................... 8

*Jenner & Block LLP v. U.S. Dep't of Just.,* 784 F. Supp. 3d 76, 99 ............................................ 8

*Perkins Coie LLP v. U.S. Dep't of Just.,* 783 F. Supp. 3d 105, 180................................................ 8

*NRA of Am. v. Vullo,* 602 U.S. 175, 187, 144 S. Ct. 1316, 218 L. Ed. 2d 642 (2024)……………9

## CODES, RULES, AND REGULATIONS

Timothy W. Ryback, The Atlantic, January 28, 2025. .............................................................. 1

International Criminal Court, 90 Fed. Reg. 9369 § 1 ................................................................ 2

Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. ......................... 2

116 Stat. 899 (codified at 22 U.S.C. §§ 7421, et seq.)............................................................ 3

The Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. § 3 (2025)................................. 3

Specially Designated National (SDN) under Section 1(a)(ii)(A) of EO 14203........................... 4

U.N. Charter – Article 1 .................................................................................................. 5

U.N. Charter – Article 4 .................................................................................................. 5

## INTEREST OF AMICI CURIAE

Amici curiae (Amici) is Lawyers for the Rule of Law, Inc., a nationwide not-for-profit corporation comprised of hundreds of lawyers including retired judges and former Assistant United States Attorneys who have an interest, individually and on behalf of the clients they are representing and will represent, in assuring that the rights guaranteed by our Constitution are supported by our government and our courts. The First Amendment issues raised in this case go to the heart of the constitutional rights that every person in the United States, including Francesca Albanese and her family, are entitled to enjoy. The motivation of Amici is the same as was announced by German Pastor Martin Neimöller in 1946 when he wrote:

> First they came for the socialists, and I did not speak out—
> because I was not a socialist.
>
> Then they came for the trade unionists, and I did not speak out—
> because I was not a trade unionist.
>
> Then they came for the Jews, and I did not speak out—because
> I was not a Jew.
>
> Then they came for me—and there was no one left to speak for
> me.

At the core of this quote – so oft repeated that it feels a truism – is the idea that one must speak out against what is wrong, not out of self-interest, but because doing so is integral to our shared humanity, our way of life, and, in this case, the rule of law We are at an

inflection point, eerily similar in so many obvious ways to that experienced by Germany in 1933.[1]

Amici are determined to speak up now, as often and forthrightly as we can to address the growing lawless, autocratic and unbridled attack on the foundation of our country. Almost daily we see our government flout the rule of law —judicial orders ignored, judges vilified and attacked

---

[1] Timothy W. Ryback, The Atlantic, January 28, 2025. This article's historical analysis is essential and chilling reading. https://tinyurl.com/yr5xz9wd (last referenced 3/10/2026)

1

by our own government, homes broken into by masked government agents without judicial warrants, individuals, including citizens and non-citizens, detained in what can only be called concentration camps, and deported to foreign lands with no semblance of due process, and citizens and non-citizens murdered by government agents with instant coverups publicized by our President and Attorney General before any credible investigation. And, in this case, executive orders are untethered from any grant of authority, and in direct contravention of the Constitution and its First Amendment guarantees.

We are nonetheless buoyed by those of our colleagues who, like us, will never look back and regret not speaking out and, by doing our part with the tools we have, slow the decline of our republic until the voters make their voice heard. Our intention in this submission is to map a path for this Court to use its substantial voice to protect the First Amendment, which we all hold dear, not just for ourselves, but in the spirit of Pastor Neimöller, for all those who cannot speak for themselves. Our interest is for this Court to boldly speak out, as it has done before, by saying, stop… no…enough…not on my watch.

## FACTS

Amici will not burden the record here by reciting all the facts which are fully set forth in Plaintiff's Complaint. (Dkt. Entry 1). Amici incorporates those facts by reference here, as if set forth in their entirety. The seminal issue in this matter is the issuance of EO 14203[2] which identifies the International Criminal Court (ICC) and its personnel as a threat to U.S. Security. Plaintiffs ably and accurately recount the history[3] of the ICC commencing with the United States' significant participation in the Rome Statute[4] and then, in 2000, President Clinton's signing onto the Rome Statute on behalf of the United States, although he never presented it to Congress for ratification.

