## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| L.C., a minor child, by and through her father MASSIMILIANO CALI, <br><br> MASSIMILIANO CALI, <br><br>      *Plaintiffs*, <br><br> v. <br><br> Donald J. TRUMP, *et al*. <br><br>      *Defendants*. | No. 1:26-cv-00688 (RJL) |

---

### BRIEF OF *AMICI CURIAE* INTERNATIONAL HUMAN RIGHTS LAW SCHOLARS AND TEACHERS IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

---

Richard R. Renner
DC Bar #987624
**The Noble Law**
700 Spring Forest Road, Suite 205
Raleigh, NC 27609
(919) 736-6381

Lawrence S. Lustberg (*pro hac vice* pending)
Michael R. Noveck (*pro hac vice* pending)
John J. Gibbons Fellowship in Public Interest
and Constitutional Law
**FBT Gibbons LLP**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500

*Counsel for* Amici Curiae *Sandra L. Babcock, Susan M. Akram, Asli U. Bali, Thomas Becker, and James Cavallaro*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................................... ii

STATEMENT OF INTEREST OF *AMICI CURIAE* .................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 3

ARGUMENT ..................................................................................................................... 6

I.    *AMICI* WORK WITH UNSRs LIKE FRANCESCA ALBANESE TO
      MONITOR, PROTECT, AND ENFORCE HUMAN RIGHTS, AND TO TEACH
      FUTURE LEADERS HOW TO PARTICIPATE IN THE INTERNATIONAL
      SPHERE......................................................................................................................... 6

II.   EO 14203 AND THE SANCTIONS ON ALBANESE VIOLATE THE FIRST
      AMENDMENT AND IMPERMISSIBLY INTERFERE WITH *AMICI'S*
      ACADEMIC WORK. ................................................................................................ 10

      A.    The Sanctions on Albanese Constitute Retaliatory, Viewpoint-Based
            Discrimination, Implicating *Amici* Because of Their Work with UNSRs
            and Because They Hold Similar Viewpoints. ......................................... 10

      B.    EO 14203 is Unconstitutionally Overbroad and Vague, and It Chills
            *Amici's* Ability to Engage in Their Academic Work............................ 15

CONCLUSION.................................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AAUP v. Rubio*,
No. 25-1068 (D. Mass. Sep. 30, 2025) ................................................................23

*Aref v. Lynch*,
833 F.3d 242 (D.C. Cir. 2016) .............................................................................11

*Baggett v. Bullitt*,
377 U.S. 360 (1964) .............................................................................................19

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ...............................................................................................19

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) .............................................................................................15

*CAIR Foundation, Inc., v. DeSantis*,
No. 25-cv-516 (N.D. Fla. Mar. 4, 2026) ..............................................................23

*Dombrowski v. Pfister*,
380 U.S. 479 (1965) .............................................................................................19

*FCC v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012) .............................................................................................19

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) .............................................................................................19

*Hartman v. Moore*,
547 U.S. 250 (2006) .............................................................................................11

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) ...........................................................................................11, 20

*Houston v. Hill*,
482 U.S. 451 (1987) .............................................................................................15

*Janus v. AFSCME, Council 31*,
585 U.S. 878 (2018) .............................................................................................10

*Johnson v. United States*,
576 U.S. 591 (2015) .............................................................................................19

*Keyishian v. Bd. of Regents,*
    385 U.S. 589 (1967) ..................................................................................6, 16, 20

*Matal v. Tam,*
    582 U.S. 218 (2017) ...........................................................................................13

*Members of City Council of Los Angeles v. Taxpayers for Vincent,*
    466 U.S. 789 ......................................................................................................15

*Nat'l Int. of Family & Life Advocates v. Becerra,*
    585 U.S. 755 (2018) ...........................................................................................11

*Open Society Justice Initiative v. Trump,*
    510 F. Supp. 3d 198 (S.D.N.Y. 2021) ..........................................................14, 21

*Perry v. Sindermann,*
    408 U.S. 593 (1972) ...........................................................................................10

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ...........................................................................................13

*Reno v. ACLU,*
    521 U.S. 844 (1997) .....................................................................................18, 19

*Rona v. Trump,*
    797 F. Supp. 3d 278 (S.D.N.Y. 2025) ................................................... *passim*

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
    515 U.S. 819 (1995) ...........................................................................................12

*Sessions v. Dimaya,*
    584 U.S. 148 (2018) ...........................................................................................19

*Smith v. Trump,*
    791 F. Supp. 3d 90 (D. Me. 2025) .....................................................................14

*Snyder v. Phelps,*
    562 U.S. 443 (2011) .....................................................................................10, 11

*Speiser v. Randall,*
    357 U.S. 513 (1958) ...........................................................................................19

*Sweezy v. New Hampshire,*
    354 U.S. 234 (1957) ...........................................................................................16

*United States v. Davis,*
    588 U.S. 445 (2019) .....................................................................................19, 22

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000).................................................................................13

*United States v. Stevens*,
    559 U.S. 460 (2010).................................................................................21

*Virginia v. Black*,
    538 U.S. 343 (2003).................................................................................15

*Virginia v. Hicks*,
    539 U.S. 113 (2003).................................................................................15

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943).................................................................................13

*Wieman v. Updegraff*,
    344 U.S. 183 (1952).................................................................................16

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the Pres.*,
    784 F. Supp. 3d 127 (D.D.C. 2025).........................................................21

**Statutes**

50 U.S.C. §§ 1601–1651...................................................................................3

50 U.S.C. § 1702(b)(3)...................................................................................18

International Emergency Economic Powers Act, Pub. L. No. 95-223, 91 Stat.
    1625 (1977) (codified as amended at 50 U.S.C. § 1701 et seq.)..................3, 18, 23

National Emergencies Act of 1976, Pub. L. No. 94-412, 90 Stat. 1255 (1976)............................3

**Regulations**

90 Fed. Reg. 9369 § 1 (Feb. 6, 2025)..........................................................5, 18

EO 13928...........................................................................................13, 20, 21

EO 14203.................................................................................................3, 22

EO 14203 § 3(a).........................................................................................3, 15

Exec. Order No. 14203, 90 Fed. Reg. 9369 (Feb. 6, 2025)...................................*passim*

**Other Authorities**

Amnesty International, *Israel/OPT: Netanyahu, Gallant and Al-Masri must face justice at the ICC for charges of war crimes and crimes against humanity* (Nov. 21, 2024), https://www.amnesty.org/en/latest/news/2024/11/israel-opt-netanyahu-gallant-and-al-masri-must-face-justice-at-the-icc-for-charges-of-war-crimes-and-crimes-against-humanity/ ................................................................................4

