**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| L.C., a minor child, by and through her father MASSIMILIANO CALI,<br><br>MASSIMILIANO CALI,<br><br>        *Plaintiffs*,<br><br>       v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States, et al.*<br><br>       *Defendants.* | Civil Action No. 1:26-cv-00688-RJL |

**DEFENDANTS' OPPOSITION TO
MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION ..............................................................................................................................1

BACKGROUND................................................................................................................................2

I.      The International Emergency Economic Powers Act.......................................................2

II.     Executive Order No. 14203 ..............................................................................................4

III.    The United States' Objections to ICC Jurisdiction ........................................................6

IV.    Threats to the United States and Its Ally Israel from the ICC .......................................7

V.     The Designation of Francesca Albanese Under E.O. 14203 ..........................................7

VI.    This Lawsuit.....................................................................................................................12

ARGUMENT ..................................................................................................................................12

I.      Plaintiffs' Months-long Delay in Seeking Preliminary Relief Eviscerates Their Claim of Irreparable Harm. .......................................................................................................13

II.     Plaintiffs Lack Standing. .................................................................................................15

III.    Even Apart from Their Unjustifiable Delay, Plaintiffs Have Not Shown Irreparable Harm. ...............................................................................................................................22

IV.    Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim....................24

        A.      Albanese's Expression as a Noncitizen Living Outside the United States is Not Protected by the First Amendment.....................................................................25

        B.      The E.O. and Designation Satisfy Strict Scrutiny..........................................29

        C.      E.O. 14203 is Content-Neutral and Satisfies Intermediate Scrutiny............31

V.     Plaintiffs Are Not Likely to Succeed on the Merits of Their IEEPA Statutory Claims.........35

        A.      E.O. 14203 Falls Within the President's Authority Under 50 U.S.C. § 1701. .............35

        B.      Plaintiffs Are Not Likely to Succeed on Their Berman Amendment Theory.............38

VI.    The Balance of the Equities and the Public Interest Do Not Favor a Preliminary Injunction........................................................................................................................41

VII.   If Granting Relief, the Court Should Limit It Appropriately. .......................................44

CONCLUSION ...............................................................................................................................45

**INTRODUCTION**

Plaintiffs ask the Court to halt the Executive Branch's implementation of economic sanctions against Francesca Albanese, a foreign national whom the U.S. Secretary of State determined has "directly engaged with the International Criminal Court ("ICC") in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries" in her official position with the United Nations. But Plaintiffs' motion fails at the threshold. First, Plaintiffs (Albanese's husband and daughter) waited far too long to sue. The President issued the challenged order, Executive Order ("E.O.") 14203, in February 2025. Albanese was designated pursuant to the E.O. in July 2025. Yet Plaintiffs did not seek preliminary relief until late February 2026—nearly *eight months* after the designation and *one full year* after the E.O. was signed. That delay belies their claims of irreparable harm and is fundamentally inconsistent with any notion that preliminary relief could be necessary now.

The unusual circumstances presented here also defeat Plaintiffs' claim to Article III standing. This case is fundamentally about the alleged rights of a nonparty to this case: Albanese. All of Plaintiffs' alleged harms flow downstream from hers. And they provide practically no evidence to support those harms. Even if Plaintiffs had standing in their own right, they would not have standing to assert Albanese's rights, because she has chosen not to assert them herself. And Albanese herself is a foreign national who lives abroad, has not lived in the United States for more than ten years, and, on this record, engaged in all relevant expression abroad. Thus, even if Plaintiffs had standing to assert Albanese's alleged speech-based rights, their First Amendment challenge to the E.O. and the designation of Albanese would fail. "[F]oreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020).

None of Plaintiffs' other merits arguments are likely to succeed, and the public interest and balance of equities support the government. The Court should deny the motion.

## BACKGROUND

**I.      The International Emergency Economic Powers Act**

The International Emergency Economic Powers Act ("IEEPA") forms the core of the United States' economic sanctions regime and grants the President expansive authority to regulate international economic transactions in response to foreign threats. *See* 50 U.S.C. §§ 1701-1702. It grants the President broad discretion to determine when an "unusual and extraordinary threat" originating outside the United States warrants the declaration of a national emergency and the exercise of IEEPA's economic authorities. *See* 50 U.S.C. § 1701. Determinations regarding how best to address threats to the Nation's foreign policy and national security are matters traditionally committed to the political branches.

For much of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), which was enacted in 1917. *See* Pub. L. No. 65-91, ch. 106, 40 Stat. 411 (codified as amended at 50 U.S.C. § 4301–41). As amended in 1933, TWEA granted the President broad authority to "investigate, regulate . . . prevent or prohibit . . . transactions" during times of war or declared national emergencies. *See* 50 U.S.C. § 4305(b)(1)(B); *see also Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981). In 1977, Congress amended TWEA and enacted IEEPA, 50 U.S.C. §§ 1701-1707, to delineate "the President's authority to regulate international economic transactions during wars or national emergencies." *See* S. Rep. No. 95-466, at 2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541. Congress later limited TWEA's application largely to periods of declared war while enacting IEEPA as the principal authority governing emergency economic powers during peacetime crises. *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984). Under IEEPA, the President may declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States[.]" *See* 50 U.S.C. § 1701(a). Like TWEA, IEEPA authorizes the President to:

investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . .

50 U.S.C. § 1702(a)(1)(B).

IEEPA provides several exemptions to the President's authority, including that the President may not:

regulate or prohibit, directly or indirectly . . . the importation from any country, or the exportation to any country, whether commercial or otherwise, regardless of format or medium of transmission, of any information or informational materials including but not limited to, publications, films, posters, phonograph records, photographs, microfilms, microfiche, tapes, compact disks, CD ROMs, artworks, and news wire feeds.

50 U.S.C. § 1702(b)(3). Commonly known as the "Berman Amendment," Congress added this exclusion to IEEPA in 1988 and expanded it in 1994 to cover additional forms of media. *See United States v. Amirnazmi*, 645 F.3d 564, 584-86 (3d Cir. 2011). Relevant implementing regulations acknowledge and incorporate the Berman Amendment. *See* 31 C.F.R. § 528.205(a).

Presidents have invoked IEEPA to block the property of designated persons under a variety of sanctions programs responding to declared national emergencies. *See, e.g.*, E.O. 13382, 70 Fed. Reg. 38,567 (June 28, 2005) (blocking the property and interests in property of persons determined to have materially contributed to the proliferation of weapons of mass destruction); E.O. 13219, 66 Fed. Reg. 34,777 (June 26, 2001) (blocking the property and interests in property of designated persons). In general, persons who are designated under an IEEPA-based sanctions program are added to the List of Specially Designated Nationals and Blocked Persons (the "SDN List"), which is administered by the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC"). Persons placed on the SDN List generally have their property and interests in property within U.S. jurisdiction "blocked" (i.e., frozen), and U.S. persons are generally prohibited from engaging in transactions with

3

them absent authorization from OFAC or an applicable exemption. *See* 50 U.S.C. § 1702(a)(1)(B); *id.* § 1705(b)-(c) (providing civil and criminal penalties for violations). Such sanctions programs are designed to influence foreign conduct by restricting financial and other transactions with designated persons, thereby restricting and deterring activities that threaten the national security or foreign policy interests of the United States.

## II.        Executive Order No. 14203

On February 6, 2025, President Trump issued Executive Order No. 14203 ("E.O. 14203" or the "Order"), 90 Fed. Reg. 9369 (Feb. 6, 2025), by finding that "any effort by the ICC to investigate, arrest, detain, or prosecute protected persons . . . constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States" and declaring a national emergency to address that threat. E.O. 14203, pmbl., 90 Fed. Reg. at 9370. "[P]rotected person" is a defined term that includes (but is not limited to) "any United States person, unless the United States provides formal consent to ICC jurisdiction over that person or becomes a state party to the Rome Statute," *id.* § 8(d)(i), and "any foreign person that is a citizen or lawful resident of an ally of the United States that has not consented to ICC jurisdiction over that person or is not a state party to the Rome Statute," *id.* § 8(d)(ii). Consistent with IEEPA, E.O. 14203 authorizes the blocking of property and interests in property of, among others, foreign persons directly engaging in or supporting such ICC efforts. *See* E.O. 14203 §§ 1, 4, 90 Fed. Reg. at 9370–71. The Order states that the ICC has "engaged in illegitimate and baseless actions targeting America and our close ally Israel" by asserting jurisdiction over and opening investigations concerning personnel of the United States and certain of its allies and issuing arrest warrants targeting Israeli government officials. *Id.* pmbl., 90 Fed. Reg. at 9369. E.O. 14203 specifically references recent ICC actions involving Israeli leadership—including arrest warrants issued against Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant—as

4

examples of the ICC's asserted jurisdiction over personnel of states that are not parties to the Rome Statute. *Id.*

E.O. 14203 lists the ICC Prosecutor, Karim Khan, in the Annex and authorizes the designation of additional foreign persons who meet certain criteria. *See* E.O. 14203, § 1(a)(i)–(ii), 90 Fed. Reg. at 9370. Section 1 blocks the property of the person listed in the Annex and of any foreign person determined by the U.S. Secretary of State, in consultation with the U.S. Secretary of the Treasury and the U.S. Attorney General, (i) to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute a "protected person," as defined in the Order, without the consent of that person's country of nationality; (ii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any such activity or any person blocked pursuant to the Order; or (iii) to be owned or controlled by, or to have acted on behalf of, a person blocked pursuant to the Order. *See* E.O. 14203 § 1(a)(i)–(ii), 90 Fed. Reg. at 9370.

E.O. 14203 provides that "[a]ll property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person" of persons blocked under the Order "may not be transferred, paid, exported, withdrawn, or otherwise dealt in." *Id.* § 1(a), 90 Fed. Reg. at 9370. Section 3 of E.O. 14203 further provides that this prohibition includes the making "of any contribution or provision of funds, goods, or services by, to, or for the benefit of any" person blocked pursuant to the Order, as well as the receipt of such funds, goods, or services from such a person. *Id.* § 3(a), (b), 90 Fed. Reg. at 9370. Absent an applicable exemption or authorization, U.S. persons may not provide funds, goods, or services to, or for the benefit of, a designated or otherwise blocked person.

E.O. 14203 authorizes the U.S. Secretary of the Treasury, in consultation with the U.S. Secretary of State, to take such actions as may be necessary to implement the Order. E.O. 14203

5

further authorizes the U.S. Secretary of the Treasury to redelegate such functions within the U.S. Department of the Treasury. *See* E.O. 14203 § 10, 90 Fed. Reg. at 9372.