---

[2] Imposing Sanctions on the International Criminal Court, 90 Fed. Reg. 9369 § 1 (Feb. 6, 2025) (EO 14203), attached to Compl. (Dkt. Entry 1) as Ex. A
[3] *See*, Plaintiff's Motion for a Preliminary Injunction pp 23-27.
[4] Rome Statute of the International Criminal Court, July 17, 1998, 2187 U.N.T.S. 90, 37 I.L.M. 999 (entered into force July 1, 2002).

2

In 2002, the George W. Bush administration formally notified the United Nations that the United States did not intend to ratify the Rome Statute. Although colloquially termed "unsigning," this action legally removed the U.S. obligation to refrain from acts that would defeat the treaty's purpose.[5]

Thereafter, in 2002, Congress passed and the President signed into law the American Servicemembers' Protection Act (ASPA),[6] an act designed to protect U.S. service members and government personnel from prosecution in the ICC. The ASPA also supported the role of the ICC in investigating and prosecuting malign conduct. The ASPA called on the ICC to investigate and prosecute Saddam Hussein, Slobodan Milosevic, Osama bin Laden, other members of Al Qaeda, leaders of Islamic Jihad, and "other foreign nationals accused of genocide, war crimes or crimes against humanity." *Id.* As we move through this history, query whether Francesca Albanese calling for the ICC's investigation of "foreign nationals accused of genocide, war crimes or crimes against humanity" differed from what the ASPA, which is still the law, calls on the ICC to do.

In January 2025, Congress considered, but did not pass, a bill[7] that would have authorized the President to issue an executive order under the International Emergency Economic Powers Act (IEEPA) to "block and prohibit all transactions in all property and interests in property of any foreign person" who amongst other activities "has directly engaged in or otherwise aided any effort by the International Criminal Court to investigate, arrest, detain, or prosecute a protected person[.]" *See* note 7. This legislatively rejected grant of authority is still one the President *does not have the right to* enjoy.

Stymied by Congress, six months later, on July 9, 2025, came the Executive's patented end-run around Congress when, through Secretary of State Marco Rubio, the Government

---

[5] The Coalition for the International Criminal Court answers key questions, https://tinyurl.com/4jy52udx (last referenced 3/10/2026)

[6] 116 Stat. 899 (codified at 22 U.S.C. §§ 7421, et seq.). https://tinyurl.com/ms8djw54 (last referenced 3/10/2026)

[7] The Illegitimate Court Counteraction Act, H.R. 23, 119th Cong. § 3 (2025). https://tinyurl.com/3u6maasy (last referenced 3/10/2026)

designated Ms. Albanese as a Specially Designated National (SDN) under Section 1(a)(ii)(A) of EO 14203, which sanctions foreign persons as "determined by the Secretary of State . . . *to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a protected person."* Rubio Press Statement, attached to Compl. (Dkt. Entry 1) as Ex. B. (emphasis added. The Executive's express exercise of a power Congress had considered and rejected constitutes yet one more baldfaced end-run[8] around the separation of powers in an obvious effort to corral, in one man, the entire power of government. What stands in the way? Only those who dare to speak. Brave citizens and non-citizens, lawyers and judges and voters.