Deena R. Hurwitz, *Lawyering for Justice and the Inevitability of International Human Rights Clinics*, 28 Yale J. Int'l L. 505 (2003) ..............................................9

Human Rights, *Manual of Operations of the Special Procedures of the Human Rights Council* 7 (2008), https://www.ohchr.org/sites/default/files/Documents/HRBodies/SP/Manual_Operations2008.pdf..............................................................................................................7, 8

*ICC Sanctions Scope, Effectiveness, and Tradeoffs*, Just Security (June 15, 2020), https://www.justsecurity.org/70779/dissecting-theexecutive-order-on-intl-criminal-court-sanctions-scope-effectiveness-and-tradeoffs ....................................14

Int'l Crim. Ct., *Rome Statute* (May 2024), https://www.icc-cpi.int/sites/default/files/2024-05/Rome-Statute-eng.pdf/........................................7

International Human Rights Clinic, Cornell Law School and International Human Rights Clinic, Boston University School of Law, *Apartheid in Israel: An Analysis of Israel's Law and Policies and the Responsibilities of U.S. Academic and Other Institutions,* University Network for Human Rights (May 15, 2025),  https://www.humanrightsnetwork.org/publications/apartheid-in-israel-gaza-west-bank-universities ..............................................................................17

Jocelyn Getgen Kestenbaum, Esteban Hoyos-Ceballos, and Melissa C. del Aguila Talvadkar, *Catalysts for Change: A Proposed Framework for Human Rights Clinical Teaching and Advocacy*, 18 Clinical L. Rev. 459 (2012)..........................................9

Marco Rubio, Sec'y of State, U.S. Dep't of State, *Sanctioning Lawfare that Targets U.S. and Israeli Persons* (Jul. 9, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/07/sanctioning-lawfare-that-targets-u-s-and-israeli-persons.....................4

*Netanyahu and Gallant,* Just Security (Mar. 6, 2025) https://www.justsecurity.org/105064/arrest-warrants-state-reactions-icc/ ...............5

OHCHR, *'ICC arrest warrants can help save lives, must be respected and complied with': UN experts* (Nov. 26, 2024), https://www.ohchr.org/en/press-releases/2024/11/icc-arrest-warrants-can-help-save-lives-must-be-respected-and-complied-un#:~:text=GENEVA%20%E2%80%93%20UN%20human%20rights%27%20experts,crimes%20and%20crimes%20against%20humanity;..................................4

Palestine, *Amici* ............................................................................................................17

*Palestine: ICC Warrants Revive Hope for Long-Delayed Justice* (Nov. 21, 2024),
   https://www.hrw.org/news/2024/11/21/palestine-icc-warrants-revive-hope-
   long-delayed-justice; ...........................................................................................4

Rosa Freedman, *The United Nations Human Rights Council: A Critique and Early
   Assessment* 105-07 (Routledge, 2013) ................................................................6

Special Procedures of the Human Rights Council,
   https://www.ohchr.org/en/special-procedures-human-rights-council ......................1

Tamar Ezer, Elizabeth Brundige, Aya Fujimura-Fanselow, and Ryan Thoreson,
   *Integrating Human Rights in Domestic Clinical Practice*, 30 Clinical L. Rev.
   345, 389 (2024) ...................................................................................................9

U.N. Office of the High Comm'r for Human Rights, *Facts and figures with regard
   to the special procedures in 2023*, U.N. Doc. A/HRC/55/69/Add.1, 49-50, 53,
   59-60 (Mar 21, 2024) ..........................................................................................8

## Constitutional Provisions

First Amendment ................................................................................. *passim*

## STATEMENT OF INTEREST OF *AMICI CURIAE*

*Amici Curiae* Sandra L. Babcock, Susan M. Akram, Asli U. Bali, Thomas Becker, and James Cavallaro respectfully submit this brief, and the accompanying Certification of Lawrence S. Lustberg ("Lustberg Cert."), in support of Plaintiffs' Motion for a Preliminary Injunction (ECF No. 3).[1]

*Amici Curiae* are law school professors, scholars, and lawyers whose teaching primarily involves work in international human rights law. *See* Lustberg Cert. ¶¶ 4–7. *Amici* are dedicated to educating law students about international law and global human rights. *Amici* thus teach classes that explore the doctrines that govern international law. Several *Amici* also help their students learn how to practice in the field through law school clinics focused on international human rights. *Id.* To that end, clinical faculty and their students engage in human rights monitoring, advocacy, litigation, and research. *Id.* ¶ 7. This work takes many forms: advocacy before United Nations experts and treaty bodies; litigation before regional and international tribunals; and the publication and dissemination of human rights reports and other scholarly research. *Id.*

Among others, *Amici* work with and advocate before United Nations Special Rapporteurs ("UNSRs"). *Id.* UNSRs are independent experts appointed by the United Nations' Human Rights Council. They are assigned to investigate, report, and advise on human rights within their area of assignment.[2] *Amici* and their students assist UNSRs by, among other things, (1) providing information about human rights violations within their area of expertise; (2) seeking the assistance

---

[1] This brief is timely filed under the schedule agreed upon in the parties' joint status report (ECF No. 10). All parties have consented to the filing of this brief. No party or party's counsel authored this brief in whole or in part, and no person or entity contributed money to fund the preparation or submission of this brief, other than *Amici* and their counsel.

[2] *See* Special Procedures of the Human Rights Council, https://www.ohchr.org/en/special-procedures-human-rights-council.

of UNSRs to communicate with governments responsible for violating human rights; (3) meeting with UNSRs regarding the interpretation of international human rights law; and (4) providing written input for the UNSRs' reports to the United Nations Human Rights Council.  *Id.*

*Amici*'s work and teaching depend on their ability to engage with experts, advocate for remedies for human rights violations, and facilitate open discussion on matters of public concern, including international conflicts.  *Id.*  Together with their students, *Amici* have documented human rights violations in dozens of countries around the world, including (in alphabetical order) Algeria, Argentina, Armenia, Australia, Azerbaijan, Bangladesh, Bolivia, Brazil, Burma, Cambodia, Chile, China, Colombia, the Dominican Republic, Ecuador, Egypt, El Salvador, Guatemala, Haiti, Honduras, India, Iraq, Israel, Jamaica, Jordan, Kenya, Lebanon, Liberia, Malawi, Mexico, Morocco, Nepal, Nigeria, Pakistan, Palestine, Paraguay, Qatar, South Africa, Syria, Tanzania, Tunisia, Turkey, Uganda, Ukraine, the United Arab Emirates, the United States, Venezuela, and Western Sahara.