### III.        The United States' Objections to ICC Jurisdiction

The Order is part of a series of actions by the United States reflecting concern that the ICC may assert jurisdiction over United States personnel and those of allied nations without their consent, thereby implicating U.S. national security and foreign policy interests, including related to U.S. sovereignty. *See*, *e.g.*, E.O. 14203, pmbl., 90 Fed. Reg. at 9369–70; 22 U.S.C. § 7421; *see generally* Jennifer Elsea, Cong. Rsch. Serv., RL31437, *International Criminal Court: Overview and Selected Legal Issues* (2002); Jennifer K. Elsea, Cong. Rsch. Serv., RL31495, *U.S. Policy Regarding the International Criminal Court*, at 4-6 (2006). In 2020, for example, the executive branch invoked IEEPA to address concerns regarding the ICC's asserted jurisdiction over U.S. personnel. *See* E.O. 13928, 85 Fed. Reg. 36,139 (June 11, 2020).[1]

Earlier executive action likewise determined that ICC investigations into U.S. military, intelligence, and other personnel could subject current and former U.S. government and allied officials to "harassment, abuse, and possible arrest" and thereby undermine U.S. sovereignty and threaten national security and foreign policy interests. E.O. 13928, pmbl., 85 Fed. Reg. at 36139. These concerns centered on the potential for the ICC to exercise jurisdiction over nationals of states that have not consented to the ICC's authority. The United States is not a party to the Rome Statute—the treaty establishing the ICC—and has consistently declined to accept the ICC's jurisdiction over U.S. nationals. *See Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 119 n.16 (2d Cir. 2010) (describing the United States' decision to "un-sign" the Rome Statute), *aff'd*, 569 U.S. 108 (2013). In May 2002, the United States formally notified the United Nations that it "does not intend to become a party" to the

---

[1] Subsequent history omitted.

Rome Statute and therefore considers itself to have "no legal obligations arising from its signature" of the treaty. Letter from John R. Bolton, Under Sec'y of State for Arms Control & Int'l Sec., to Kofi Annan, U.N. Sec'y-Gen. (May 6, 2002). That same year, Congress enacted the American Service-Members' Protection Act ("ASPA"), Pub. L. No. 107-206, tit. II, 116 Stat. 820, 899 (2002) (codified at 22 U.S.C. §§ 7421–33), which restricts several forms of cooperation between the United States and the ICC. Congress enacted ASPA in part because of concerns that the Rome Statute could expose U.S. military personnel and other officials to prosecution before an international tribunal exercising jurisdiction without the consent of the United States. *See* 22 U.S.C. § 7421(9).

## IV.    Threats to the United States and Its Ally Israel from the ICC

Since October 7, 2023, the United States has developed significant new concerns with recent ICC lawfare actions targeting the State of Israel—an important ally and partner of the United States that also has not consented to the ICC's jurisdiction. On October 7, Hamas launched a truly genocidal rampage of murder, rape, and kidnapping against Israeli citizens. This war was launched by Hamas, Hezbollah, the Islamic Republic of Iran, and other regional actors to kill Israeli civilians and destroy the Jewish State. Hamas fought this war embedded in hundreds of miles of tunnels underneath and in "civilian" buildings and institutions throughout Gaza. Yet the ICC chose to target Israel for defending itself. Grossly and illegitimately abusing its power, the ICC has issued arrest warrants for Israel's Prime Minister and former Defense Minister without Israel's consent—a direct affront to that country's sovereignty. E.O. 14203 addresses these abuses as well as the ICC Prosecutor's failure to close the investigation of U.S. personnel in Afghanistan.

## V.    The Designation of Francesca Albanese Under E.O. 14203

**1.** Plaintiffs' lawsuit relies on the designation of Francesca Albanese ("Albanese") pursuant to E.O. 14203, though she is not a party to this lawsuit. According to Plaintiffs' complaint, Albanese and her husband, Plaintiff Massimiliano Cali, are Italian citizens. ECF No. 1, Compl. ¶ 17. From 2012 to

7

2015, they lived in the United States, but they did not become U.S. citizens. *Id.* ¶¶ 18–20. Albanese and Cali moved to Jakarta in 2015, and they have not lived in the United States since then. *Id.* ¶ 20; *see* Mem. of P. & A. in Supp. of Pls.' Mot. for a Prelim. Inj. ("PI Br.") at 9, ECF No. 3-1. They moved to Tunisia in 2021. Compl. ¶ 20. Albanese and Cali have a child, Plaintiff L.C., who was born in the United States but left the country with her parents in 2015. PI Br. at 9.

**2.** Since April 2022, Albanese was the U.N. Human Rights Council's "Special Rapporteur on the situation of human rights in the Palestinian territory occupied since 1967." PI Br. at 7. However, she was not a United Nations employee. *See* United Nations, "Special Procedures of the Human Rights Council," Off. of the High Comm'r for Hum Rts, United Nations, "Special Procedures of the Human Rights Council" (last visited Mar. 18, 2026), https://www.ohchr.org/en/special-procedures-human-rights-council/special-procedures-human-rights-council (explaining that Special Rapporteurs "are not United Nations staff members and do not receive financial remuneration" (emphasis removed)).

Albanese "has spewed unabashed antisemitism, expressed support for terrorism, and open contempt for the United States, Israel, and the West." Sec'y of State Marco Rubio, U.S. Dep't of State, Press Statement, *Sanctioning Lawfare that Targets U.S. and Israeli Persons* (July 9, 2025) ("Sec'y Rubio Press Statement"), https://www.state.gov/releases/office-of-the-spokesperson/2025/07/sanctioning-lawfare-that-targets-u-s-and-israeli-persons. "That bias has been apparent across the span of her career[.]" *Id.*; *see also Francesca Albanese in Her Own Words*, Anti-Defamation League (updated Feb. 26, 2026), https://www.adl.org/resources/article/francesca-albanese-her-own-words. In that position, she has urged the ICC to prosecute Israel's prime minister and defense minister. She was among those who filed the Amicus Curiae Submission by the UN Mandate Holders of the Human Rights Council regarding the Situation in the State of Palestine to the ICC's Pre-Trial Chamber on August 6, 2024. In this amicus brief, Albanese argued that the ICC had jurisdiction to issue arrest warrants for Israeli nationals and recommended that the arrest warrants be processed expeditiously. "Amicus Curiae

8

Submission by the United Nations Mandate Holders of the Human Rights Council," https://www.icc-cpi.int/court-record/icc-01/18-320, published August 6, 2024; *see also* United Nations Human Rights Office of the High Commissioner, "A/79/384: Report of the Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967, Francesca Albanese - Genocide as colonial erasure," https://www.ohchr.org/en/documents/country-reports/a79384-report-special-rapporteur-situation-human-rights-palestinian ("urg[ing] the ICC Prosecutor to investigate" alleged "crimes" committed "by Israel" and to "investigate other prominent individuals mentioned in the present report").

In addition to demanding international criminal sanctions against America's close ally, Albanese has advocated for punitive action against American individuals and entities. She authored a July 2025 report as Special Rapporteur in which she "urge[d] the International Criminal Court and national judiciaries to investigate and prosecute corporate executives and/or corporate entities for their part in the commission of international crimes and laundering of the proceeds from those crimes." Francesca Albanese (Special Rapporteur on the situation of human rights in the Palestinian territories occupied since 1967), *From economy of occupation to economy of genocide*, ¶ 96, U.N. Doc. A/HRC/59/23 (July 2, 2025), https://docs.un.org/en/A/HRC/59/23. This recommendation was no mere general suggestion: the report falsely and maliciously accuses specific American companies such as Lockheed Martin of "enhanc[ing] Israeli capacity to perpetuate apartheid," and it accuses "United States tech giants" of "profiting from . . . the occupied Palestinian territory" and U.S.-based Caterpillar Inc. of providing "heavy machinery in service of settler-colonial destruction." *Id.* ¶¶ 32, 36, 43–45 (emphasis omitted). It alleges that companies including U.S.-based Chevron, "[b]y supplying Israel with coal, gas, oil and fuel, . . . are contributing to civilian infrastructures that Israel uses to entrench permanent annexation and now weaponizes in the destruction of Palestinian life in Gaza," and concludes that "[t]he ostensibly civilian nature of such infrastructure does not exonerate a

company from responsibility." *Id.* ¶ 60. Not stopping at accusing American businesses, Albanese also asserted that "[f]aith-based charities"—including some based in the United States—"have also become key financial enablers of illegal projects." *Id.* ¶ 81. To the best of undersigned counsels' knowledge, no evidence in the record indicates that any of these reports, recommendations, or statements by Albanese at issue in this case were written while Albanese was present in the United States (and Plaintiffs do not even allege otherwise).

**3.** Albanese's recommendations as Special Rapporteur carry weight with the ICC because of its close working relationship with the United Nations. According to the U.N.'s Office of Legal Affairs website, the Relationship Agreement between the United Nations and the ICC (the "Relationship Agreement"), which entered into force on October 4, 2004, "creates a general framework for cooperation between all units and entities of the United Nations, including its offices, funds and programmes, on the one hand, and the International Criminal Court . . . on the other." United Nations Office of Legal Affairs, "United Nations – International Criminal Court Cooperation" at 1, https://legal.un.org/ola/UNICCCooperation.aspx. And according to Article 3 of the Relationship Agreement, "[t]he United Nations and the [ICC] agree that, with a view to facilitating the effective discharge of their respective responsibilities, they shall cooperate closely, whenever appropriate, with each other and consult each other on matters of mutual interest pursuant to the provisions of the present Agreement . . . ." United Nations Office of Legal Affairs, "UN-ICC Relationship Agreement" at 2, . For example, Section X(j) of the U.N. Report of the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs of the Occupied Territories issued a recommendation for the General Assembly and/or Member States to "[f]ully cooperate with the International Criminal Court." United Nations, "Report of the Special Committee to Investigate Israeli Practices Affecting the Human Rights of the Palestinian People and Other Arabs

of the Occupied Territories" at 26, https://www.ohchr.org/en/documents/thematic-reports/a79363-report-special-committee-investigate-israeli-practices-affecting.

**4.** On July 9, 2025, the U.S. Secretary of State designated Albanese pursuant to E.O. 14203. *See* E.O. 14203 § 10, 90 Fed. Reg. at 9372. The designation was made under § 1(a)(ii)(A) of the Order because Albanese had "directly engaged with the International Criminal Court (ICC) in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." Sec'y Rubio Press Statement. Specifically, Albanese recommended "that the ICC, without a legitimate basis, issue arrest warrants targeting Israeli Prime Minister Benjamin Netanyahu and former Defense Minister Yoav Gallant." *Id.* She also "recommend[ed] the ICC pursue investigations and prosecutions of" various companies and their executives. *Id.* (Albanese has also "expressed support for terrorism." *Id.*) As the Secretary explained, "these campaigns of political and economic warfare . . . threaten our national interests and sovereignty." *Id.* OFAC implemented the designation by adding Albanese to the SDN List. U.S. Dep't of the Treasury, Off. of Foreign Assets Control, "International Criminal Court-related Designation," https://ofac.treasury.gov/recent-actions/20250709_33.