## THE FIRST AMENDMENT

The First Amendment embodies "one of our society's defining principles" that if "'there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion[.]'" *Texas v. Johnson*, 491 U.S. 397, 415 (1989) (quoting *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Ms. Albanese's statements and writings are central to the public debate concerning events that have divided our nation and the world and are the exact kind of viewpoint speech that our Constitution protects. A simple review of the communications identified in Plaintiffs' Motion for Preliminary Injunction[9] reveal the considered thoughts and writings of a highly educated and respected woman who was sought after and hired by the United Nations that is dedicated:

---

[8] The list of executive overreach and unlawful concentration of power in this Administration is long. For example the Administration is replacing career United States Attorneys with unvetted political appointees, coercing law firms to provide millions of dollars worth of "pro-bono" services to the Administration's favored causes and to forgo some of their legal representations in favor of the Administration's favored clients and issues, authorizing illegal entries into homes to make arrests without judicial warrants, threatening the federalization of national guard to patrol polling places in order to intimidate voters, promoting gerrymandering explicitly in order to effect election results, requiring asylum applicants to attend pointless court dates in order to deny them any due process, terminating their applications, and immediately deporting them, promoting regulations which strip State Bar Associations from even considering ethics complaints against government lawyers, the list goes on and on. These are the same tools used in Germany in 1933 to dissolve the Republic. *See, supra* note 1.

[9] Plaintiffs' Motion for a Preliminary Injunction (Dkt. Entry 3-1) pp 22-26.

4

1. To maintain international peace and security, and to that end: to take effective collective measures for the prevention and removal of threats to the peace, and for the suppression of acts of aggression or other breaches of the peace, and to bring about by peaceful means, and in conformity with the principles of justice and international law, adjustment or settlement of international disputes or situations which might lead to a breach of the peace;
2. To develop friendly relations among nations based on respect for the principle of equal rights and self-determination of peoples, and to take other appropriate measures to strengthen universal peace;
3. To achieve international co-operation in solving international problems of an economic, social, cultural, or humanitarian character, and in promoting and encouraging respect for human rights and for fundamental freedoms for all without distinction as to race, sex, language, or religion; and
4. To be a centre for harmonizing the actions of nations in the attainment of these common ends.[10]

Whether Ms. Albanese's perspective, for which she was targeted and punished without any due process, is "right" within the context of the current national and international context is irrelevant. Rather, her speech constitutes just the type of competing perspective that is the beating heart of our constitutional system. *See Garrison v. State of La.*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").

Having reviewed her particular statements and writings (*See supra*, note 9), the Court can observe that what Ms. Albanese has called for in her writings and interviews is wholly consistent with the mission and values of the United Nations, a mission that the United States has agreed to uphold.[11] Her speech, while representative of political debate that is divided and sometimes divisive, has *never* amounted to a threat to the security of the United States nor to anyone in the United States. In particular, her communications that the ICC is the proper forum for the resolution

---

[10] U.N. Charter – Article 1 https://www.un.org/en/about-us/un-charter/chapter-1. (last referenced on 3/10/2026)
[11] The United States is, of course, a member of the United Nations, as such it has agreed to be bound by the U.N. Charter, *See*, Article 4 of the U.N. Charter, https://tinyurl.com/5d8dde9p (last referenced on 3/10/2026)

for disputes between Israel and the Palestinians is itself consistent with the mission of the United

Nations which is:

> [T]o take effective collective measures for the prevention and removal of threats to the peace, and for the suppression of acts of aggression or other breaches of the peace, and to bring about by peaceful means, and *in conformity with the principles of justice and international law.* (emphasis added).

*See, supra* note 10. Far from threatening the security of the United States, Ms. Albanese's

perspective represents our collective and "profound national commitment to the principle that

debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S.

443, 452 (2011) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)); *see also*

*Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the highest rung

of the hierarchy of First Amendment values, and is entitled to special protection.") (internal

quotation marks omitted).

Our courts have consistently and stridently held that the First Amendment is, in the words

of Justice Robert H. Jackson, "the fixed star in our constitutional constellation" *Barnette*, 319 U.S.

at 642. In ruling after ruling, courts have held that the freedom to voice and write one's opinions

should never be abridged.[12] First Amendment infringements premised on content-based

communications "—those that target speech based on its communicative content—are

presumptively unconstitutional[.]" *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Those

that discriminate against viewpoint expressions, such as have been applied to Ms. Albanese's

viewpoints, are more harshly dismissed as "a particularly egregious form of content

discrimination." *Vidal v. Elster*, 602 U.S. 286, 293 (2024) (quoting *Rosenberger v. Rector and*

*Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) (internal quotation marks omitted). In *Vidal*, the

Court explained the principle by stating:

---

[12] The National Constitution Center in Philadelphia maintains a compendium of Supreme Court cases that underscore the centrality of the First Amendment to our basic freedoms. https://tinyurl.com/43rhtuwt (last referenced on 3/10/2026)
*And see*, Justia, Supreme Court, Free Speech cases. https://tinyurl.com/yz28fwk9 (last referenced on 3/10/2026)

> In general, we have held that the First Amendment prohibits the Government from restricting or burdening "expression because of its message, its ideas, its subject matter, or its content." Ashcroft v. American Civil Liberties Union, 535 U. S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002) (internal quotation marks omitted). "When enforcing this prohibition, our precedents distinguish between content-based and content-neutral regulations of speech." National Institute of Family and Life Advocates v. Becerra, 585 U. S. 755, 766, 138 S. Ct. 2361, 201 L. Ed. 2d 835 (2018). A content-based regulation "target[s][*293] speech based on its communicative content," restricting discussion of a subject matter or topic. Reed v. Town of Gilbert, 576 U. S. 155, 163, 135 S. Ct. 2218, 192 L. Ed. 2d 236 (2015). "As a general matter," a content-based regulation is "'presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests.'" National Institute of Family and Life Advocates, 585 U. S., at 766, 138 S. Ct. 2361, 201 L. Ed. 2d 835. Our precedents distinguish further a particularly "egregious form of content discrimination"—viewpoint discrimination. Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819, 829, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995). A viewpoint-based regulation targets not merely a subject matter, [****12]"but particular views taken by speakers on a subject." Ibid. *It is also generally subject to heightened scrutiny, though viewpoint discrimination's "violation of the First Amendment is . . . more blatant."* Ibid. […] our precedents dictate that these distinctions inform our assessment under the First Amendment. we start with them[…]." (emphasis added).

The use of retributive sanctions to quash viewpoint speech with which the President disagrees is anathema not only to the foundational principles of the First Amendment, as articulated by our Supreme Court, but also to our free society and undermines the foundation of our democracy.

The Executive's "disdain" for certain speech, rather than justifying censorship or punishment, reflects only a deep misunderstanding of our constitutional system. As stated by the court in *Am. Ass'n of Univ. Professors v. Rubio* 802 F. Supp. 3d 120, 166 (D. Mass. 2025) (footnote omitted):

> Everything above in this section is necessary background to frame the problem this President has with the First Amendment. Where things run off the rails for him is his fixation with "retribution." "I am your retribution," he thundered famously while on the campaign trail. Yet government retribution for speech (precisely what has happened here) is directly forbidden by the First Amendment. The President's palpable

7

misunderstanding that the government simply cannot seek retribution for speech he disdains poses a great threat to Americans' freedom of speech. It is at this juncture that the judiciary has robustly rebuffed the President and his administration.

Far from justification, the disdain and personal disagreement that underpins the President's executive orders render them all the more egregious.

And in *Jenner & Block LLP v. U.S. Dep't of Just.*, 784 F. Supp. 3d 76, 99 (D.D.C. May 23, 2025), a First Amendment case related to sanctions levied against a law firm, the court held:

> [T]he order targets Jenner not merely for the fact of its speech but for the specific views it expresses thereby. […]. The order thus engages in the 'egregious form of content discrimination' known as 'viewpoint discrimination,' making its inconsistency with the First Amendment 'all the more blatant.' (citations omitted) […] [T]he order targets Jenner not merely for the fact of its speech but for the specific views it expresses thereby […] The order thus engages in the 'egregious form of content discrimination' known as 'viewpoint discrimination,' making its inconsistency with the First Amendment 'all the more blatant.'.") (citations omitted);

Again in *Perkins Coie LLP v. U.S. Dep't of Just.*, 783 F. Supp. 3d 105, 180 (D.D.C. 2025), the Court correctly held that:

> The U.S. Constitution affords critical protections against Executive action like that ordered in EO 14230. Government officials, including the President, may not "subject[] individuals to 'retaliatory actions' after the fact for having engaged in protected speech." *Hous. Cmty. Coll. Sys.*, 595 U.S. at 474 (quoting Nieves, 587 U.S. at 398). They may neither "use the power of the State to punish or suppress disfavored expression," *Vullo*, 602 U.S. at 188, nor engage in the use of "purely personal and arbitrary power," *Yick Wo*, 118 U.S. at 370. In this case, these and other foundational protections were violated by EO 14230. On that basis, this Court has found that EO 14230 violates the Constitution and is thus null and void. For the reasons explained, plaintiff is entitled to summary judgment and declaratory and permanent injunctive relief on Counts II through IX of the Amended Complaint.

Indeed, this Court is intimately familiar with this President's play book. In *Hale v. Exec. Office of the President*, 784 F. Supp. 3d 127, 152-53 (D.D.C. 2025), this Court held:

> At the heart of the First Amendment's Free Speech Clause is the recognition that viewpoint discrimination is uniquely harmful to a

free and democratic society." *NRA of Am. v. Vullo*, 602 U.S. 175, 187, 144 S. Ct. 1316, 218 L. Ed. 2d 642 (2024); *see also Rosenberger v. Rector of Univ. of Va.*, 515 U.S. 819, 828, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995) ("It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."). As such, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rational for the restriction." *Rosenberger*, 515 U.S. at 829. Such viewpoint discrimination is "an egregious" violation of the First Amendment.

On January 12, 2026, Senator Mark Kelly, CAPT, USN (Ret.) filed a Complaint for Declaratory and Injunctive Relief against Secretary of Defense Pete Hegseth. The case challenged Secretary Hegseth's censure of Senator Kelly and his potential attempt to demote him based on the release of a video informing service members of their obligation *not* to follow illegal orders. This Court issued a preliminary injunction[13] in favor of Senator Kelly, and sharply rebuked Secretary Hegseth's censure as a violation of Kelly's First Amendment rights holding that:

> [T]his Court has all it needs to conclude that Defendants have trampled on Senator Kelly's First Amendment freedoms and threatened the constitutional liberties of millions of military retirees. After all, as Bob Dylan famously said, "You don't need a weatherman to know which way the wind blows." [Citation omitted]. To say the least, our retired veterans deserve more respect from their Government, and our Constitution demands they receive it!"

In conclusion, this Court held:

> [R]ather than trying to shrink the First Amendment liberties […] Defendants might reflect[…] and be grateful for the wisdom and expertise that retired servicemembers have brought to public discussions and debate on military matters in our Nation over the past 250 years. If so, they will more fully appreciate why the Founding Fathers made free speech the first Amendment in the Bill of Rights! Hopefully this injunction will in some small way help bring about a course correction in the Defense Department's approach to these issues.

*See*, note 13.  This Court got it right in *Hale* and *Kelly*. The facts and law in this matter permit no different finding here. Amici know and, we trust, this Court will remember Bob Dylan's lyrics.

---

[13] February 12, 2026 Memorandum Order, https://tinyurl.com/z6arkxfb (last referenced 3/10/2026)

For all the foregoing reasons, Amici respectfully request this Court grant Plaintiffs' Motion for a

Preliminary Injunction.


                                        Respectfully Submitted:


Dated: March 12, 2026
       New York, NY

                                        /s/ Nancy Hollander

                                        Nancy Hollander
                                        Bar ID: TX0061)
                                        5 Columbus Circle Suite 1501
                                        New York New York 10019
                                        917-806-0700
                                        nh@fbdlaw.com

                        **CERTIFICATE OF COMPLIANCE**

       Pursuant to LCvR 7(o), I hereby certify that this brief conforms to the requirements

of LCvR 5.4.

                                         */s/ Nancy Hollander*
                                        Nancy Hollander