Of particular relevance to this case, *Amici* have engaged in research and advocacy—including the issuance of reports and communications with United Nations ("U.N.") treaty bodies and experts—about violations of Palestinians' human rights by the State of Israel.  *Id.* ¶¶ 9–11. That work has involved communication and collaboration with Francesca Albanese, the UNSR for the situation of human rights in the Palestinian Territory occupied since 1967 ("Special Rapporteur Albanese" or "Albanese").

Executive Order 14203 ("EO 14203" or "the Order")—the legality of which is challenged in this case—and the sanctions imposed upon Albanese as a "specially designated national" ("SDN") under that order directly implicate *Amici*'s speech and their core academic work.  Those sanctions restrict *Amici*'s ability to meet and communicate with, or otherwise support, the work of

Albanese.  Further, the threat of sanctions under EO 14203 chills *Amici*'s own engagement in protected advocacy.  Indeed, *Amici* fear punishment similar to that imposed on Special Rapporteur Albanese if they continue to speak about and advocate for remedies for Israel's human rights violations.  And without being able to participate in such activity, *Amici* are constrained in their ability to educate the next generation of human rights lawyers.  Because their mission is grounded in academic freedom, information sharing, and the training of future advocates, *Amici* have a strong educational and professional interest in ensuring that EO 14203 and subsequent designations receive meaningful constitutional scrutiny and are invalidated where they infringe upon protected speech, as has happened here.

## INTRODUCTION AND SUMMARY OF ARGUMENT

On February 6, 2025, President Trump issued Executive Order 14203, "Imposing Sanctions on the International Criminal Court" ("EO 14203").  EO 14203 declared a national emergency under the National Emergencies Act of 1976 (NEA), Pub. L. No. 94-412, 90 Stat. 1255 (1976) (codified as amended at 50 U.S.C. §§ 1601–1651), and stated that the International Criminal Court ("ICC") poses "an unusual and extraordinary threat to the national security and foreign policy of the United States" under the International Emergency Economic Powers Act (IEEPA), Pub. L. No. 95-223, 91 Stat. 1625 (1977) (codified as amended at 50 U.S.C. § 1701 et seq.).  Exec. Order No. 14203, 90 Fed. Reg. 9369 (Feb. 6, 2025).  EO 14203 imposes sanctions against foreign persons who, as designed by the Secretary of State, "have directly engaged" or "have materially assisted, sponsored, or provided financial, material, or technological support for" "any effort by the ICC to investigate, arrest, detain, or prosecute a protected person without consent of that person's country of nationality."  *Id.* §§ 1(ii)(A)–(B).  EO 14203's sanctions prohibit, under penalty of substantial civil fines and criminal prosecution, "any contribution or provision of funds, goods, or services" to the designated persons.  *Id.* § 3(a).

3

On July 9, 2025, Secretary of State Marco Rubio invoked EO 14203 to impose sanctions on Ms. Albanese, the Special Rapporteur on the situation of human rights in the Palestinian Territory occupied since 1967.  Press Release, Marco Rubio, Sec'y of State, U.S. Dep't of State, *Sanctioning Lawfare that Targets U.S. and Israeli Persons* (Jul. 9, 2025) (*Rubio Designation of Sanctions*),    https://www.state.gov/releases/office-of-the-spokesperson/2025/07/sanctioning-lawfare-that-targets-u-s-and-israeli-persons.  Secretary Rubio applied Section 1(a)(ii)(A) of the Order because, he concluded, Special Rapporteur Albanese "has directly engaged with the International Criminal Court (ICC) in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel." *Id.*  Rubio identified two specific prohibited actions Albanese took: (1) "recommending that the ICC, without a legitimate basis, issue arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant";  and (2) "recommending the ICC pursue investigations and prosecutions of . . . companies and their executives," including American companies.  *Id.*

Special Rapporteur Albanese is not an employee of the ICC.  She therefore does not participate in the ICC's investigations or direct its activities.  Her advocacy regarding issues of concern to the ICC has no binding effect; indeed, the ICC is at liberty to ignore her recommendations.    Yet because of her two written recommendations—which parallel recommendations made by dozens of human rights experts and organizations[3]—Secretary Rubio

---

[3] Human Rights Watch, *Palestine: ICC Warrants Revive Hope for Long-Delayed Justice* (Nov. 21, 2024), https://www.hrw.org/news/2024/11/21/palestine-icc-warrants-revive-hope-long-delayed-justice; Amnesty International, *Israel/OPT: Netanyahu, Gallant and Al-Masri must face justice at the ICC for charges of war crimes and crimes against humanity* (Nov. 21, 2024), https://www.amnesty.org/en/latest/news/2024/11/israel-opt-netanyahu-gallant-and-al-masri-must-face-justice-at-the-icc-for-charges-of-war-crimes-and-crimes-against-humanity/;  OHCHR, *'ICC arrest warrants can help save lives, must be respected and complied with': UN experts* (Nov. 26, 2024), https://www.ohchr.org/en/press-releases/2024/11/icc-arrest-warrants-can-help-save-lives-must-be-respected-and-complied-

and President Trump have severely constrained her ability to function and engage in expressive activities with the American public and American institutions. Rubio's designation of Albanese therefore encroaches on her constitutionally protected speech. As well, the EO restricts the ability of *Amici* to engage in their own expressive activities of public importance, including their academic work and related human rights advocacy.

EO 14203 violates the First Amendment in several ways. *First*, it engages in viewpoint discrimination, retaliating against those who express particular political speech. Specifically, President Trump issued EO 14203 in opposition to the ICC's exercise of jurisdiction over particular matters about which the President disagrees with the ICC's position.[4] Special Rapporteur Albanese was then targeted for engaging in advocacy which, while consistent with her mandate, is contrary to the President's viewpoint. But the First Amendment specifically prohibits the government from imposing punishment for someone's political speech. And *Amici*, who conduct academic work and human rights advocacy in connection with UNSRs like Albanese, and who at times express similar political positions to those of Albanese's, are thus potential targets of the EO's viewpoint discrimination as well.