In conjunction, OFAC issued a general license authorizing the wind down of certain transactions involving Albanese "through 12:01 a.m. eastern daylight time, August 8, 2025." Off. of Foreign Assets Control, U.S. Dep't of the Treasury, *Issuance of International Criminal Court-Related General License* (July 9, 2025), https://ofac.treasury.gov/media/934491/download?inline. OFAC also issued two specific licenses: one permitting certain transactions incidental to the care of Albanese's minor child, L.C., and one permitting certain transactions incidental to the upkeep or sale of a residence owned by Albanese and Plaintiff Massimiliano Cali in the United States. ECF Nos. 1-11, 1-12 (Compl. Exhibits C and D).

11

## VI.    This Lawsuit

Although the E.O. was issued in February 2025, and Albanese was designated in July 2025, Plaintiffs did not bring this lawsuit or move for preliminary relief until February 2026. PI Br. at 2, 16. Plaintiffs are L.C. (proceeding by and through her father and guardian, Cali), and Cali himself. *Id.* at 1, 6, 9. As noted, both Cali and L.C. live outside the United States. *See* Compl. ¶ 20. Plaintiffs seek declaratory and injunctive relief challenging E.O. 14203 and Albanese's designation pursuant to that Order. *See id.* at 1, 13-14, 16-17. Although Albanese is the subject of the challenged designation, she is not a named plaintiff. PI Br. at 1.

Plaintiffs ask the Court to declare E.O. 14203 unconstitutional on its face and as applied, set aside Albanese's designation and related agency action, and preliminarily enjoin Defendants from enforcing civil or criminal penalties under E.O. 14203 and IEEPA. PI Br. at 1-4, 17, 40. Those requests rest on First Amendment and IEEPA theories. PI Br. at 17-32. More specifically, Plaintiffs contend that E.O. 14203 and Albanese's designation violate the First Amendment because they impose content- and viewpoint-based restrictions on speech. PI Br. at 3, 17-20. Plaintiffs further argue that the Order exceeds the President's authority under IEEPA because it violates the Berman Amendment and § 1701's substantive limits. PI Br. at 24-32. And in seeking preliminary relief, Plaintiffs ask the Court to bar enforcement of E.O. 14203 and IEEPA penalties during the pendency of this action. PI Br. at 1, 40.

## ARGUMENT

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To warrant such extraordinary relief, a movant must prove four factors: "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

12

The movant must carry an evidentiary burden to satisfy these factors. Relying on allegations in the complaint is not sufficient. Instead, the movant "bears the burden of producing credible evidence sufficient to demonstrate her entitlement to injunctive relief." *Workman v. Bissessar*, 275 F. Supp. 3d 263, 267 (D.D.C. 2017). If he does not produce such evidence, he "has failed to make the clear showing of likelihood of success on the merits." *Id.* (cleaned up); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (noting that a preliminary injunction "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" (citation omitted)); *Bird v. Barr*, No. 19-CV-1581 (KBJ), 2020 WL 4219784, at *5 (D.D.C. July 23, 2020) (Jackson, J.) ("Evidence that goes beyond the unverified allegations of the pleadings and motion papers *must be presented* to support or oppose a motion for a preliminary injunction." (emphasis added) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (3d ed. 2015))). Furthermore, a motion for preliminary injunction "shall be supported by all affidavits on which the plaintiff intends to rely." *Howell v. DHS*, No. 24-CV-2791 (JMC), 2024 WL 4582978, at *5 n.6 (D.D.C. Oct. 25, 2024) (quoting LCvR 65.1(c)).

I.    **Plaintiffs' Months-long Delay in Seeking Preliminary Relief Eviscerates Their Claim of Irreparable Harm.**

Delay in seeking emergency relief undercuts a claim of irreparable harm. *See, e.g.*, *Florida EB5 Invs., LLC v. Wolf*, 443 F. Supp. 3d 7, 13 (D.D.C. 2020) (Leon, J.) (holding that plaintiff's approximately four-month delay in seeking a preliminary injunction "undercut[] its asserted harms"). Here, the lack of irreparable harm—most clearly demonstrated by the Plaintiffs' own behavior in dragging their feet to file—requires denying Plaintiffs' motion. E.O. 14203 was issued on February 6, 2025, and the Secretary of State designated Albanese on July 9, 2025. Yet Plaintiffs did not file this action or seek preliminary relief until February 25, 2026.

Plaintiffs' unexplained decision to tarry in seeking relief is fundamentally inconsistent with their claim that a preliminary injunction is necessary *now*—eight months and counting after the designation; seven months and counting after the expiration of the wind down general license; and *more than a full year* after the E.O. was signed. Courts in this Circuit have found much shorter delays inconsistent with arguments for preliminary relief. *See, e.g.*, *Wolf*, 443 F. Supp. 3d at 13; *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (holding that a party's "inexcusable" 44-day delay "bolstered" the conclusion that preliminary injunctive relief should not issue); *Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 44 (D.D.C. 2000) (concluding that a delay of over two months in seeking injunctive relief "militate[d] against a finding of irreparable harm"); *W. Watersheds Project v. Bernhardt*, 468 F. Supp. 3d 29, 49–50 (D.D.C. 2020) ("unexplained delays," including waiting three months before providing statutorily-required notice of suit and waiting five weeks after filing suit to seek preliminary injunction, "undermine[d] [plaintiffs'] contention that they will be irreparably harmed absent an injunction"); *Sierra Club v. EPA*, 793 F. Supp. 3d 158, 165-66 (D.D.C. 2025) (holding that plaintiffs' delay of roughly 100 days was "inexcusable" and undercut their claim of irreparable harm). More generally, courts routinely reject claims of irreparable harm where a plaintiff's own conduct demonstrates a lack of urgency. *See, e.g.*, *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (finding that "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm" (collecting cases)); *Muvvala v. Wolf*, No. 1:20-cv-02423 (CJN), 2020 WL 5748104, at *5-6 (D.D.C. Sept. 25, 2020) (denying emergency injunctive relief where plaintiffs failed to show that alleged economic harms and loss of driving privileges constituted imminent irreparable injury); *Arrington v. Santander Consumer USA Inc.*, No. 25-cv-03891 (DLF), 2025 WL 4083338, at *1-2 (D.D.C. Nov. 24, 2025) (denying emergency relief where plaintiff failed to demonstrate imminent irreparable harm and an approximately eighteen-month delay

14

in seeking relief "implie[d] a lack of urgency" (citation omitted)). Here, the delay completely undermines Plaintiffs' claim of irreparable harm.

Plaintiffs do not explain their delay. The closest they get is stating that Albanese sought permission from the United Nations to challenge her designation on her own behalf and was informed, via letter dated January 14, 2026, that she was not authorized to do so because of the United Nations' view of the immunities associated with her official position. PI Br. at 16. Plaintiffs do not specify how long Albanese waited after being designated before asking the United Nations for its position. Regardless, Plaintiffs' argument only underscores the absence of irreparable harm. Plaintiffs in this case are Cali and L.C., not Albanese, and the United Nations' position applies only to Albanese, not to Cali or L.C. Any alleged uncertainty about Albanese's ability to sue does not explain why Plaintiffs—who claim to be suffering irreparable harm in their own right—waited months before filing suit. And Plaintiffs identify no other reason they could not have filed suit promptly after the July 9, 2025, designation and sought relief based on their own alleged injuries—or why, if they believe the E.O. is facially invalid and harms them in some way, they could not have sued in February 2025. Indeed, Plaintiffs did not even sue promptly after the U.N. letter. They waited six more weeks *after* January 14, 2026, to seek preliminary relief.

Plaintiffs' over-seven-month delay in challenging the designation—and yearlong delay in challenging the February 2025 E.O.—cripple their assertion that emergency relief is necessary. For that reason alone, the Court should deny the motion for a preliminary injunction.

## II.    Plaintiffs Lack Standing.

Plaintiffs lack standing to obtain preliminary relief—whether on their own behalf or on behalf of Albanese as a third party. To win preliminary relief, a plaintiff "must show a likelihood of success" on "not only substantive theories but also establishment of jurisdiction." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (citation omitted). In this posture, "standing must be

15

evaluated 'under the heightened standard for evaluating a motion for summary judgment,'" *id.* (citation omitted), and "each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the same manner and degree of evidence required'" at this stage, *Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) (citation omitted). Mere allegations of harm are not enough. *See Elec. Priv. Info. Ctr.*, 928 F.3d at 104.

This case implicates third-party standing because it is about the designation of Albanese. The named Plaintiffs' alleged injuries are derivative of restrictions imposed on a nonparty, and much of the requested relief would run directly to Albanese's benefit. Thus, the case (and Plaintiffs' motion) raise the "threshold question whether they have standing to raise the rights of" Albanese. *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).

In litigation, "[t]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). "Because third party standing is the exception rather than the norm, the burden is on the plaintiff to establish that he has third party standing, not on the defendant to rebut third party standing." *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 23 (D.D.C. 2010) (cleaned up); *cf. FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (noting that "when (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*, standing is not precluded, but it is ordinarily substantially more difficult to establish" (cleaned up)). Although that burden falls on the plaintiff at any stage of the proceeding, it is particularly pronounced in this posture, where Plaintiffs must produce "credible evidence sufficient to demonstrate [their] entitlement to injunctive relief." *Workman*, 275 F. Supp. 3d at 267. Without such evidence, Plaintiffs have not established their standing to obtain preliminary relief.

A plaintiff seeking to assert the rights of a third party—as Plaintiffs do here—must first satisfy the three core constitutional standing requirements: injury in fact, causation, and redressability on their

16

own behalf. *Al-Aulaqi*, 727 F. Supp. 2d at 24; *see also, e.g.*, *Trump v. CASA, Inc.*, 606 U.S. 831, 866 (2025) (Alito, J., concurring) ("[A]t a minimum, we have said that a litigant seeking to assert the legal rights or interests of others must demonstrate ordinary Article III standing for itself *and* answer the additional 'threshold question whether [it has] standing to raise the rights of others.'" (citation omitted)); *Kowalski*, 543 U.S. at 129 & n.2. If the plaintiff establishes his own Article III standing, then he must also show that he satisfies the two additional requirements of third-party standing: that he "has a 'close relationship' to the right holder and that there is some 'hindrance' to the right holder's ability to 'protect his own interests.'" *CASA*, 606 U.S. at 866–67 (Alito, J., concurring) (quoting *Kowalski*, 543 U.S. at 130).

**1.** Plaintiffs cannot clear the third-party standing threshold—or establish standing in their own right—because they have not established their own Article III injury. The four categories of harms they assert do not suffice for standing.