Second, the provisions of EO 14203 and related sanctions are unconstitutionally vague and overbroad, imposing severe consequences on individuals based upon unclear standards. This lack

---

un#:~:text=GENEVA%20%E2%80%93%20UN%20human%20rights%27%20experts,crimes%20and%20crimes%20against%20humanity; Rebecca Ingber, *Mapping State Reactions to the ICC Arrest Warrants for Netanyahu and Gallant,* Just Security (Mar. 6, 2025) https://www.justsecurity.org/105064/arrest-warrants-state-reactions-icc/.

[4] EO 14203, Imposing Sanctions on the International Criminal Court, 90 Fed. Reg. 9369 § 1 (Feb. 6, 2025) ("I, DONALD J. TRUMP, President of the United States of America, find that the International Criminal Court (ICC) . . . has engaged in illegitimate and baseless actions targeting America and our close ally Israel. The ICC has, without a legitimate basis . . . abused its power by issuing baseless arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and Former Minister of Defense Yoav Gallant.").

of clearly defined boundaries as to what speech is or is not prohibited by EO 14203 forces *Amici* to refrain from engaging in their constitutionally protected expression, including their academic work and related human rights advocacy.  This is of particular significance in the pedagogical environment in which *Amici* work, intruding upon their academic work and freedom, which has particular First Amendment importance.  *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967).

The First Amendment implications of EO 14203 merit a robust judicial inquiry.  Because EO 14203 (1) constitutes unlawful retaliatory viewpoint discrimination and (2) is vague, overbroad, and creates a severe unconstitutional chilling effect on protected speech, it cannot survive judicial scrutiny.

## ARGUMENT

I. ***AMICI* WORK WITH UNSRS LIKE FRANCESCA ALBANESE TO MONITOR, PROTECT, AND ENFORCE HUMAN RIGHTS, AND TO TEACH FUTURE LEADERS HOW TO PARTICIPATE IN THE INTERNATIONAL SPHERE.**

EO 14203's unconstitutionality, particularly as applied to Special Rapporteur Albanese, results in part from the role of the UNSRs with whom scholars and practitioners of international human rights law in U.S. law schools routinely work in order to monitor and promote the human rights of individuals and communities around the world.  Accordingly, *Amici* briefly describe the function of UNSRs in general and explain how *Amici*'s partnership with UNSRs both serves their pedagogical interests and facilitates students' participation in the international legal order.

Special Rapporteurs are part of the U.N. "Special Procedures," a system for the protection of human rights situated within the U.N. Human Rights Council.  UNSRs have a mandate to issue recommendations—not decisions—with respect to their fields, and states bear no legally binding obligation to comply with the findings of Special Rapporteurs.  Rosa Freedman, *The United Nations Human Rights Council: A Critique and Early Assessment* 105–07 (Routledge, 2013).  Special Rapporteurs are expressly required to be independent of both governments and the UN

Secretariat; a UNSR's status as an independent advocate is protected under the 1946 Convention on the Privileges and Immunities of the United Nations and reaffirmed in the Code of Conduct for Special Procedures Mandate-Holders adopted by the Human Rights Council in 2007. U.N. Human Rights Council Res. 5/2, arts. 3–4, U.N. Doc. A/HRC/RES/5/2 (June 18, 2007) ("Mandate-holders are independent United Nations experts. While discharging their mandate, they shall . . . (a) [a]ct in an independent capacity"); Manual of Operations of the Special Procedures of the Human Rights Council ¶¶ 10–13 (2008) ("The independent status of the mandate-holders is crucial in order to enable them to fulfill their functions in all impartiality").

UNSRs thus occupy a unique position within the international human rights system. They are not judicial actors or government representatives, but rather "independent" experts who interact with "a wide range of actors," including both governments and civilians. U.N. Office of the High Comm'r for Human Rights, *Manual of Operations of the Special Procedures of the Human Rights Council* 7 (2008) ("*UNSR Manual*"), https://www.ohchr.org/sites/default/files/Documents/HRBodies/SP/Manual_Operations2008.pdf. UNSRs do not have the authority of, for example, the International Criminal Court (ICC), which exercises binding jurisdiction over individuals accused of serious international crimes pursuant to the Rome Statute. *See generally* Int'l Crim. Ct., *Rome Statute* (May 2024), https://www.icc-cpi.int/sites/default/files/2024-05/Rome-Statute-eng.pdf/. UNSRs instead exercise their functions through their "expertise," "impartiality," and "personal integrity," rather than any particular legal judgment or authority. U.N. Human Rights Council Res. 5/1, ¶¶ 39; *see also UNSR Manual* at 5; 54, U.N. Doc. A/HRC/RES/5/1 (June 18, 2007).

Because Special Rapporteurs operate without a permanent investigative infrastructure or enforcement machinery, *see* U.N. Human Rights Council Res. 5/1, ¶¶ 39, they depend heavily on information they receive from other interested parties. *Amici* are among such interested parties.

They work with UNSRs, alongside other non-governmental actors, to build the evidentiary foundation for the UNSR's reports.  The independence of UNSRs gives their engagement with human rights clinics, scholars, and advocacy organizations a distinctive character: rather than receiving evidence to support a prosecution or other legal proceeding, UNSRs are building a public record, grounded in professional expertise and intended to influence state behavior through transparency, dialogue, and the mobilization of international opinion.  Indeed, the U.N. Office of the High Commissioner for Human Rights has itself recognized that participation of actors within civil society, including "academic institutions," is often integral to the credibility and reach of the Special Procedures system.  *UNSR Manual* at 31.  Accordingly, human rights clinics and academic practitioners significantly contribute to the Special Procedures system by bringing examples and patterns of human rights violations to the UNSRs' attention that would otherwise remain invisible to the international community.  *See* U.N. Office of the High Comm'r for Human Rights, *Facts and figures with regard to the special procedures in 2023*, U.N. Doc. A/HRC/55/69/Add.1, 49-50, 53, 59-60 (Mar 21, 2024).

*Amici*'s work with UNSRs also serves their pedagogical goals of teaching students how to effectively interact with the international human rights community.  Indeed, the flexibility and independence of the UNSRs provide opportunities for engagement without the procedural obstacles that sometimes limit legal appeals to international human rights tribunals. UNSRs are accessible and open to collaboration with law school clinics: unlike courts or treaty bodies, they do not impose strict time limits or licensing rules that prevent student participation.  In this way, UNSRs afford law students a unique opportunity to share their research findings with experts who may then incorporate them into their reports.  Law students also meet with UNSRs in Geneva, New York, or elsewhere to discuss various issues, such as the plight of imprisoned clinic clients;

the interpretation of treaties; or an appropriate legal response to urgent situations involving societies in armed conflict. *See* Lustberg Cert. ¶ 8.