*First*, Plaintiffs assert a "broad chilling effect on [their] First Amendment rights" and cite cases about irreparable-harm findings flowing from First Amendment injury. PI Br. at 33. This theory muddles distinct stages of the inquiry. Plaintiffs rely on *no First Amendment activity of their own* and identify no future First Amendment activity in which they want to, but feel they may not, engage. Instead, they seek to assert Albanese's rights. *Id.* at 34–35 (describing alleged effects on Albanese's speech only). But they must establish an *injury* of their own before they can assert Albanese's alleged First Amendment rights. *Al-Aulaqi*, 727 F. Supp. 2d at 23 (holding that, "before a litigant may be accorded third party standing," "he must show that he *himself* has suffered a concrete, redressable 'injury in fact'" (citation and footnote omitted)). Bootstrapping an alleged First Amendment injury supposedly suffered by a foreign national onto non-existent and non-alleged injuries to the named Plaintiffs' own speech interests does not work. (If Cali were to assert First Amendment rights of his own—which he

does not—he would run into the same problem as Albanese: he is a noncitizen living abroad, and on this record would have no First Amendment rights at all for expressions made while abroad.)

*Second*, Plaintiffs assert that "L.C. suffers significant harms to her fundamental rights as a U.S. citizen" because she alleges that she is "exposed to liability as a felon if she gives or receives anything of value to [sic] her mother." PI Br. at 34. This alleged harm does not suffice for standing for two reasons. The first reason is that Plaintiffs do not identify any actual transaction in which L.C. wishes to engage that they think would "expose[]" her to liability. Because she does not claim that she intends to engage in any conduct in the foreseeable future that would subject her to penalties even on Plaintiffs' view of the world, her alleged injury is not sufficiently "concrete and particularized" for standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992); *see also id.* at 564 ("Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."). At this stage, Plaintiffs bear the burden to show, through "credible evidence," that they have standing. *See Workman*, 275 F. Supp. 3d at 267. They have not done so.

The second reason L.C.'s alleged potential liability does not confer standing is because Plaintiffs' allegations are inconsistent with the record. Defendant Treasury Department, through OFAC, issued a broad license "authoriz[ing]" certain transactions between L.C. (and other "U.S. persons") and Albanese. ECF No. 1-12 (Compl. Exhibit D). Specifically, Section I of the Parental License authorizes the following:

> all transactions that would otherwise be prohibited pursuant to Executive Order (E.O.) 14203 involving Francesca Paola Albanese, a person designated pursuant to E.O. 14203, that are ordinarily incident and necessary to Francesca Paol[a] Albanese's role as the parent and legal guardian of [L.C.], the U.S. person minor child of Francesca Paola Albanese and Massimilliano Cali. This authorization includes the purchasing, making payment for, and receiving goods, services, and funds essential to the maintenance of [L.C.], including, but not limited to, health and medical expenses, transportation, telecommunication costs, housing costs, food, clothing, insurance, and legal fees and expenses.

18

*Id.* at 3. L.C. is thus expressly authorized to "receive[]" items of value from Albanese "that are ordinarily incident and necessary to" their parent-child relationship. *Id.* Moreover, the list of specific authorized transactions is illustrative and not exhaustive. The Parental License also does not foreclose L.C.'s giving gifts or other items to Albanese: the "all transactions" language is not limited to transactions initiated by Albanese, and the non-exhaustive list "includes the purchasing . . . and receiving," which, while not exhaustively limiting the "all transactions" language, also indicates that transactions initiated either by Albanese or by a U.S. person are covered by the license. *Id.* In sum, the plain text of the Parental License contradicts Plaintiffs' arguments about L.C.'s harms.

And even if it did not, the attached declaration from an official at OFAC would. Consistent with the text of the Parental License, the declaration explains that OFAC generally views transactions like L.C.'s hypothetically giving her parent a gift as authorized by the Parental License or exempt. Exhibit A ¶ 9, Decl. of Mary Pat Rasmussen. To the extent the text of the Parental License and the OFAC declaration do not resolve any perceived lack of clarity—and even if Plaintiffs put forward evidence of a particular activity L.C. wishes to undertake, which they have not done—Plaintiffs' alleged harms relating to such activities would still be too remote: Plaintiffs did not even obtain OFAC's guidance on whether any given activity they may wish to engage in as a family is within the scope of the Parental License or exempt. *See id.* ¶¶ 7–8.

***Third***, Plaintiffs argue that their "property rights are severely impaired." PI Br. at 35. To the extent this argument is based on Albanese's interest in real property or interest in "traveling for work or collaborating with U.S.-based" organizations, *id.*, once again: those interests may not be asserted by Plaintiffs as a basis for their own Article III or third-party standing. Regardless, Plaintiffs provide no evidence that Albanese actually needs to travel to the United States now for work. As for the residential property—where Albanese and Cali have not lived in more than ten years—the allegation that "they

19

cannot supervise the upkeep of their real property," PI Br. at 35, is inconsistent with the record: another license granted by OFAC expressly authorizes U.S. persons to "engage in all transactions necessary . . . that are ordinarily incident and necessary to maintain and upkeep the Property." ECF No. 1-11 (Compl. Exhibit C) at 3. (The license also permits transactions incident to the sale of the property.) Plaintiffs do not show that any property rights belong to L.C., but they argue that Cali's "professional interests" are impaired "insofar as he is barred from traveling to the headquarters of his employer, the World Bank." PI Br. at 35. Like so many assertions in the brief, however, this one is supported only by a cite to the complaint; Plaintiffs provide no evidence to support Cali's alleged professional harms, including evidence about the frequency with which he would travel to the United States for professional reasons absent Albanese's designation. Setting that aside, Plaintiffs also do not establish that Cali's "professional interests" should even be considered as "property interests" or fall in any other category of harm that a court would view as irreparable for purposes of preliminary relief. In sum, Plaintiffs' assertions about property interests also do not suffice to establish cognizable injury for standing.

*Fourth*, to the extent Plaintiffs separately invoke harms to their "family" interests, their allegations are too vague and speculative to support standing. PI Br. at 34. These alleged harms, too, are largely Albanese's. *See id.* (arguing that banks do not work with Albanese and that Cali's insurer does not provide her health insurance). To reiterate: Plaintiffs must show *they* are experiencing harms. But the harms they do assert as their own—hyperbolically describing "potential" prosecution and penalties "for simple, everyday exchanges like buying [Albanese] coffee, taking a family trip, or going for a family meal"—are too speculative for standing. *See Lujan*, 504 U.S. at 560–61 (holding that injury required for standing purposes must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" (cleaned up)). They are also unsupported by any evidence. And they are

20

inconsistent with the declaration explaining that OFAC generally views activities like a family trip as authorized by the Parental License or exempt. Exhibit A ¶ 9, Decl. of Mary Pat Rasmussen.

In sum, Plaintiffs have not carried their burden on standing. That is doubly so because, in this preliminary-injunction posture, Plaintiffs may not rely on mere allegations and must back up their claims of harm with evidence. *See Workman*, 275 F. Supp. 3d at 267; *Bird*, 2020 WL 4219784, at *5. Plaintiffs have not done so.

**2.** Even if Plaintiffs had carried their burden on Article III standing, they still would lack standing to assert Albanese's rights because they have not shown the requisite "hindrance" to Albanese's ability to protect her own interests. *See Kowalski*, 543 U.S. at 130. Third-party standing requires more than the absence of authorization from another entity; it requires an impediment to the right holder's ability to sue on her own behalf. For example, *Whitmore v. Arkansas*, 495 U.S. 149, 165 (1990), framed the relevant obstacle as inability to litigate due to "mental incapacity, lack of access to court, or other similar disability," not mere non-authorization. *See also, e.g.*, *Al-Aulaqi*, 727 F. Supp. 2d at 31–32 (explaining that the hindrance requirement exists to ensure that the right holder "did not simply decline to bring the claim on his own behalf, but could not in fact do so," and rejecting third-party standing where the absent son "could have brought suit on his own behalf, but . . . simply declined to do so"). The U.N. letter on which Plaintiffs rely does not show that Albanese was unable to sue in a U.S. court to protect her own interests. At most, it shows that the United Nations would not authorize a lawsuit in connection with her official position. But that is not the kind of incapacity, lack of access, or other genuine inability that this Court has recognized as sufficient. *See Al-Aulaqi*, 727 F. Supp. 2d at 31-32; *see also Whitmore*, 495 U.S. at 165. Thus, even if Plaintiffs had Article III standing, they would not have standing to assert Albanese's interests in this Court. Any claim based on her interests—for example, her purported First Amendment rights—fails for lack of standing, especially in the context of preliminary relief.

III.    **Even Apart from Their Unjustifiable Delay, Plaintiffs Have Not Shown Irreparable Harm.**

Even if Plaintiffs' vague and speculative assertions of potential harm supplied standing to sue or to seek preliminary relief—and they do not—those assertions do not establish irreparable harm. Irreparable harm is "the *sine qua non* for obtaining a preliminary injunction" because it is the factor that justifies granting relief before the merits have been adjudicated. *Monbo v. U.S. Dep't of the Navy*, No. 24-cv-2547 (APM), 2025 WL 1455541, at *1 (D.D.C. Jan. 29, 2025). As the movants, Plaintiffs have the burden to make a "clear showing" that irreparable injury is likely in the absence of preliminary relief. *Winter*, 555 U.S. at 22; *see also Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). Making that clear showing requires supporting claimed harms with concrete evidence; speculation and mere allegations are not enough. *See Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur." (emphasis omitted)); *Workman*, 275 F. Supp. 3d at 267 (holding that movant must put forth "credible evidence"). Plaintiffs have not carried their burden.

First, Plaintiffs' irreparable harm theory fails because the only plaintiffs before the Court are Cali and L.C.; however, the PI brief focuses overwhelmingly on alleged harms to non-party Albanese. *See* PI Br. at 1, 16–17, 33–36. Plaintiffs assert that Albanese has been effectively debanked, has lost speaking engagements and institutional affiliations, faces travel related restrictions, and has encountered obstacles to publishing and other professional activity. *See id.* at 33–35. But Plaintiffs cannot rely on harms to a nonparty to establish their own irreparable harm. In any event, Plaintiffs make no showing that would support a finding that the harms in those categories are actually irreparable. They bear the burden to explain why the general rule that "mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of" preliminary relief does not apply to them, *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 47 (D.D.C. 2014) (cleaned up),

22

and they have not carried that burden. Nor have they cited cases controlling on this Court that hold any of the types of harms they assert as to Albanese are irreparable.