This student involvement with the work of UNSRs is at the heart of experiential learning in a human rights clinic. *See, e.g.*, Tamar Ezer, Elizabeth Brundige, Aya Fujimura-Fanselow, and Ryan Thoreson, *Integrating Human Rights in Domestic Clinical Practice*, 30 Clinical L. Rev. 345, 389 (2024) (observing how the Cornell Gender Justice Clinic contributed to a report by the U.N. Special Rapporteur on violence against women and girls). Reciprocally, this type of student involvement significantly contributes to and supplements the advocacy of UNSRs. *See* Deena R. Hurwitz, *Lawyering for Justice and the Inevitability of International Human Rights Clinics*, 28 Yale J. Int'l L. 505 (2003) (noting that the then-U.N. Special Rapporteur on Violence Against Women, Radhika Coomaraswamy, asked the Lowenstein Clinic to compile a report on violence against women in the United States over the ten years of her tenure). And clinics then use UNSR research and reports to engage in further advocacy related to international human rights violations. *See, e.g.*, Jocelyn Getgen Kestenbaum, Esteban Hoyos-Ceballos, and Melissa C. del Aguila Talvadkar, *Catalysts for Change: A Proposed Framework for Human Rights Clinical Teaching and Advocacy*, 18 Clinical L. Rev. 459, 476 (2012) (explaining how the Cornell International Human Rights Clinic expanded on the research conducted by former Special Rapporteur on the Right to Education, Katarina Tomasevski, and contributed to the Colombian Constitutional Court's holding that, per constitutional and international human rights norms, primary public education must be free and obligatory throughout the country); Ezer et al., *supra*, 30 Clinical L. Rev. at 362–63 (highlighting how the Miami Human Rights Clinic filed an *amicus* brief in the Ninth Circuit explicating human rights violations in the impositions of fines and fees for life-

sustaining activities in collaboration with the National Homelessness Law Center and Leilani Farha, the former UNSR on the right to adequate housing and Global Director of The Shift).

In sum, UNSRs serve a special role in the international order by investigating and speaking about human rights abuses with a wide range of governmental and non-governmental actors. And *Amici* and their students leverage their ability to interact with UNSRs to learn advocacy skills, enhance their understanding of human rights law, and facilitate their own speech about these issues. As is explained more below, EO 14203 impermissibly interferes with this speech in violation of the First Amendment.

## II.    EO 14203 AND THE SANCTIONS ON ALBANESE VIOLATE THE FIRST AMENDMENT AND IMPERMISSIBLY INTERFERE WITH *AMICI'S* ACADEMIC WORK.

### A.    The Sanctions on Albanese Constitute Retaliatory, Viewpoint-Based Discrimination, Implicating *Amici* Because of Their Work with UNSRs and Because They Hold Similar Viewpoints.

The designation of Albanese under EO 14203 targets critical political speech that lies at the very core of First Amendment protection. Her work as UNSR implicates matters of profound public concern, an area occupying "the highest rung of the hierarchy of First Amendment values," meriting "special protection." *Janus v. AFSCME, Council 31,* 585 U.S. 878, 914 (2018) (quoting *Snyder v. Phelps*, 562 U.S. 443, 452 (2011)). The designation is, in substance, a penalty for speech, whereby the government invokes national security and foreign-affairs concerns to suppress expression it disfavors.

The constitutional prohibition on such retaliation for expressing one's viewpoint is well-settled. The government "may not deny a benefit to a person on a basis that infringes [that person's] constitutionally protected interests—especially, [the person's] interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). This principle extends to any punitive government action taken in reprisal for protected expression. *See Hartman v. Moore*, 547 U.S.

10

250, 256 (2006).  To make out a First Amendment retaliation claim, a plaintiff must show that: (i) she engaged in constitutionally protected expression; (ii) defendants responded with an adverse action sufficient to deter a person of ordinary firmness in the plaintiff's position from speaking again; and (iii) there is a causal connection between the plaintiff's protected speech and the retaliatory actions taken against her.  *Aref v. Lynch*, 833 F.3d 242, 258 (D.C. Cir. 2016).

The circumstances here easily meet these requirements.  First, Special Rapporteur Albanese engaged in protected speech by advocating for redress of human rights abuses in Gaza and the West Bank.  *See Snyder*, 562 U.S. at 453 ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public" (citation modified)).  Albanese is not a governmental actor; she has no employment relationship to the ICC, cannot direct any of its official action, and, as described above, acts independently in her capacity as a UNSR.  Thus, while EO 14203 is purportedly concerned with actions that "materially assist[]" the ICC, *id.* § 1(a)(ii)(B), targeting purely independent speech like Albanese's is nonetheless constitutionally impermissible. *See Nat'l Int. of Family & Life Advocates v. Becerra,* 585 U.S. 755, 771–774 (2018) (affirming Supreme Court's protection of speech of those who provide advice about international law, and recognizing that such speech is entitled to the ordinary protections of First Amendment principles); *cf. Holder v. Humanitarian Law Project*, 561 U.S. 1, 26 (2010) (rejecting constitutional challenge to material support statute that was "carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations").  Second, the sanctions imposed have had "severe" adverse consequences, as detailed in Plaintiffs' filings.  *See* Pls.' Brief ISO PI, 33–37 ("Francesca's assets are blocked, she

11

is barred from the United States, she is debanked, her professional contacts and opportunities are cut off, her ideological opponents threaten her associates, her husband cannot even buy her a coffee, and her daughter runs life-altering legal risks if she invites her mother on a school trip. Their family home has been seized, they are unable to return to the United States, Max's professional opportunities are diminished, and they have had their intimate relationships as spouse, parent, and child stripped of everyday normalcy."); *see also* Compl. ¶¶ 68–73.  And third, the retaliatory motive is hardly concealed.  EO 14203 was explicitly issued in response to the ICC's exercise of jurisdiction over purported war criminals whose actions the United States has supported.[5]  And Secretary Rubio's designation of Special Rapporteur Albanese specifically targeted her letter-writing and other advocacy with the ICC and others about Israel's conduct in Gaza and the West Bank.  *See Rubio Designation of Sanctions*, *supra* ("[s]he has recently escalated [her human rights advocacy] by writing . . . letters to dozens of entities worldwide").  Albanese has thus been targeted by President Trump and Secretary Rubio solely for the substance and viewpoint of her work, in violation of the First Amendment.