To the extent Plaintiffs do allege harms to their own interests, those allegations fail because they are not supported by evidence. Plaintiffs allege derivative effects on their family life, travel, jointly owned property, and household and financial affairs. *See* PI Br. at 9-11, 33–36. But Plaintiffs make no evidentiary showing from Cali or L.C. establishing such effects. For example, Plaintiffs submitted no declaration from Cali attesting to any blocked transaction, frozen account, denied banking relationship, or any other concrete injury he is presently suffering. They were required to provide such evidence (if any exists) with their motion. *See Howell*, 2024 WL 4582978, at *5 n.6 (stating that a motion for preliminary injunction "shall be supported by all affidavits on which the plaintiff intends to rely"). But they have not.

Setting aside the complete lack of evidence, Plaintiffs' claimed harms are not even alleged with enough specificity to constitute irreparable harms. Plaintiffs do not identify any bank account belonging to Cali that has been frozen, any asset (other than the residential property) of Cali or L.C. that has been blocked, any transaction by either named Plaintiff that has been denied, or any imminent enforcement action directed at either of them. *See, e.g.*, *Mazurek*, 520 U.S. at 972; *Workman*, 275 F. Supp. 3d at 267; *Wis. Gas Co.*, 758 F.2d at 674. Plaintiffs do not even allege that Cali is unable to access his separate assets or otherwise engage in financial activity.

Moreover, the details Plaintiffs *do* provide undermine the seriousness of their claimed harms. They represent that Cali remains employed by the World Bank. PI Br. at 1, 34. Plaintiffs also acknowledge that OFAC issued licenses authorizing certain transactions related to the jointly owned property and transactions ordinarily incident and necessary to Albanese's role as L.C.'s parent and legal guardian. *Id.* at 16, 34–35. Those allegations water down even more Plaintiffs' claim that emergency injunctive relief is necessary to prevent imminent irreparable harm to the named Plaintiffs.

23

In sum, Plaintiffs have not shown with the required concreteness that Cali or L.C. themselves face the sort of imminent irreparable injury that would justify the extraordinary remedy of a preliminary injunction.

**IV.      Plaintiffs Are Not Likely to Succeed on Their First Amendment Claim.**

Plaintiffs' First Amendment claim fails on the merits for three reasons. First, only Albanese's expression is allegedly being targeted, but she has no rights under the First Amendment because she is a noncitizen who lives abroad, engaged in the expression at issue abroad, and is not present in the United States. And as discussed, *supra* Argument § II, the named Plaintiffs do not claim that either of them engaged in any protected speech. Second, even if either Plaintiff had a First Amendment interest to vindicate and if the E.O. or designation were content- or viewpoint-based, strict scrutiny is satisfied because the E.O. and subsequent actions taken under it are narrowly tailored to the compelling government interest of protecting Americans, and nationals of U.S. allies that have not consented to ICC jurisdiction, from harassment, abuse, and possible arrest. Third, even if Plaintiffs showed a likelihood of success on their First Amendment theory regarding the designation, they would still fall short regarding their challenge to the E.O. because it does not regulate speech based on its content. Thus, it receives intermediate scrutiny. It satisfies that level of scrutiny because it is reasonably related to the legitimate government interest in protecting Americans and their allies from unwarranted prosecution and oppression. Even if Plaintiffs' First Amendment claim had merit from a pleading-stage standpoint—and it does not—it fails as a basis for preliminary relief because Plaintiffs put forward no evidence that supports their theories. *See Mazurek*, 520 U.S. at 972; *Workman*, 275 F. Supp. 3d at 267; *Bird*, 2020 WL 4219784, at *5; *cf. Fulmen*, 547 F. Supp. 3d at 22–23.

**A. Albanese's Expression as a Noncitizen Living Outside the United States is Not Protected by the First Amendment.**

Plaintiffs seek relief on their First Amendment claim based on statements made *outside the United States* by Albanese—a nonparty and noncitizen who *has not lived in the United States in more than ten years.* That is an extraordinary proposition. Little wonder that Plaintiffs cite no authority holding that an individual in Albanese's position—or her family members who also live outside the United States—may avoid the imposition of sanctions by asserting First Amendment rights. The law is clear: as a foreign citizen living abroad and engaging in expression abroad, Albanese does not enjoy First Amendment protections for *any* expression that Plaintiffs allege led to her designation.

"[I]t is long settled as a matter of American constitutional law that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020); *see also, e.g.*, *id.* at 436 (holding that "foreign organizations operating abroad have no First Amendment rights"); *TikTok Inc. v. Garland*, 604 U.S. 56, 69 n.2 (2025) (holding that "[t]o the extent that ByteDance Ltd.'s asserted expressive activity occurs abroad, that activity is not protected by the First Amendment"); *In re Gliner*, 133 F.4th 927, 934 (9th Cir. 2025) (stating that "'foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution,' including those under the First Amendment," and holding that district court improperly denied discovery application on First Amendment grounds because "no evidence suggest[ed] that the" entity and individual subject to potential discovery were "U.S. citizens or [were] present in the United States" (some brackets and citation omitted)); *Cent. Me. Power Co. v. Me. Comm'n on Governmental Ethics & Election Pracs.*, 144 F.4th 9, 26 (1st Cir. 2025) (holding that foreign public-utility company did "not have any First Amendment rights"); *Baaghil v. Miller*, 1 F.4th 427, 433 (6th Cir. 2021) (holding that U.S. resident's Yemeni citizen relatives living abroad could not obtain judicial review of visa denials "by invoking their own federal constitutional rights," because "[n]oncitizens living abroad do not have any

American constitutional rights"); *Karadzic v. Gacki*, 602 F. Supp. 3d 103, 111 (D.D.C. 2022) (holding that Serbian national's challenge to OFAC sanctions did "not implicate First Amendment principles because" he had "no constitutional rights"); *Keyhanpoor v. Blinken*, 633 F. Supp. 3d 88, 94 (D.D.C. 2022) (holding that noncitizen plaintiffs lacked standing for Fifth Amendment challenge to visa denials because they did not have constitutional rights). Although, in some cases, "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country," *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990), "a foreign national is not entitled to constitutional protection absent substantial connections to the United States," *Fulmen Co. v. Off. of Foreign Assets Control*, 547 F. Supp. 3d 13, 22 n.1 (D.D.C. 2020) (Leon, J.).

Albanese does not have the requisite "substantial connections." First, she is not "within the territory of the United States" at all. Plaintiffs' complaint indicates that she still lives in Tunisia (and they have put forth no evidence to the contrary). ECF No. 1, Compl. ¶ 20. According to Plaintiffs' own telling, Albanese has not lived in the United States in *more than 10 years*. PI Br. at 9. Plaintiffs also neither allege nor show through evidence that any of Albanese's relevant expression took place in the United States. Those facts alone should defeat Plaintiffs' First Amendment theory because "foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *Agency for Int'l Dev.*, 591 U.S. at 433.

Even if "substantial connections" to the United States could exist in some cases for a noncitizen living and speaking outside the United States, Albanese still lacks such connections on the record before the Court. Being "married to a U.S. citizen" (which Albanese is not) would not be enough to establish "substantial connections." *See Bautista-Rosario v. Mnuchin*, 568 F. Supp. 3d 1, 8 (D.D.C. 2021). Having a U.S. citizen child—who does not live in the United States and has not done so in more than ten years—surely is not enough either. *See Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 60 n.17 (D.D.C. 1998) (holding that allegation that plaintiff "regularly [came] to the United

26

States to visit her ill daughter and grandchild" did "not rise to the level of a substantial connection" (cleaned up)), *aff'd*, 199 F.3d 1352 (D.C. Cir. 2000).

The other allegations of Albanese's American connections discussed in the preliminary-injunction motion do not make up the gap. They fall into three categories: past residency and volunteering activities in the United States (concluding *more than ten years ago*, in 2015), PI Br. at 9; affiliations with organizations based in the United States, *id.* at 6–7; and property interests in the United States—namely, one residential property and a bank account and mortgage, *id.* at 9. Plaintiffs cite no authority binding on this Court that holds such tenuous connections of a noncitizen who lived in the United States for only three years, and has long since packed up and moved abroad, can support a claim for First Amendment protection. Decisions that find "substantial connections" involve a closer relationship with the United States; for example, in *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 201–02 (D.C. Cir. 2001), the panel relied on the plaintiff's "*overt presence within* the National Press Building in Washington, D.C."; the plaintiff's "interest in a small bank account"; *and* "the entire record including the classified information" (emphasis added). Here, Plaintiffs do not even show that any of Albanese's alleged continuing U.S. ties require her to spend time physically present in the country.

Even if the allegations regarding Albanese's connections to the United States might be sufficient at the pleading stage in support of stating a claim for First Amendment relief—and they are not—they fail as a basis for preliminary relief because Plaintiffs have not provided evidence in support. As this Court held when ruling on cross-motions for dispositive relief in another OFAC sanctions-related case, statements that "are conclusory, vague, and find no support in the administrative record" are "utterly insufficient to establish the kind of 'substantial connection' necessary for a foreign national to assert constitutional claims." *Fulmen*, 547 F. Supp. 3d at 22–23. The same is true in the context of a preliminary-injunction motion. *See Mazurek*, 520 U.S. at 972 (noting that a preliminary injunction

27

"should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion" (citation omitted)); *Workman*, 275 F. Supp. 3d at 267 (noting that a preliminary-injunction movant "bears the burden of producing credible evidence sufficient to demonstrate her entitlement to injunctive relief"). Yet Plaintiffs have not even provided affidavits or declarations supporting their allegations of connections to the United States. *See Howell*, 2024 WL 4582978, at \*5 n.6 (stating that a motion for preliminary injunction "shall be supported by all affidavits on which the plaintiff intends to rely").

Plaintiffs invoke *Smith v. Trump*, 791 F. Supp. 3d 90, 92–95, 97–98 (D. Me. 2025), and *Rona v. Trump*, 797 F. Supp. 3d 278, 284–93 (S.D.N.Y. 2025), but those cases do not resolve the issues presented here. In both cases, the courts addressed as-applied First Amendment challenges brought by *U.S. citizen* plaintiffs—human-rights advocates in *Smith* and law professors in *Rona*—who alleged that E.O. 14203 chilled their speech-related advocacy directed to the ICC. *See Smith*, 791 F. Supp. 3d at 90, 92–95, 97–98; *Rona*, 797 F. Supp. 3d at 284–93. By contrast, the named Plaintiffs here do not even allege that they themselves seek to provide comparable speech-based support to the ICC. *Smith*, 791 F. Supp. 3d at 92-95, 97-100; *Rona*, 797 F. Supp. 3d at 284-93. Instead, their First Amendment theory depends on the alleged speech interests of Albanese, a nonparty foreign national living abroad who affirmatively seeks to harm the United States and its ally. *See* PI Br. at 1-2, 16-23. Unlike in *Smith* and *Rona*, the threshold questions here are whether any named plaintiff has a First Amendment interest and whether Albanese—a noncitizen living and speaking abroad—may invoke First Amendment protection. In any event, neither decision is binding on this Court, and the Court should address the First Amendment issues afresh.