Accordingly, the sanctions imposed against Albanese under EO 14203 constitute unconstitutional viewpoint discrimination based on the content of the speech.  The First Amendment forbids sanctions such as these, which constitute "egregious form[s] of content discrimination."  *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Thus, the government "must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."  *Id.* at 829.  If the government fails to remain content-neutral, punishment of disfavored viewpoints, such as those of Albanese's, "can be turned against minority and dissenting views to the detriment of a free and

---

[5] EO 14203, *supra* n.4.

open society." *Matal v. Tam*, 582 U.S. 218, 243-44 (2017); *see also See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.").

Thus, under *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015), any regulation that "applies to particular speech because of the topic discussed or the idea or message expressed" is presumptively unconstitutional and must survive strict scrutiny, a burden the government cannot carry here. Under this form of strict scrutiny, the government must demonstrate that the regulation regime is "the least restrictive means" of achieving a compelling interest. *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Even assuming the government's asserted concerns—that, per EO 14203, those who assist the ICC are an unusual threat to national security—rise to the level of a compelling interest, the designation of Albanese under these sanctions cannot withstand scrutiny. Albanese's sole actions consisted of speech in the form of written recommendations consistent with her role as a UNSR. She did not—and could not— engage in any official conduct on behalf of the ICC. And even then, the sanctions against Albanese go far beyond her advocacy to the ICC. Instead, they block all of her financial transactions within the United States.

Other district courts have reached the same conclusion. In 2025, two law professors challenged EO 14203 and its application to their interactions with Karim Khan, the Prosecutor of the ICC, on First Amendment grounds. *Rona v. Trump*, 797 F. Supp. 3d 278 (S.D.N.Y. 2025). Judge Furman explained that another judge in the Southern District of New York had previously held that a similar executive order from President Trump's first term, EO 13928, was unconstitutional under the First Amendment. *Id.* at 283–84 (discussing *Open Society Justice*

13

*Initiative v. Trump*, 510 F. Supp. 3d 198 (S.D.N.Y. 2021)).  Analyzing EO 14203, Judge Furman determined that it "regulates speech based on its content" because "whether Plaintiffs may engage in such speech depends on what they say."  *Id.* at 288–89 (citation modified).  Applying strict scrutiny, Judge Furman concluded that EO 14203 "unnecessarily circumscribes Plaintiffs' protected expression," so it "violates the First Amendment."  *Id.* at 292 (citation modified).[6]

*Amici* have a vested interest in preventing the imposition of draconian sanctions for constitutionally protected speech.  As part of their pedagogy and human rights advocacy, *Amici* frequently collaborate with the work of Albanese and other UNSRs like her by providing them information relevant to their mandates, supporting their interpretation of international law, or engaging in other joint work such as filing *amicus* briefs and organizing conferences.  Moreover, *Amici* have, and continue to, espouse the very viewpoints that Albanese has been punished for: speech about violations of Palestinians' human rights by Israel.  *See* Lustberg Cert. ¶¶ 4–7. *Amici* now feel the threat of the U.S. governmental machinery upon them, and fear a similar "civil death"[7] as has been imposed on Special Rapporteur Albanese.  Accordingly, *Amici* respectfully request that the Court hold that the sanctions against Albanese constitute unlawful viewpoint discrimination so that *Amici* can continue to advocate on similar issues as Albanese knowing that the courts will protect them against any governmental reprisal.

---

[6] In the District of Maine, Judge Torrensen applied a lower standard of intermediate scrutiny, but nonetheless also held that EO 14203 likely violated the First Amendment because it "appears to burden substantially more speech than necessary."  *Smith v. Trump*, 791 F. Supp. 3d 90, 98 (D. Me. 2025).

[7] *See* Adam M. Smith, *Dissecting the Executive Order on ICC Sanctions Scope, Effectiveness, and Tradeoffs*, Just Security (June 15, 2020), https://www.justsecurity.org/70779/dissecting-theexecutive-order-on-intl-criminal-court-sanctions-scope-effectiveness-and-tradeoffs.

**B.     EO 14203 is Unconstitutionally Overbroad and Vague, and It Chills *Amici's* Ability to Engage in Their Academic Work.**

As described above, the specific sanctions imposed against Special Rapporteur Albanese under EO 14203 constitute unconstitutional, retaliatory viewpoint discrimination.  But more generally, EO 14203 is also unconstitutionally overbroad and vague on its face.

A facial overbreadth challenge requires a court to determine whether the law reaches "a substantial amount of constitutionally protected speech." *Houston v. Hill*, 482 U.S. 451, 466 (1987).  Specifically, a law may be "invalidated on its face," *Virginia v. Black,* 538 U.S. 343, 375 (2003) (quoting *Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 800) (1984)), where it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (citation modified) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)).  EO 14203 fails this standard.

Here, EO 14203 provides that once a person is designated by the Secretary of State, others cannot engage in any activity "for the benefit of" that person.  EO 14203 § 3(a).  So conceived, it places strict limits on the ability of *Amici* to provide services that benefit Special Rapporteur Albanese—and other UNSRs or human rights experts like her who might be designated in the future.  The restrictions appear to encompass the provision of human rights reports, recommendations, telephonic or in-person meetings, and informal consultations regarding human rights violations in Israel and Palestine, which may benefit Albanese or other designated persons.

Notably, EO 14203 is targeted against the ICC.  But *Amici* do not seek to engage with the ICC.  Rather, they seek to collaborate with Albanese in her capacity as a U.N. Special Rapporteur, engage with her and her staff regarding their research, and include her work within the marketplace of ideas of the academic institution.  *See* Lustberg Cert. ¶¶ 9–13.  Nonetheless, the sanctions' reach

extends far enough to prohibit even these quintessentially academic, advocacy, and speech functions. Specifically, EO 14203, as the sanctions imposed on Albanese show, has a ripple effect on human rights scholars and clinical professors such as *Amici* who wish to advocate for the rights of Palestinian victims of human rights violations. Such advocacy includes: (1) the submission of human rights reports to Albanese that fall within her U.N. mandate as a Special Rapporteur; (2) the provision of information to Albanese that informs her legal assessment of Israel's human rights obligations; (3) advocacy around the enforcement of human rights treaties and international humanitarian law, including recommendations for criminal prosecutions of Israeli officials for the commission of war crimes; and (4) dissemination and promotion of Albanese's scholarship and reports to students and the general public.