The Court should deny relief on the First Amendment claim because Plaintiffs have no First Amendment interests at stake.

### B.    The E.O. and Designation Satisfy Strict Scrutiny.

Even if Albanese had "substantial connections" to the United States, Plaintiffs' First Amendment claim would fail. That is because the E.O. and Albanese's designation survive the highest level of First Amendment scrutiny. Under strict scrutiny, which applies if a regulation is content- or viewpoint-based, the regulation survives if it "furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (citation omitted). Both the E.O. on its face and Albanese's designation satisfy that test (assuming, without conceding, that it applies).

Although "concerns of national security and foreign relations do not warrant abdication of the judicial role," the "evaluation of the facts" relating to national security "by the Executive . . . is entitled to deference." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010). Here, upholding the sovereignty of the United States and the critical national security and foreign policy interests of the United States and its allies by protecting the citizens of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies, respectively, is a compelling interest. *See id.* at 33–34; *Bank Markazi v. Peterson*, 578 U.S. 212, 217 (2016) (noting that IEEPA blocking regime allows President to "best further[ ] the United States' foreign-relations and national-security interests" (citation omitted)); *Haig v. Agee*, 453 U.S. 280, 307 (1981) (stating that "no governmental interest is more compelling than the security of the Nation"); *cf. Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (stating that "any policy toward aliens" is "interwoven with" issues "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference").

In this case, the Executive has determined that the sanctions imposed on Albanese are necessary to discourage her activities that are endangering the United States' interests. *See supra* Background § V. The "Executive [is] uniquely positioned to make principled distinctions between

29

activities that will further" a threat to the United States' national security interest "and undermine United States foreign policy, and those that will not." *Humanitarian L. Project*, 561 U.S. at 35. And this is a proper use of sanctions authority: orders such as E.O. 14203 uniquely allow the President to address a threat by, among other things, discouraging certain types of conduct and preventing transactions with specified persons, or in areas that may create leverage on those responsible for the activities of concern. *See Zarmach Oil Servs. v. U.S. Dep't of Treasury*, 750 F. Supp. 2d 150, 157–58 (D.C. Cir. 2010). No other, equally effective means of addressing problems in this area has been developed.

Thus, the Court should conclude that the E.O. on its face is narrowly tailored. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57 (D.D.C. 2002) (concluding that restrictions created by an Executive Order promulgated under IEEPA prohibiting the provision of funds to a blocked entity were "narrowly enough tailored" to serve the government's national security and foreign policy interest), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003). The Court should reach the same decision with respect to Albanese's designation—even if it concludes that her designation was content-based with reference to her speech. By designating Albanese, the government took action against a person who—in her official role in a position of influence with the United Nations—has participated in demanding, and purporting to provide factual and legal support for, ICC actions against Americans and a close U.S. ally, Israel. As the Secretary of State stated when announcing Albanese's designation, she "directly engaged with the International Criminal Court (ICC) in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." *Supra* Background § V. She also recommended investigations and prosecutions of U.S. companies. *See id.* Only sanctions of the sort imposed here can reasonably be expected to discourage such conduct with any effectiveness. Where the political branches have concluded that particular restrictions are necessary to achieve foreign policy and national security goals, the First Amendment does not require courts to reject that "considered judgment." *Humanitarian L. Project*, 561 U.S. at 36.

30

Even if the Court closely examined the means-end fit, however, it would find that strict scrutiny is satisfied because less restrictive alternatives are not available to the government. As noted, sanctions like these are uniquely targeted to address a specific and highly sensitive national-security issue. The E.O. and designation also include appropriate safeguards. For example, the text of the E.O. itself states that it "shall be implemented consistent with applicable law," which includes the Berman Amendment. Exec. Order No. 14203 § 12(b), 90 Fed. Reg. at 9372. Moreover, OFAC has issued public guidance confirming that the U.S. government "does not sanction persons for their engagement in activities subject to U.S. constitutional protection, such as protected speech or religious practice or for their religious beliefs; nor do U.S. persons violate OFAC sanctions for engaging in such constitutionally protected activity." Off. of Foreign Assets Control, U.S. Dep't of Treasury, *FAQ 1190. Do U.S. sanctions target persons for engaging in political speech, religious practice, or other constitutionally protected activities?* (Aug. 27, 2024), https://ofac.treasury.gov/faqs/1190. Especially in this pre-enforcement posture—where no penalties have been imminently threatened against or imposed on Plaintiffs—the record provides no basis for the Court to find that the E.O. or the designation of Albanese are more restrictive than necessary to achieve the government's ends. The E.O. and designation reflect the least speech-restrictive approach consistent with advancing those interests.

## C.    E.O. 14203 is Content-Neutral and Satisfies Intermediate Scrutiny.

**1.** Although E.O. 14203 satisfies strict scrutiny (as explained above), the Court should apply at most intermediate scrutiny because the E.O. is a content-neutral regulation of conduct, not speech.[2] A restriction is content-based if it "on its face draws distinctions based on the message a speaker conveys . . . , cannot be justified without reference to the content of the regulated speech, or [was]

---

[2] Although space is limited here to do so, the government reserves the right to argue in a future posture that the E.O. is subject to rational-basis review.

adopted by the government because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 163-64 (internal quotation marks omitted). None of those factors apply here.

To begin with, the E.O. does not regulate speech at all. It regulates conduct. The E.O. prohibits dealing in the property or interests in property of blocked persons, including by providing "funds, goods, or services" to them or for their benefit. E.O. 14203 §§ 1(a), 3(a), 90 Fed. Reg. at 9370. On their face, these restrictions do not implicate speech, and they are content-neutral as they draw no distinction based on the message or content of the funds, goods, or services provided. *See McGuire v. Reilly*, 260 F.3d 36, 43 (1st Cir. 2001) ("Thus, a law designed to serve purposes unrelated to the content of protected speech is deemed content-neutral even if, incidentally, it has an adverse effect on certain messages while leaving others untouched."). Further, the E.O. contains a content-neutral justification for the challenged restriction: "to oppose any ICC actions against the United States, Israel, or any other ally of the United States that has not consented to ICC jurisdiction." Exec. Order No. 14203, pmbl., 90 Fed. Reg. at 9369; *cf. TikTok Inc. v. Garland*, 604 U.S. at 72 (stating that "preventing China from collecting vast amounts of data from 170 million U.S. TikTok users" was "decidedly content agnostic.").

Any incidental effect on speech does not change the content-neutral nature of the E.O. The E.O. aims to counter the ICC's ability to prosecute U.S. citizens and citizens of foreign allies that have not consented to the ICC's jurisdiction by restricting funds, goods, and services to blocked persons; a restriction that is devoid of any reference to speech or a specific message. It does not prevent Plaintiffs from speaking in any way or on any subject. *See Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34, 53 (D.D.C. 2005) ("*IARA*") (upholding OFAC sanctions of blocking assets pursuant to executive order under intermediate scrutiny where "nothing in the IEEPA or the Executive Order prohibits the [plaintiff] from expressing its views"), *aff'd in part and remanded on other grounds sub nom. Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728 (D.C. Cir. 2007). It was adopted to address the

government's national security and foreign policy concerns, not because of a disagreement with a certain message, and it is justified without reference to the content of incidentally regulated speech. *See Reed*, 576 U.S. at 163-64. "[N]othing in . . . the Executive Order" "prohibits [Plaintiffs or Albanese] from expressing [their] views." *IARA*, 394 F. Supp. 2d at 53. And "the government's interest is completely unrelated to the suppression of free expression . . . ." *Id.*

To the extent Plaintiffs argue that the E.O. should receive strict scrutiny "because it targets the practice of law," PI Br. at 20, the Court should disregard that argument. It is doubly forfeited. First, no such theory appears in the complaint. Second, Plaintiffs neither point to any language in the E.O. that arguably targets the practice of law nor make any other effort to explain what they mean.

**2.** Intermediate scrutiny (at most) applies, and the E.O. satisfies intermediate scrutiny. A regulation survives intermediate scrutiny if it "advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Humanitarian L. Project*, 561 U.S. at 26–27 (citation omitted). As explained, the E.O. serves a governmental interest that is both "important" and "compelling"—safeguarding U.S. national security and foreign policy by protecting the personnel of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies, respectively. And the E.O. is narrowly tailored to that interest. But even if it were not, the Court should conclude it is sufficiently tailored to advancing that interest to survive intermediate scrutiny.

Even outside the national-security context, courts "generally defer" to the government in "determining whether the government's ends are advanced by a regulation." *G.K. Ltd. Travel v. City of Lake Oswego*, 436 F.3d 1064, 1073 (9th Cir. 2006). Applying such deference, the Supreme Court has upheld speech restrictions when they are justified in numerous ways, such as with "studies and anecdotes[,]" and through "history, consensus, and 'simple common sense.'" *Lorillard Tobacco Co. v.*

*Reilly*, 533 U.S. 525, 555 (2001) (citation omitted); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508-09 (1981) (noting that even in the face of a "meager record," the Court "hesitate[d] to disagree with the accumulated, common-sense judgments of local lawmakers"). That deference expands in the foreign-policy arena. *See Zarmach Oil Servs.*, 750 F. Supp. 2d at 157–58 (declining "to adjudicate such matters of strategy and tactics relating to the conduct of foreign policy, which 'are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference'" (quoting *Regan*, 468 U.S. at 242)). Here, the executive branch has made a judgment that its interests are served by sanctioning persons who directly engage in the ICC's efforts to investigate, arrest, detain, or prosecute Americans and high-ranking officials in allied countries (among other designation criteria, including material support to blocked persons). The E.O. is reasonably related to that interest.

This is true even to the extent the E.O. incidentally affects speech. *See Church of Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 209 (2d Cir. 2004) (holding that "a conduct-regulating statute of general application that imposes an incidental burden on the exercise of free speech rights does not implicate the First Amendment"); *accord Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706 (1986); *see also Amirnazmi*, 645 F.3d at 584 (stating that "a statute is not overly broad and thus violative of the First Amendment merely because it regulates incident to its scheme protected activities or property" and rejecting challenge to IEEPA sanctions (cleaned up)); *Kadi v. Geithner*, 42 F. Supp. 3d 1, 34 (D.D.C. 2012) (applying intermediate scrutiny and noting that "the designation of [plaintiff] as a [Specially Designated Global Terrorist] and the blocking of his assets merely restrict[] his ability to make financial transfers to other SDGTs, not his ability to express his views generally."). The purpose of the E.O. is to protect U.S. persons and those of U.S. allies from ICC proceedings by restricting the ability of the ICC Prosecutor and other blocked persons to assist those efforts and incentivizing behavior change.

Incidental effects on speech in this context are not a First Amendment violation—even if Plaintiffs had a First Amendment right to assert, which they do not.