As described above, these activities are essential to *Amici*'s academic freedom and pedagogical efforts to educate their students. Such activities enjoy special First Amendment protection. *See, e.g.*, *Wieman v. Updegraff*, 344 U.S. 183, 190-91 (1952) (invalidating associational restrictions on academic professionals, recognizing that such measures "inhibit individual freedom" and limit the exchange of ideas in "which all teachers ought especially to cultivate and practice"). The Supreme Court has identified academic freedom as "a special concern of the First Amendment." *Keyishian v. Bd. of Regents*, 385 U.S. 589, 603 (1967). That concern traces to *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957), where the Court held that "[t]eachers and students must always remain free to inquire, to study and to evaluate" without government interference—freedoms essential to "the well-being of the Nation." *Id.* at 250. For *Amici*, engaging with Special Rapporteur Albanese's work is a vital component of effective human rights teaching and advocacy. As human rights clinical and doctrinal professors, they routinely teach students how to interact with U.N. actors as a means of enhancing the protection of

individuals and communities subject to human rights abuses. Specifically, they teach law students about the role of the UNSRs in documenting and reporting on human rights violations, and encourage their students to interact with the UNSRs in the course of their clinical work. *See* Lustberg Cert. ¶¶ 4–8. But apparently, when it comes to their work documenting human rights violations in Palestine, *Amici* must forgo these lessons.

For example, on May 15, 2025, *Amici* Sandra Babcock, Thomas Becker, Susan Akram, and James Cavallaro, on behalf of their respective law clinics and non-governmental organizations, jointly published a human rights report entitled "Apartheid in Israel: An Analysis of Israel's Laws and Policies and the Responsibilities of U.S. Academic and Other Institutions." International Human Rights Clinic, Cornell Law School and International Human Rights Clinic, Boston University School of Law, *Apartheid in Israel: An Analysis of Israel's Law and Policies and the Responsibilities of U.S. Academic and Other Institutions,* University Network for Human Rights (May 15, 2025), https://www.humanrightsnetwork.org/publications/apartheid-in-israel-gaza-west-bank-universities. This report contained numerous recommendations directed to institutional actors including university administrators, the U.S. Government, the Government of Israel, and the U.N. and human rights bodies. *Id.* at 89-91. The authors recommended, *inter alia*, that U.N. actors should "[c]ontinue to document and *investigate* Israel's violations of international human rights and humanitarian law." *Id.* at 91 (emphasis added). In the months following the publication of the report, *Amici* sent the report to a number of international human rights experts and scholars. In August 2025, Babcock considered sending the report to Special Rapporteur Albanese given its relevance to her mandate, but was advised that doing so could violate EO 14203. *See* Lustberg Cert. ¶ 10. *Amici's* professional engagements involving faculty and students have also been impacted. For example, *Amicus* Susan Akram was scheduled to speak at a conference at the

17

University of Southern Maine on February 28, 2026.  Because one of the invited speakers was Albanese, who was only participating virtually, the University of Southern Maine decided at the last minute it would not hold the conference on campus.  This last minute change made it very difficult for *Amicus* Akram and other students and faculty from the university to attend.  *See* Lustberg Cert. ¶11.

Moreover, EO 14203 prescribes draconian punishments based on wholly vague language: it imposes sanctions on foreign persons who are deemed to have "directly engaged" or "materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of," or were "owned or controlled by, or . . . have acted or purported to act for on behalf of, directly or indirectly" the ICC's efforts to "investigate, arrest, detain or prosecute a protected person without consent of that person's country of nationality."  EO 14203 § 1. When a person is sanctioned under EO 14203, others are prohibited from "making any contribution or provision of funds, goods, or services . . . for the benefit of" the person.  Faculty and students now question whether they may engage with Albanese's published work at all— whether assigning her reports or books to students, discussing her findings in seminars, citing her analysis in scholarship, or building on her research—without violating EO 14203.  *See* Lustberg Cert. ¶¶ 9–11.[8]  The First Amendment does not tolerate such ambiguity.  "Vague laws force potential speakers to 'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."  *Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (quoting

---

[8] IEEPA, upon which EO 14203 relies, contains an exception for "informational materials."  50 U.S.C. § 1702(b)(3).  But the EO does not explicitly incorporate that IEEPA exception, so *Amici* cannot infer that it applies here.  Indeed, in *Rona*, the Government posited that IEEPA's exception did not apply to speech transmitted to a sanctioned person, but instead was limited to "informational materials that are widely circulated in a standardized format."  *Rona*, 797 F. Supp. 3d at 290.  Judge Furman therefore held that IEEPA's informational materials exception did not prevent EO 14203 from "regulat[ing] protected speech based on content."  *Id.*

*Baggett v. Bullitt*, 377 U.S. 360, 372 (1964)).  The absence of clear boundaries is itself a First Amendment injury, because it "delegates basic policy matters…for resolution on an ad hoc and subjective basis."  *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972).   More fundamentally, due process requires "fair notice of the conduct [the law] punishes," *United States v. Davis*, 588 U.S. 445, 480 (2019) (quoting *Johnson v. United States*, 576 U.S. 591, 596 (2015).  The void-for-vagueness doctrine thus prevents "arbitrary or discriminatory law enforcement by insisting that a state provide standards to govern the actions of" government agents.  *Sessions v. Dimaya*, 584 U.S. 148, 156 (2018).  And particularly "in the First Amendment context," as in this case, the "need for precision" is at its apex.  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253–54 (2012); *see also Reno*, 521 U.S at 870–71 (1997).  By creating an imprecise landscape for compliance, EO 14203 fails these requirements.  Thus, *Amici* and others lack clarity about what speech is prohibited and face enormous consequences if they cross the unclear line into illegality.

The statute's vague and overbroad scope is only amplified by the severe punishments that attach to it.  Indeed, the penalties authorized by EO 14203—asset freezes, transactional prohibitions, and potential criminal liability—are among the most powerful tools in the Government's toolbox.  When the potential consequences for violations are so significant, it causes rational actors to "steer far wider of the unlawful zone" in fear of potential ramification.  *Speiser v. Randall*, 357 U.S. 513, 526 (1958).  But the Supreme Court has consistently held that government actions producing such chilling effects are constitutionally impermissible, even when the government operates through informal mechanisms rather than direct censorship.  *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).  As the Court recognized in *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965), "[t]he threat of sanctions may deter . . . almost as potently as the actual

application of sanctions," and the "chilling effect upon the exercise of First Amendment rights" created by severe penalties demands judicial intervention.