**V.      Plaintiffs Are Not Likely to Succeed on the Merits of Their IEEPA Statutory Claims.**

      **A.      E.O. 14203 Falls Within the President's Authority Under 50 U.S.C. § 1701.**

Plaintiffs contend that E.O. 14203 exceeds the President's authority under 50 U.S.C. § 1701(b) because, in their view, the Order does not respond to a "new" threat and is foreclosed by Congress's existing legislation governing the United States' relationship with the ICC. PI Br. at 26. That argument misreads both the statutory text and the governing principles that apply to executive branch determinations in matters of foreign affairs and national security. IEEPA authorizes the President to exercise specified economic powers, upon declaring a national emergency, to address "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States," to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Once such a declaration is made, the statute empowers the President to employ economic sanctions and related authorities to address that threat. *Id.* § 1702(a)(1)(B). E.O. 14203 expressly invokes this authority and determines that recent actions by the ICC—including efforts to investigate, arrest, detain, or prosecute "protected persons," such as United States personnel and officials of allied countries that have not consented to ICC jurisdiction—constitute "an unusual and extraordinary threat to the national security and foreign policy of the United States." E.O. 14203, pmbl., 90 Fed. Reg. at 9370. That determination satisfies the statutory prerequisites for the exercise of IEEPA authority.

Plaintiffs argue that E.O. 14203 cannot satisfy 50 U.S.C. § 1701 because the United States has long objected to the ICC's assertion of jurisdiction over U.S. personnel and therefore the asserted threat is not "new." PI Br. at 29-31. But nothing in IEEPA requires the President to identify a threat that has never previously existed. 50 U.S.C. § 1701(a). The statute requires that the President determine

that an "unusual and extraordinary threat" exists and declare a national emergency to address it. *See id.* E.O. 14203 identifies precisely such a threat. *See* E.O. 14203, pmbl., 90 Fed. Reg. at 9369–70. The Order explains that the ICC has asserted jurisdiction and opened preliminary investigations concerning personnel of the United States and certain of its allies, including Israel. *Id.* It further states that the ICC has issued arrest warrants targeting senior officials of a close United States ally. *Id.* Further, the ICC's recent actions concerning Israel after the October 7, 2023 attacks and the ensuing conflict in Gaza materially altered the geopolitical and legal landscape surrounding the ICC's activities and reasonably led the President to conclude that the ICC's conduct posed an unusual and extraordinary threat. *See* E.O. 14203, pmbl., 90 Fed. Reg. at 9369; *see also* Statement of ICC Prosecutor Karim A.A. Khan KC: Applications for Arrest Warrants in the Situation in the State of Palestine, Int'l Crim. Ct. (May 20, 2024), https://www.icc-cpi.int/news/statement-icc-prosecutor-karim-aa-khan-kc-applications-arrest-warrants-situation-state (publicly announcing the ICC Prosecutor's applications for arrest warrants before entry of E.O. 14203).

Plaintiffs' theory also disregards the substantial deference owed to the executive branch in matters of foreign affairs and national security. *See Regan*, 468 U.S. at 223 (emphasizing the "traditional deference to executive judgment in the realm of foreign policy"); *Islamic Am. Relief Agency v. Gonzales,* 477 F.3d 728, 734 (D.C. Cir. 2007) (applying "extremely deferential" review to executive national-security determinations); *Zarmach Oil Servs.*, 750 F. Supp. 2d at 155 (recognizing deference in reviewing sanctions determinations). The determination reflected in E.O. 14203 that recent ICC actions threaten the national security and foreign policy of the United States is precisely the type of judgment committed to the political branches.

Plaintiffs' argument that Congress's prior legislation addressing the ICC limits the President's authority under IEEPA fares no better. PI Br. at 28-31. Congress has enacted statutes addressing certain aspects of the United States' relationship with the ICC such as provisions designed to protect

36

United States personnel from ICC process. *See, e.g.*, 22 U.S.C. § 7422(a)(2) (authorizing certain waivers of restrictions on cooperation with the ICC only if the ICC has agreed not to seek jurisdiction over "covered United States persons" and to ensure that such persons will not be "arrested, detained, prosecuted, or imprisoned by or on behalf of the International Criminal Court"); 22 U.S.C. § 7427. But those provisions do not purport to limit the President's separate authority under IEEPA to respond through economic sanctions to foreign threats to the national security or foreign policy of the United States. They govern U.S. dealings with ICC proceedings involving protected persons, not the President's authority under IEEPA to address "any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." 50 U.S.C. § 1701(a).

Plaintiffs rely on decisions such as *Food & Drug Administration v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), to argue that Congress's failure to enact IEEPA-specific sanctions legislation pertaining to the ICC implicitly limits the President's authority. *See* PI Br. at 30–31. That reliance is inapposite. *Brown & Williamson* considered whether an agency could claim regulatory authority that conflicted with the broader statutory framework Congress had enacted. 529 U.S. at 159–60. The Supreme Court concluded that allowing the U.S. Food and Drug Administration to regulate tobacco products would have contradicted Congress's carefully constructed tobacco specific regulatory framework. *Id.* Here, by contrast, no statutory scheme prohibits the use of economic sanctions to respond to the conduct of foreign actors supporting the efforts of the ICC that the E.O. delineates. To the contrary, Congress has granted the President broad authority under IEEPA to address unusual and extraordinary threats originating outside the United States through economic measures. *See* 50 U.S.C. §§ 1701–02. The President's invocation of that authority therefore does not conflict with any congressional statute and, in fact, effectuates the will of Congress.

37

Plaintiffs' interpretation would transform § 1701 into a vehicle for courts to second-guess the President's assessment of international developments and determine whether a particular threat is sufficiently "new" or "extraordinary." *See Regan*, 468 U.S. at 223, 228 (emphasizing the "traditional deference to executive judgment in the realm of foreign policy"). Nothing in the statutory text supports such judicial oversight of foreign policy judgments. The statute requires only that the President identify an "unusual and extraordinary threat" originating outside the United States and declare a national emergency to address it. 50 U.S.C. § 1701(a). E.O. 14203 does exactly that. *See* E.O. 14203, pmbl., 90 Fed. Reg. at 9369–70. Because the Order identifies actions of the ICC that threaten the national security and foreign policy of the United States and invokes authorities Congress expressly provided to address such threats, Plaintiffs cannot demonstrate that E.O. 14203 exceeds the President's authority under IEEPA. Their 50 U.S.C. § 1701(b) claim therefore is not likely to succeed on the merits.

Plaintiffs separately invoke the Berman Amendment, 50 U.S.C. § 1702(b)(3), but that statutory limitation does not aid them here.

**B.      Plaintiffs Are Not Likely to Succeed on Their Berman Amendment Theory.**

Plaintiffs' Berman Amendment theory is overbroad and misplaced. First, the Plaintiffs do not even allege that they were prevented from engaging in exempt activity. Second, even if they could contest the designation on Albanese's behalf on Berman Amendment grounds, the designation does not run afoul of the Berman Amendment.

Plaintiffs do not allege that Defendants prohibited Cali or L.C. from importing or exporting any "information or informational materials" within the meaning of 50 U.S.C. § 1702(b)(3). See PI Br. at 24-26. Nor do they identify any article, report, book, film, communication, or other informational material of Cali or L.C. that the government prevented them from transmitting, receiving, publishing, or distributing. Instead, Plaintiffs challenge Albanese's designation and the downstream consequences

38

they contend flow from that designation. *See id.* at 1–3, 15–16, 24–26. They further contend that the U.S. Secretary of State designated her because she "recommend[ed]" that the ICC issue arrest warrants and pursue investigations and prosecutions. *Id.* at 2, 16 (alteration in original). In other words, Plaintiffs advance their Berman Amendment theory not because the named Plaintiffs themselves were prohibited from importing or exporting informational materials, but because they contend that Albanese's designation was based in part on speech. That point is especially significant because Plaintiffs ask the Court to set aside Albanese's designation, remove her from the SDN List, and enjoin enforcement against her even though she is not a party in this case. *See id.* at 1, 17, 40. But as discussed in Argument § II, *supra*, Plaintiffs do not show why they should be able to obtain relief based on Albanese's alleged speech.

Even if Plaintiffs could contest the designation (or E.O. 14203) on Albanese's behalf, their theory falls outside the scope of the Berman Amendment. Section 1702(b)(3) withdraws from the President the authority to "regulate or prohibit, directly or indirectly," the importation or exportation of "information or informational materials." 50 U.S.C. § 1702(b)(3). It does not, by its terms, create a freestanding bar on designation whenever the alleged factual basis for the designation includes speech or advocacy. The Berman Amendment was enacted to prevent the use of embargo and sanctions authorities to block the cross-border flow of informational materials—such as books, magazines, films, photographs, artworks, and similar expressive materials—and to prevent restrictions on the permissible means of paying for such materials. *See id.*; *see also, e.g.*, *Kalantari v. NITV, Inc.*, 352 F.3d 1202, 1205 (9th Cir. 2003) (explaining that Congress added the Berman Amendment in reaction to seizures of "shipments of magazines and books from embargoed countries" and restrictions on "the permissible forms of payment for informational materials purchased from Cuba"); *TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 96-97, 108–09 (D.D.C. 2020) (describing § 1702(b)(3) as protecting the importation and exportation of publications, films, photographs, artworks, and news wire feeds). That

39

is not what Plaintiffs allege here. Again, they do not show that Defendants prohibited Cali or L.C.—or Albanese—from importing or exporting any "information or informational materials" within the meaning of 50 U.S.C. § 1702(b)(3), from engaging in any "personal communication" not involving a transfer of anything of value, *id.* § 1702(b)(1), or from engaging in any transaction exempted as "ordinarily incident to travel" within the meaning of *id.* § 1702(b)(4). They also cannot satisfactorily explain why their theory holds water given that the U.S. Department of the Treasury's regulations implementing E.O. 14203 provide that "[t]he prohibitions contained in this part do not apply to any transactions that are exempt pursuant to section 203(b) of the International Emergency Economic Powers Act (50 U.S.C. 1702(b))." 31 C.F.R. § 528.205(a).

Nor does *TikTok Inc. v. Trump* support Plaintiffs' theory. 507 F. Supp. 3d 92 (D.D.C. 2020). There, the challenged restrictions operated on transactions necessary to distribute and operate a communications platform such that the restrictions would effectively impede the exchange of informational materials and personal communications on the platform itself. *See id.* at 103-05, 108-10. Here, by contrast, Plaintiffs do not even allege that Defendants prohibited Cali or L.C. from transmitting, receiving, publishing, or distributing informational materials or from engaging in personal communication. *See* PI Br. at 24–26. Instead, their claim is that Albanese's designation was unlawful because, in their view, it rested on conduct related to speech. *See id.* at 1–3, 15–16, 17–32. That theory does not establish a likelihood of success on a Berman Amendment claim under 50 U.S.C. § 1702(b)(3).