Here, the sanctions' severity has dissuaded faculty and students from engaging in expressive activities constituting the crux of their academic work. *See* Lustberg Cert. ¶¶ 10–13. In order to protect their students and themselves, they must refrain from engaging with Albanese lest they be arrested or fined. And the sanctions imposed on Albanese, combined with the vagueness and the overbreadth of EO 12403, have made it difficult for faculty to determine whether they can require students to even read her reports without violating EO 14203. This is precisely the "pall of orthodoxy over the classroom" that the First Amendment was designed to prevent. *Keyishian*, 385 U.S. at 603.

Controlling precedent forecloses such sweeping restrictions on protected expression. Even where the government possesses a compelling interest in restricting material support to designated entities of national security concern, the Constitution requires "a specific intent to further [the entity's] unlawful activity" and protects independent advocacy categorically. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 29–30 (2010). The *Holder* Court took pains to distinguish coordinated support from independent speech, a distinction the EO obliterates. Here, *Amici*'s implicated speech aims to provide independent and academic perspectives on issues directly related to Special Rapporteur Albanese's work, including international legal definitions of genocide, apartheid, war crimes, and human rights protections.

Indeed, in the cases cited above, courts have specifically held EO 14203 (and its predecessor from the first Trump Administration, EO 13928) unconstitutional on First Amendment grounds precisely because of its breadth. In *Rona*, the district court determined that the EO's "broad scope" encompassed actions that were "indisputably speech," including interactions

between the law professors and Karim Khan that closely parallel *Amici*'s interactions with Albanese. *Id.* at 289 (finding that liaising with witnesses and victims of international crimes to support ongoing investigations, submitting *amicus curiae* briefs, and communicating with the SDN with respect to internships and jobs were activities that fell within the scope of EO 14203); *see also Open Society Justice Initiative*, 510 F. Supp. 3d at 210 (noting various speech activities covered by the prior EO 13928). During that litigation, the government conceded that under EO 14203, a person who transmitted an *amicus* brief "drafted at the specific request of and in coordination with" an SDN could be subject to sanctions. *See id.* at 290. That EO 14203 has been found to extend to the preparation and filing of litigation documents—paradigmatic First Amendment activity—exposes the extent of its reach. *See Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Office of the Pres.*, 784 F. Supp. 3d 127, 156 (D.D.C. 2025) ("Filing and pursuing lawsuits are forms of protected petitioning." (citing cases)). The *Rona* Court's conclusions also illustrate the risks to *Amici* should they test the limits of EO 14203 by sharing information with Albanese regarding the substance of her mandate.

Finally, to whatever extent Defendants intend to argue that they will not apply EO 14203's provisions to protected activity, that argument also fails to satisfy the overbreadth doctrine. In *United States v. Stevens*, 559 U.S. 460 (2010), the Government promised that it would exercise "prosecutorial discretion" and "apply [the statute] far more restrictively than its language." *Id.* at 480. The Court rejected the argument that these assurances saved the statute. To the contrary, the Court held that the Government's position was "an implicit acknowledgment of the potential constitutional problems with a more natural reading" of the statute's terms. *Id.* Thus, even any

21

governmental "professions of good will" are not enough for EO 14203 to survive constitutional scrutiny. *Rona*, 797 F. Supp. 3d at 289.[9]

Here, the sanctions imposed by EO 14203 silence academic inquiry into and activity regarding disfavored subjects through the threat of devastating financial and criminal penalties. The restriction on *Amici*'s association with the ideas and information produced by Special Rapporteur Albanese stifles the continued marketplace of ideas so critical to the academic setting. Those restrictions are the direct result of the Executive Orders vague and overbroad terms. The Court should therefore invalidate EO 14203 as violative of the First Amendment's prohibition on overbroad and vague regulation of protected speech.

## CONCLUSION

As scholars, teachers, and human rights lawyers committed to rigorous legal inquiry, open debate, and the pedagogical development of our students, *Amici* are deeply troubled by EO 14203 and the resulting designation against Special Rapporteur Albanese. By targeting controversial political speech on matters of public concern, including litigation, academic engagement, and advocacy related to governmental policy, the sanctions operate as retaliatory and viewpoint-discriminatory measures that strike at the heart of the First Amendment. EO 14203 is substantially overbroad, posing a real threat to protected expression—including academic activity—and sweeping far beyond any permissible scope. Consequently, EO 14203 produces severe and

---

[9] Indeed, the Supreme Court has declined to adopt a "fairly possible" reading of a statute to save it from being held unconstitutionally vague. *United States v. Davis*, 588 U.S. 445, 463 (2019). Specifically, the Supreme Court rejected the Government's invitation to construe the scope of a statute in such a way that would lead the statute to properly reach certain conduct, solely to prevent it from being held unconstitutional by the Court. *See id.* at 464 ("[A] court may not . . . construe a criminal statute to penalize conduct it does not clearly proscribe."). Accordingly, neither governmental professions of good will nor judicial construction may cure the unconstitutionality of a statute's vague provisions.

objectively measurable chilling effects: its unclear boundaries foster objectively reasonable self-censorship, its punitive sanctions amplify deterrence, and its consequences substantially hinder academic freedom and the marketplace of ideas within the university context.  Indeed, other courts have already concluded, in the context of similar Executive Orders, that "Secretaries Noem and Rubio are engaged in a mode of enforcement . . . solely on the basis of political speech, and with the intent of chilling such speech and that of others similarly situated."  *AAUP v. Rubio*, No. 25-1068, at *123 (D. Mass. Sep. 30, 2025).  Recognizing the "troubling trend of using an executive office to make a political statement at the expense of others' constitutional rights," courts are accordingly rejecting attempts to "choose[] political posturing over the First Amendment."  *CAIR Foundation, Inc., v. DeSantis*, No. 25-cv-516, at *1–2 (N.D. Fla. Mar. 4, 2026).  *Amici* respectfully urge the Court to do the same here, by granting Plaintiffs' Motion for a Preliminary Injunction and enjoining Defendants from enforcing civil or criminal penalties under EO 14203 and IEEPA.


Dated: March 13, 2026                       Respectfully submitted,

                                            s/ Richard R. Renner
                                            Richard R. Renner
                                            DC Bar # 987624
                                            **The Noble Law**
                                            700 Spring Forest Road, Suite 205
                                            Raleigh, NC 27609
                                            (919) 736-6381
                                            rrenner@thenoblelaw.com

                                            Lawrence S. Lustberg (*pro hac vice* pending)
                                            Michael R. Noveck (*pro hac vice* pending)
                                            **FBT Gibbons LLP**
                                            One Gateway Center
                                            Newark, NJ  07102
                                            (973) 596-4500
                                            llustberg@fbtgibbons.com
                                            mnoveck@fbtgibbons.com