Further, *Learning Resources, Inc. v. Trump* does not advance Plaintiffs' theory. 146 S. Ct. 682, 607 U.S. --- (2026). That case did not interpret the Berman Amendment or consider whether a designation allegedly premised in part on speech violates 50 U.S.C. § 1702(b)(3). Instead, it addressed whether IEEPA's authority to "regulate . . . importation" permits the President to impose tariffs. In holding that it does not, the Supreme Court emphasized the distinct character of tariffs as a revenue raising

40

measure and expressly declined to define the full "metes and bounds" of the President's authority to "regulate . . . importation" under IEEPA. *See Learning Resources*, at 146 S. Ct. at 643–44 (alteration in original). Plaintiffs therefore cannot invoke *Learning Resources* to transform 50 U.S.C. § 1702(b)(3) into a freestanding bar on designation whenever the asserted factual basis includes advocacy or other speech related conduct.

## VI.    The Balance of the Equities and the Public Interest Do Not Favor a Preliminary Injunction.

Because Defendants are government officials sued in their official capacities and federal agencies, the balance of equities and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government's interests are especially substantial if the challenged action concerns economic measures adopted in response to asserted threats to the Nation's national security and foreign policy. Courts have long recognized both the executive branch's "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010), and the heightened deferential standard owed to the political branches in matters of foreign policy. *See, e.g.*, *Regan*, 468 U.S. at 242; *Zarmach Oil Servs.*, 750 F. Supp. 2d at 155; *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

The government's interests are concrete and substantial. The President determined that efforts by the ICC to investigate, arrest, detain, or prosecute protected persons without the consent of their country of nationality constitute an unusual and extraordinary threat to the national security and foreign policy of the United States. *See* E.O. 14203, pmbl., 90 Fed. Reg. at 9369-70. The President further found that the ICC had "engaged in illegitimate and baseless actions targeting America and our close ally Israel," that such actions "directly endanger[] current and former United States personnel," threaten "to infringe upon the sovereignty of the United States," and undermine "the critical national security and foreign policy work of the United States Government and our allies." *Id.*

41

at 9369. E.O. 14203 reflects the President's judgment regarding how best to address that threat. *See id.* at 9369-70. That judgment is also reflected in the designation at the center of this case; although Albanese is not a plaintiff, her designation forms the crux of Plaintiffs' suit, and the U.S. Secretary of State publicly stated that she was designated for having "directly engaged with the International Criminal Court (ICC) in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." Sec'y Rubio Press Statement.

Courts have long recognized that sanctions determinations under IEEPA involve national security and foreign affairs judgments and are therefore subject to a deferential standard of review. *See, e.g.*, *Islamic Am. Relief Agency*, 477 F.3d at 734; *Regan*, 468 U.S. at 242; *Zarmach Oil Servs.*, 750 F. Supp. 2d at 155. Preventing the executive branch from implementing such measures would directly undermine those interests. *See Diegelmann v. Yellen*, No. 24-1090 (JEB), 2024 WL 4880468, at *7-8 (D.D.C. Nov. 25, 2024) (explaining that courts should be "'extremely deferential' to executive blocking orders," which lie "at the intersection of national security, foreign policy, and administrative law" (quoting *Islamic Am. Relief Agency*, 477 F.3d at 734)), *appeal filed*, No. 24-5277 (D.C. Cir.).

Plaintiffs cannot show that the balance of equities tips in their favor. Their argument that the government has no interest in enforcing an unconstitutional law depends on the premise that E.O. 14203 is unlawful. PI Br. at 37. But for the reasons explained above, Plaintiffs have not made that showing. Nor have they shown a likely First Amendment injury sufficient to outweigh the government's interests. E.O. 14203 regulates economic activity with designated or otherwise blocked foreign persons under IEEPA; it does not target the suppression of ideas or the dissemination of information. *See, e.g.*, E.O. 14203 §§ 1, 3, 90 Fed. Reg. at 9370; 50 U.S.C. § 1702(a)(1)(B) (authorizing the President to "regulate, direct and compel, nullify, void, prevent or prohibit" transactions involving property in which a foreign national has an interest); 31 C.F.R. § 528.201 (prohibiting transfers or other dealings in blocked property); 31 C.F.R. § 528.205(a) ("[t]he prohibitions contained in this part

42

do not apply to any transactions that are exempt pursuant to section 203(b) of the International Emergency Economic Powers Act"); 50 U.S.C. § 1702(b)(3) (excluding from the President's authority the importation or exportation of "information or informational materials"). And even under Plaintiffs' own theory, the alleged speech-related burdens fall principally on Albanese, who is not a plaintiff. PI Br. at 1–4, 17–23, 33–35. Moreover, Plaintiffs acknowledge that OFAC issued licenses authorizing certain transactions related to the jointly owned property and transactions ordinarily incident and necessary to Albanese's role as L.C.'s parent and legal guardian. PI Br. at 16, 34–35. Those licenses further mitigate the alleged harms to the named Plaintiffs and undercut any claim that the equities favor the extraordinary remedy of a preliminary injunction. Plaintiffs therefore cannot convert their unproven constitutional theory into an equitable interest that outweighs the government's national security and foreign policy interests.

The same is true of Plaintiffs' appeals to asserted international interests. Plaintiffs contend that the public interest favors an injunction because Albanese's designation allegedly impairs "international human rights efforts" and undermines international institutions. *See* PI Br. at 38. The Court should not consider purely "international" interests in balancing the public interest and equities, and Plaintiffs cite no authority to the contrary.[3] Regardless, courts must give heightened deference to the executive branch's "evaluation of the facts" and its "sensitive and weighty interests of national security and foreign affairs" where preliminary relief would interfere with executive branch action taken in those domains. *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73, 85 (D.D.C. 2020) (citation omitted). Here, Plaintiffs' preferred conception of international advocacy priorities does not outweigh the executive branch's

---

[3] Plaintiffs wrongly suggest that the sanctions at issue are inconsistent with the international legal obligations of the United States and therefore the public interest favors a preliminary injunction. *See* PI Br. at 38–39. That is incorrect, and Plaintiffs have not demonstrated that (or explained how) the sanctions are inconsistent with the U.S. obligations to the United Nations.

43

determination that the ICC's efforts to investigate, arrest, detain, or prosecute "protected persons," as stated in E.O. 14203, threaten the national security and foreign policy of the United States. Nor can Plaintiffs plausibly maintain that the government "will not face any harm if a preliminary injunction is granted." *See TikTok*, 490 F. Supp. 3d at 85 (emphasis omitted).

Finally, the extraordinary breadth of the relief Plaintiffs request further confirms that the balance of equities and the public interest do not favor a preliminary injunction. *See Regan*, 468 U.S. at 242. Plaintiffs do not merely seek relief for injuries allegedly suffered by themselves. PI Br. at 1, 17, 40. Rather, they ask the Court to order the government to remove Albanese from the SDN List and broadly restrict the enforcement of sanctions against her even though she is not a plaintiff in this case. *Id.* at 1, 17, 40. Granting such sweeping relief would substantially intrude on the executive branch's administration of a sanctions program in an area at the core of foreign affairs and national security. *See Regan*, 468 U.S. at 242.

For those reasons, the balance of equities and the public interest weigh strongly against preliminary relief.

## VII.    If Granting Relief, the Court Should Limit It Appropriately.

In the event the Court does grant relief, it must be tailored to harms that the named Plaintiffs can establish. *See Murthy v. Missouri*, 603 U.S. 43, 61 (2024) (holding that plaintiffs "must demonstrate standing . . . for each form of relief that they seek" (citation omitted)). Even if the Court finds that Plaintiffs have standing to assert Albanese's alleged First Amendment rights, for example, the fact remains that she is not a party to this action. Thus, there is *no basis for enjoining the sanctions against her. See Gill v. Whitford*, 585 U.S. 48, 73 (2018) (holding that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury"). At most, if Plaintiffs carried their burden on the four *Winter* factors, the Court's authority would extend to enjoining the sanctions' effects on the named Plaintiffs. Defendants maintain that no basis exists for granting any part of Plaintiffs' requested relief—especially

44

given Plaintiffs' egregious and unjustified delay in bringing this action—but if the Court disagrees, it should limit that relief according to the longstanding equitable principles recently reaffirmed by the Supreme Court in *CASA*. *See* 606 U.S. at 856.

Those limitations are especially critical insofar as Plaintiffs challenge E.O. 14203 on its face. To the extent Plaintiffs have standing at all—and they do not, *see supra* Argument § II—it is only to challenge the effects of Albanese's designation on them. Based on Plaintiffs' presentation of evidence at this stage, the E.O., on its face, has no effect on them. They have thus made no showing that their alleged harms would justify preliminarily enjoining the operation of the E.O. as a facial matter. *See Gill*, 585 U.S. at 73; *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (holding that relief must be "limited to the inadequacy that produced the injury in fact that the plaintiff has established"). Moreover, doing so would create a grave separation-of-powers issue by enjoining the enforcement of presidential action pursuant to an express grant of authority in a duly enacted federal statute. *Cf. Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers) (recognizing that the Supreme Court has traditionally presumed that "all Acts of Congress . . . 'should remain in effect pending a final decision on the merits'"); *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 508 (2010) ("Because the unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions, the normal rule is that partial, rather than facial, invalidation is the required course" (cleaned up)); *Family Plan. Ass'n of Me. v. HHS*, 803 F. Supp. 3d 195, 197 (D. Me. 2025) (recognizing that plaintiffs' "convictions are not equal to the task of enjoining congressional will in this arena"). In sum, longstanding equitable principles and the Plaintiffs' own conduct require that the Court tailor relief (if any) to redressing injuries that Plaintiffs prove stem from Albanese's designation.

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

March 18, 2026                              *Respectfully submitted,*

                                            BRETT A. SHUMATE
                                            Assistant Attorney General
                                            Civil Division

                                            YAAKOV M. ROTH
                                            Principal Deputy Assistant Attorney General
                                            Civil Division

                                            ERIC J. HAMILTON
                                            Deputy Assistant Attorney General

                                            ELIZABETH HEDGES
                                            Counsel to the Assistant Attorney General
                                            Civil Division

                                            STEPHEN M. ELLIOTT
                                            Assistant Branch Director

                                            */s/ Kian K. Azimpoor*
                                            KIAN K. AZIMPOOR (DC Bar No. 90024613)
                                            Trial Attorney
                                            United States Department of Justice
                                            Civil Division, Federal Programs Branch
                                            1100 L Street NW
                                            Washington, DC 20005
                                            Tel: (202) 598-0860
                                            Fax: (202) 616-8470
                                            Email: kian.k.azimpoor@usdoj.gov


                                            *Counsel for Defendants*