# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| L.C., a minor child, by and through her father MASSIMILANO CALI, | ) ) ) | CIVIL ACTION |
| MASSIMILIANO CALI, | ) ) | No. 1:26-cv-00688-RJL |
| *Plaintiffs*, | ) ) | |
| *v.* | ) ) | DATE: March 25, 2026 |
| DONALD J. TRUMP, *et al.*, | ) ) | |
| *Defendants*. | ) ) ) ) | |

# REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR
# A PRELIMINARY INJUNCTION

i

**TABLE OF CONTENTS**

REPLY ........................................................................................................................... 1

   I.    Plaintiffs are likely to prevail on the merits. .................................................... 3

      A.   EO 14203 generally, and Francesca's designation specifically, violate the
      Berman Amendments. ................................................................................................4

      B.   EO 14203 generally, and Francesca's designation specifically, violate the
      First Amendment. .....................................................................................................6

      C.   EO 14203 generally, and Francesca's designation specifically, violate
      IEEPA's predicates for designation. ......................................................................13

   II.   Plaintiffs continue to suffer concrete, particularized, and irreparable harms. ................. 14

      A.   L.C. continues to suffer irreparable Article III injuries. ............................................. 15

      B.   Max continues to suffer irreparable Article III injuries. ............................................. 18

      C.   Plaintiffs' motion for a preliminary injunction is timely. ........................................... 19

   III.   Plaintiffs have standing. ................................................................................. 21

   IV.   The balance of equities favors injunctive relief. .......................................................... 24

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Aamer v. Obama*,
742 F.3d 1023 (D.C. Cir. 2014) ................................................................................. 3

*Al-Aqeel v. Paulson*,
568 F.Supp.2d 64 (D.D.C. 2008) ............................................................................... 7

*Al-Aulaqi v. Obama*,
727 F.Supp.2d 1 (D.D.C. 2010) ............................................................................... 23

*Aptheker v. Secretary of State*,
378 U.S. 500 (1964) ................................................................................................. 16

*Austin v. Reagan Nat'l Advert. of Austin*,
596 U.S. 61 (2022) ..................................................................................................... 9

*Bond v. United States*,
564 U.S. 211 (2011) ................................................................................................... 7

*Boumediene v. Bush*,
553 U.S. 723 (2008) ................................................................................................. 12

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ................................................................................................... 9

*Connick v. Myers*,
461 U.S. 138 (1983) ................................................................................................... 9

*CREW v. DOJ*,
No. 25-cv-4426 (CKK), 2026 WL 472589 (D.D.C. Feb. 19, 2026) ........................ 15

*Davis v. Ichord*,
442 F.2d 1207 (D.C. Cir. 1970) ............................................................................... 17

*Elrod v. Burns*,
427 U.S. 347 (1976) ................................................................................................... 2

*El-Shifa Pharmaceuticals v. United States*,
607 F.3d 836 (D.C. Cir. 2010) ................................................................................. 24

*FEA v. Trump*,
795 F.Supp.3d 74 (D.D.C. 2025) ............................................................................. 19

*Fla. EB5 Invs. v. Wolf*,
443 F.Supp.3d 7 (D.D.C. 2020) ............................................................................... 19

*Franz v. United States*,
707 F.2d 582 (D.C. Cir. 1983) ................................................................................. 15

*Gitlow v. New York*,
268 U.S. 652 (1925) ................................................................................................... 7

*Holder v. HLP*,
561 U.S. 1 (2010) ..................................................................................................... 11

*Kadi v. Geithner*,
   42 F.Supp.3d 1 (D.D.C. 2012) .................................................................................................... 6

*Kelly v. Hegseth*,
   No. 26-cv-81 (RJL), 2026 WL 391777 (D.D.C. Feb. 12, 2026) ................................................ 9

*Learning Resources v. Trump*,
   146 S.Ct. 628 (2026) ................................................................................................................ 14

*Lepelletier v. F.D.I.C.*,
   164 F.3d 37 (D.C. Cir. 1999) .................................................................................................... 22

*Lopez Bello v. Smith*,
   651 F.Supp.3d 20 (D.D.C. 2022) ................................................................................................ 7

*Marland v. Trump*,
   498 F.Supp.3d 624 (E.D.Pa. 2020) ............................................................................................. 4

*Morton v. Mancari*,
   417 U.S. 535 (1974) .................................................................................................................. 14

*Nat'l Council of Resistance of Iran v. State*,
   251 F.3d 192 (D.C. Cir. 2001) .................................................................................................... 7

*National Wildlife Federation v. Gorsuch*,
   693 F.2d 156 (D.C. Cir. 1982) .................................................................................................. 14

*New York Times v. Sullivan*,
   376 U.S. 254 (1964) .................................................................................................................... 9

*NRDC v. EPA*,
   656 F.2d 768 (D.C. Cir. 1981) .................................................................................................... 2

*Olenga v. Gacki*,
   507 F.Supp.3d 260 (D.D.C. 2020) .............................................................................................. 7

*OSJI v. Trump*,
   510 F.Supp.3d 198 (S.D.N.Y. 2021) ................................................................................... 10, 13

*Pantoja v. Martinez*,
   567 F.Supp.3d 76, 78 (D.D.C. 2021) ........................................................................................ 15

*People's Mojahedin Org. of Iran v. State*,
   327 F.3d 1238 (D.C. Cir. 2003) .................................................................................................. 6

*PETA v. Gittens*,
   215 F.Supp.2d 120 (D.D.C. 2002) .................................................................................... 2, 3, 24

*Prince v. Massachusetts*,
   321 U.S. 158 (1944) .................................................................................................................. 17

*Public Citizen v. Nat'l Highway Traffic Safety Admin.*,
   489 F.3d 1279 (D.C. Cir. 2007) ................................................................................................ 21

*R.A.V. v. St. Paul*,
   505 U.S. 377 (1992) .................................................................................................................. 11

*RadLAX Gateway Hotel v. Amalgamated Bank*,
566 U.S. 639 (2012) ............................................................................................................ 14

*Ranjan v. DHS*,
747 F.Supp.3d 192 (D.D.C. 2024) ......................................................................................... 7

*Rona v. Trump*,
797 F.Supp.3d 278 (S.D.N.Y. 2025) ..................................................................................... 10

*Russian Volunteer Fleet v. United States*,
282 U.S. 481 (1931) .............................................................................................................. 6

*Ryan v. Lew*,
934 F.Supp.2d 159 (D.D.C. 2013) ......................................................................................... 23

*Skinner v. Switzer*,
562 U.S. 521 (2011) .............................................................................................................. 10

*Smith v. Trump*,
791 F.Supp.3d 90 (D.Me. 2025) ........................................................................................... 10

*Snyder v. Phelps*,
562 U.S. 443 (2011) .............................................................................................................. 9

*SPLC v. DHS*,
No. 18-cv-760 (CKK), 2020 WL 3265533 (D.D.C. June 17, 2020) ..................................... 23

*Texas Children's Hospital v. Burwell*,
76 F.Supp.3d 224 (D.D.C. 2014) .......................................................................................... 19

*Thomas v. Collins*,
323 U.S. 516 (1945) .............................................................................................................. 9

*TikTok v. Garland*,
604 U.S. 56 (2025) ................................................................................................................ 4

*Turner v. U.S. Agency for Glob. Media*,
502 F.Supp.3d 333 (D.D.C. 2020) ........................................................................................ 23, 24

*United States v. Chichakli*,
651 F. App'x 62 (2d Cir. 2016) ............................................................................................. 16

*United States v. Robel*,
389 U.S. 258 (1967) .............................................................................................................. 12

*Univ. Legal Servs. v. D.C.*,
No. 18-cv-0301 (KBJ), 2019 WL 1430045 (D.D.C., Mar. 30, 2019) ................................... 4

*Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*,
784 F.Supp.3d 127 D.D.C. 2025) ......................................................................... 10, 22, 23, 24

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) .............................................................................................................. 24

*Zaid v. Exec. Off. of President*,
No. 25-cv-01365 (AHA), 2025 WL 3724884 (D.D.C. Dec. 23, 2025) ................................. 19

**Statutes**

22 U.S.C. §§ 7421, *et seq.*.................................................................................... 2, 11, 13

50 U.S.C. § 1701........................................................................................................ 2, 13

50 U.S.C. § 1702........................................................................................................ 1, 16

**Other Authorities**

31 C.F.R. § 528.205 ......................................................................................................... 4

7 FAM § 453................................................................................................................... 11

H.R. Conf. Rep. No. 103-482 (1994).............................................................................. 4

Regulations Governing the Status, Basic Rights and Duties of Officials other
    than Secretariat Officials, and Experts on Mission, ST/SGB/2002/9 ...................... 23

**REPLY**

Defendant Marco Rubio designated Francesca Albanese under the International Economic Emergencies Powers Act ("IEEPA") for "*recommending* the [International Criminal Court] pursue investigations" and "writing threatening letters." Compl. (Dkt. 1), Ex. B. (emphasis added). The sanctions against Francesca bear none of the procedural or substantive hallmarks of regularity that one sees in the sanctions the Office of Foreign Asset Control ("OFAC") typically imposes against terrorists, international criminals, and rogue governments. Instead, the undisputed record shows that they were an ad hoc effort to target a UN Special Rapporteur, the mother of a U.S. citizen, and an American homeowner for saying things that Defendants did not like. A preliminary injunction of that irregular and unlawful action is warranted.

1.      Plaintiffs are likely to prevail the merits. *First*, Francesca's designation is unlawful under the Berman Amendments, which prohibit using sanctions to "directly or indirectly" stifle the flow of "information and informational materials" and "personal communications." 50 U.S.C. § 1702(c). Defendants ask this Court to ignore the statutory text in favor of cherry-picked excerpts of legislative history, and to construe the Berman Amendments as limited to the physical "importing" of "books, magazines, films, photographs, artworks, and similar expressive materials." Opp.39-40. But that is not what the law says, and no court has interpreted it so narrowly and so contrary to Congress' purposes.

*Second*, Francesca's designation is unlawful under the First Amendment, which forbids the government from punishing advocacy generally, and the practice of law specifically. Defendants' arguments to the contrary are conclusory, fail to cite or distinguish contrary precedent, and substitute personal invective for reason. In fact, Defendants cite *no* non-speech conduct to justify Francesca's designation.

Defendants insist that Francesca and Max enjoy no constitutional protections whatsoever because they are Italian citizens. Opp.25-26. But this blanket assertion fails to engage with the governing law or the uncontested facts. Francesca and Max have substantial connections to the United States, including joint ownership of a home in this district; real property that is effectively frozen due to the sanctions. Whatever the fullest scope of Plaintiffs' constitutional rights may be, the Constitution does not allow the government to strip a family of the use and enjoyment of their home because they disapprove of what the mother has to say.

*Third*, Francesca's designation is unlawful under IEEPA's threshold statutory predicate, which forbids the President from using sanctions to override the will of Congress. *See* American Service Member Protection Act ("ASPA"), 22 U.S.C. §§ 7421, *et seq.* Defendants defend EO 14203 on the ground that "nothing in IEEPA requires the President to identify a threat that has never previously existed." Opp.35. But IEEPA's very first section directs that sanctions may only be used "to deal with an unusual and extraordinary threat," defined as a "new threat," and that they "may not be exercised for any other purpose." 50 U.S.C. § 1701(b). Defendants attempt to override the plain meaning of IEEPA's text with general pleas for "substantial deference." Opp.36. But "no amount of deference can justify an interpretation of the statute that is contrary to law." *NRDC v. EPA*, 656 F.2d 768, 774 (D.C. Cir. 1981).

2.    A preliminary injunction is warranted because Francesca's unlawful designation causes Plaintiffs significant irreparable harms. Foremost, "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *PETA v. Gittens*, 215 F.Supp.2d 120, 128 (D.D.C. 2002) (*quoting Elrod v. Burns*, 427 U.S. 347, 374 (1976)). L.C. and Max have also suffered concrete, particularized harms: the seizure of their family home, a

travel ban to the United States, and the chilling effect on their speech and associational rights that is both inherent to, and the explicit purpose of, Francesca's designation as an SDN.

Defendants seek to undermine the gravity of these harms by accusing Plaintiffs of "dragging their feet" in bringing this action several months after the sanctions were imposed. Opp.13. But as the Cali Declaration makes plain, Plaintiffs diligently exhausted alternatives to litigation through the United Nations, which strictly regulates when its personnel, such as Francesca, may pursue remedies in national legal systems. Declaration of Massimiliano Cali (Dkt. 30-1) ("Cali Decl.") ¶¶ 6, 9, 16, 20, 22, 25. That process only reached its resolution in January 2026, when the United Nations notified Plaintiffs that Francesca was prohibited from suing on her own behalf. Compl., Ex. E.

3.     A preliminary injunction is warranted because the balance of equities also favors enjoining Francesca's designation. Defendants assert only an abstract interest in deference to their discretionary judgments about what is in the foreign policy interests of the United States. But no deference is warranted, in foreign affairs or otherwise, when Defendants act in violation of Congressional laws. And given that the only concrete interest Defendants seek to vindicate is their interest in suppressing political speech, "the public interest favors a preliminary injunction whenever First Amendment rights have been violated." *PETA*, 215 F.Supp.2d at 128.

## I.     Plaintiffs are likely to prevail on the merits.

A preliminary injunction is warranted because "the first and most important" of the factors this Court must consider when evaluating a preliminary injunction is whether the movant "ha[s] established a likelihood of success on the merits." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *see also PETA*, 215 F.Supp.2d at 128. Plaintiffs are likely to prevail on all three grounds on which they seek injunctive relief.

3

### A. EO 14203 generally, and Francesca's designation specifically, violate the Berman Amendments.

The *only* factual basis for Francesca's designation is her "speech or advocacy," Opp.39, which violates the Berman Amendments' prohibition on the use of sanctions to "indirectly" regulate the flow of "information that is protected under the First Amendment to the U.S. Constitution." H.R. Conf. Rep. No. 103-482, at 239 (1994), *reprinted in* 1994 U.S.C.C.A.N. 398, 483. The Berman Amendments are the result of successive Congressional enactments to bar Defendants from using IEEPA sanctions to regulate speech. *Marland v. Trump*, 498 F.Supp.3d 624, 642 (E.D.Pa. 2020). Defendants chafe against Congress' choice to prioritize the free flow of information to and from abroad over their views of what would best serve the Administration's foreign policy interests. But Defendants' complaint lies with Congress, not with Plaintiffs or this Court. Where Congress has found the Berman Amendments too restrictive, it has legislated accordingly. *See TikTok v. Garland*, 604 U.S. 56, 68 (2025).

Defendants contend that Plaintiffs' argument does not "hold[] water" because the Treasury regulations "implementing E.O. 14203 provide that '[t]he prohibitions contained in this part do not apply to any transactions that are exempt pursuant to [the Berman Amendments].'" Opp.40 (quoting 31 C.F.R. § 528.205(a)). The relevance this has to the arguments before this Court is unclear. A generic guarantee that the government will generally comply with the law does not establish that the government *is* complying with the law. *Cf. Univ. Legal Servs. v. D.C.*, No. 18-CV-0301 (KBJ), 2019 WL 1430045, at *7 (D.D.C., Mar. 30, 2019).

Defendants further contend that the Berman Amendments do not protect speech, as such, but only "informational materials" in tangible form. Opp.39. This argument draws no support from the statutory text. Rather, Defendants base this argument on cherry picked excerpts from the legislative history, and variously hammer on the phrase "informational materials" at least eight

4

times in their brief, all the while eliding the full statutory text, which bars the regulation of "*information* and informational materials." Opp.38-41.

Even accepting Defendants' cramped interpretation of the Berman Amendments, however, Francesca's designation would still be unlawful. Defendants have sanctioned her for writing reports, sending letters, and signing an amicus brief. Opp.8-9; Compl., Ex B. All of that is speech. The formats through which that speech was conveyed are all "informational materials." And as Defendants admit, Defendant Rubio sanctioned Francesca "to discourage such conduct." Opp.30. Whatever else the English language might permit, using the full force of IEEPA sanctions to "discourage" the writing of reports, letters, and amicus briefs, is — at the very least — an "indirect" regulation of "informational materials."

The sanctions against Francesca also realize the very harms to Americans that Congress enacted the Berman Amendments to prevent. Defendants' own amici have publicly celebrated the fact that "Albanese is now blocked by the global financial system, unable to open a bank account, use a credit card, or receive payments. She was barred entry to America … In interviews, Albanese says the sanctions have been 'devastating' to her, and that they are having a 'chilling effect' on other UN officials who think twice before criticizing Israel."[1]

The sanctions have resulted in the cancellation of speaking engagements in the United States, even where Francesca planned to convey "information" virtually. Cali Decl. ¶¶ 24, 31-32. As amici explain in detail, they have inhibited the pedagogical opportunities of *American* students at *American* universities, and the political advocacy of *American* civil society organizations. Br. of JVP, Amicus Curiae, (Dkt. 21-1), at 2-3; Br. of DAWN, *et al.*, Amici Curiae, (Dkt. 19), at ¶ 3;

---

[1] UN Watch's Top 10 Moments of 2025, UN Watch, December 23, 2025, https://unwatch.org/un-watchs-top-10-moments-of-2025/.

5

Br. of International Human Rights Law Scholars and Teachers, Amici Curiae, (Dkt. 16-1), at 15; *see also* Sidoti Decl. (Dkt. 3-3) at ¶ 19 ("The sanctions have a chilling effect on other experts, operating literally *in terrorem.*"). And they have been leveraged by Defendants' amici to menace the American publisher and distributors of Francesca's books. Cali Decl. ¶¶ 19, 26.

When publishers and distributors must hire compliance counsel to sell a book, and when Defendants' own amici crow about the "chilling effect" these sanctions have had, Defendants have impermissibly sought to "indirectly" regulate "information and informational materials."

**B. EO 14203 generally, and Francesca's designation specifically, violate the First Amendment.**

**1. Francesca and Max are entitled to the protections of the First Amendment.**

Defendants acknowledge that foreign nationals are entitled to constitutional protections if they have "substantial connections to the United States." Opp.26. Yet, Defendants fail to mention that in this Circuit, that standard is met when a foreign national has "presence or property" in the United States. *People's Mojahedin Org. of Iran v. State*, 327 F.3d 1238, 1241 (D.C. Cir. 2003); *see also Kadi v. Geithner*, 42 F.Supp.3d 1, 26 (D.D.C. 2012) (the D.C. Circuit has "looked to the presence of property as the benchmark for satisfying the 'substantial connections' test, and whether a party has the ability to raise constitutional claims, at least with respect to that property.'").

Plaintiffs' ownership of real property in this district, and the sanctions' direct infringement of their property rights, is more than sufficient to warrant constitutional protection. If the government confiscated their property without due process and just compensation, Plaintiffs could assert the Fifth Amendment without any other connections to the United States. *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 491–92 (1931). And where the government deprives them of the use and value of their home because of what they say, they can assert the First Amendment's protections, either because the freedom of speech is encompassed by their Fifth Amendment rights,

6

*see Gitlow v. New York*, 268 U.S. 652, 666 (1925), or because in defending their property rights, they are entitled to "object that [their] injury results from disregard" of provisions of the Constitution that protect individual liberty. *Bond v. United States*, 564 U.S. 211, 225 (2011).

In addition, the depth and numerosity of Max and Francesca's connections to the United States are more than sufficient to be considered "substantial." What qualifies as "substantial connections" is a "fact-dependent, case-by-case assessment." *Olenga v. Gacki*, 507 F.Supp.3d 260, 274 (D.D.C. 2020); *see also Ranjan v. DHS*, 747 F.Supp.3d 192, 198 (D.D.C. 2024) (noting "The D.C. Circuit has no test to determine what degree of connection to the United States counts as 'substantial'" and looking to other precedent that "presents similar facts."). Connections that this Court has found substantial include having a U.S. citizen child, residence in the United States, a spouse with residence and work in the United States on a temporary visa, and holding a U.S. visa. *Lopez Bello v. Smith*, 651 F.Supp.3d 20, 38 (D.D.C. 2022). They have also included routine travel to the United States, acquiring U.S. property, being an officer of a U.S. company, *Al-Aqeel v. Paulson*, 568 F.Supp.2d 64, 70 (D.D.C. 2008), as well as having an "overt presence" in a press office and "an interest in a small bank account." *Nat'l Council of Resistance of Iran v. State*, 251 F.3d 192, 201 (D.C. Cir. 2001).

Here, Max and Francesca's connections are substantial, enduring, and a matter of public record: home ownership; a mortgage with a U.S. financial institution; payment of property taxes into the federal fisc;[2] a U.S. citizen daughter; deep professional and academic ties to the country; frequent travel to the United States, where both the World Bank and United Nations are headquartered; and professional associations and speaking engagements, including with Tufts,

---

[2] Given the sensitivities of this case, Plaintiffs are not providing links to these publicly available documents but can do so under redaction if the Court desires.

7

Princeton, Columbia, and Georgetown, which terminated Francesca's decade-long affiliation due to her designation.[3]

### 2. Strict scrutiny applies to EO 14203 and Francesca's designation.

Defendants ask this Court to apply intermediate scrutiny, arguing that "the E.O. does not regulate speech but rather conduct" and that it "does not prevent Plaintiffs from speaking in any way or on any subject." Opp. 32. This is plainly false.

Defendants and their amici are candid about the reason they targeted Francesca: for "recommending that the ICC" prosecute Israeli officials, "writing threatening letters," "making extreme and unfounded accusations and recommending the ICC pursue investigations and prosecutions," Compl., Ex. B; *see also* Opp.8-10; Br. of ACLJ, Amicus Curiae (Dkt. 20-1), at 5-6 (recognizing that "the Secretary of State[ determined] that Francesca Albanese's advocacy warranted SDN status"); Br. of UN Watch, Amici Curiae; H. Neurer Decl. (Dkt. 14-2) ¶ 9.[4] Even if this Court accepts these histrionic and often defamatory accusations at face value, Defendants and their amici do not identify a single *act* that amounts to more than the "speech on public issues

---

[3] Visit by United Nations Special Rapporteur Francesca Albanese, Tufts Univ., https://sites.tufts.edu/murrowcenter/visit-by-united-nations-special-rapporteur-francesca-albanese/; SPIA Event Featuring UN's Francesca Albanese Draws Heated Debate, Princeton Alumni Weekly, https://paw.princeton.edu/article/spia-event-featuring-uns-francesca-albanese-draws-heated-debate; E. Pickering & M. Bordoff, *U.N. special rapporteur on the occupied Palestinian territories speaks at Barnard 'Gaza In Focus' event*, Columbia Spectator (Nov. 6, 2024), https://www.columbiaspectator.com/news/2024/11/06/un-special-rapporteur-on-the-occupied-palestinian-territories-speaks-at-barnard-gaza-in-focus-event/; N. Abreau, *GU Cuts Ties With Affiliated Scholar Following US Sanctions*, The Hoya (Jan. 15, 2026), https://acmcu.georgetown.edu/news/event-coverage/anatomy-of-genocide-in-gaza/.

[4] "Most directly relevant to the designation at issue in this case, Albanese has actively *supported* and *promoted* the International Criminal Court's proceedings against Israeli and American leaders–the 'protected persons' under Executive Order 14203. She has *publicly called on* the ICC to investigate and prosecute Israeli leaders, *tagged* the ICC and its Chief Prosecutor *in social media posts urging* specific investigative actions, *posted support* for the ICC's issuance of arrest warrants against Israeli Prime Minister Netanyahu and Defense Minister Gallant, and *described* the ICC's proceedings as 'the flame of accountbility [sic].'"

8

[that] occupies the 'highest rung of the hierarchy of First Amendment values' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983).

If Defendants and their amici wish to sanction Francesca for being "hurtful," *Snyder v. Phelps*, 562 U.S. 443, 460 (2011), "urging a course of action" with which they disagree, *Thomas v. Collins*, 323 U.S. 516, 537 (1945), "communicat[ing] information, express[ing] opinion, recit[ing] grievances, [and] protest[ing] claimed abuses" they reject as false, *New York Times v. Sullivan*, 376 U.S. 254, 266 (1964), or "advocating" a worldview they passionately oppose, *Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969), they must satisfy strict scrutiny. "Speech on 'matters of public concern' lies at the core of First Amendment protection" even when it constitutes "opposition to national foreign policy," and "even 'vehement, caustic, and … unpleasantly sharp attacks on government and public officials,'" *Kelly v. Hegseth*, No. 26-cv-81 (RJL), 2026 WL 391777, at *8 (D.D.C. Feb. 12, 2026) (quoting *Phelps*, 562 U.S at 451; *Bond v. Floyd*, 385 U.S. 116, 132 (1966), and *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

Against this, Defendants contend that EO 14203 is content neutral because it never uses the word "speech" to describe the "conduct" it regulates. Opp.32. And Defendants' opposition uses no less than eleven synonyms for "speech," Opp.8-10, without ever identifying any non-speech conduct to justify Francesca's designation.

Speech by any other name remains constitutionally protected and "a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a 'function or purpose' proxy that achieves the same result." *Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61, 74 (2022). Every federal court to consider EO 14203 has concluded that it is subject to strict scrutiny, because it is. *Rona v. Trump*, 797 F.Supp.3d 278

9

(S.D.N.Y. 2025); *Smith v. Trump*, 791 F.Supp.3d 90 (D.Me. 2025); *cf. OSJI v. Trump*, 510 F.Supp.3d 198 (S.D.N.Y. 2021). Defendants give this Court no basis to conclude differently here.

Strict scrutiny is independently warranted because EO 14203 generally, and the designation of Francesca specifically, are viewpoint discriminatory attacks on the practice of law. *Wilmer Cutler Pickering Hale & Dorr LLP v. Exec. Off. of President*, 784 F.Supp.3d 127, 143 (D.D.C. 2025); *see also* Mem.20 (collecting cases). Defendants ask this Court to "disregard that argument" as "doubly forfeited." Opp. 33. Plaintiffs, however, have forfeited nothing. The complaint's very first ground for relief is the First Amendment. Plaintiffs were under no obligation to pin their "claim for relief to a precise legal theory." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011).

Defendants' protests notwithstanding, EO 14203 does nothing but target the practice of law. Its purpose is to authorize sanctions on those who participate in judicial proceedings before an international tribunal. The first individual designated under EO 14203 was the ICC's Chief Prosecutor. EO 14203, Annex A. The next raft of designations targeted its judges.[5] Then followed Francesca, whose designation Defendants justify, in part, based upon her joining an amicus brief, Opp.8-9, the precise conduct deemed constitutionally protected in *Rona*, *Smith*, and *OSJI*.

Defendants give away the game later in their brief, when they admit that EO 14203's purpose was to "restrict the ability of the ICC Prosecutor and other blocked persons to assist [ICC proceedings]." Opp.34. Indeed, it is difficult to characterize the verbs "investigate, arrest, detain, or prosecute" as anything other than the practice of law.

---

[5] Press Statement, Marco Rubio (Dec. 18, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/12/sanctioning-icc-judges-directly-engaged-in-the-illegitimate-targeting-of-israel; Press Statement, Marco Rubio (June 5, 2025), https://www.state.gov/releases/office-of-the-spokesperson/2025/06/imposing-sanctions-in-response-to-the-iccs-illegitimate-actions-targeting-the-united-states-and-israel/.

### 3. EO 14203 and Francesca's designation fail strict scrutiny.

To survive strict scrutiny, EO 14203 must be narrowly tailored to a compelling state interest. *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992). Defendants' most specific statement of the compelling interest that EO 14203 and the designation of Francesca ostensibly serve is their assertion that "protecting the citizens of the United States and its allies from investigation, arrest, detention, and prosecution by the ICC without the consent of the United States or its allies, respectively, is a compelling interest." Opp.29. But Defendants never explain why.

U.S. nationals, and the nationals of our allies, are prosecuted in foreign courts so routinely that the *Foreign Affairs Manual* has a whole section on lodging diplomatic protests. 7 FAM § 453. Simply declaring something to be within the "foreign policy interests" of the United States does not by fiat make it a "compelling interest" for First Amendment purposes. And unlike in *Holder v. HLP*, 561 U.S. 1, 33–34 (2010), where the political branches collectively addressed the threat posed by violent terrorist organizations, Congress has never treated thwarting the risk of unconsented-to investigations by the ICC as a "compelling interest" that justifies the imposition of sanctions on those who engage in ICC-related advocacy. *See* 22 U.S.C. § 7421, *et seq*.

Neither EO 14203, nor the designation of Francesca are narrowly tailored. As the Supreme Court held in *HLP*, the prohibition on speech-based support to terrorist organizations was only constitutional because it was "carefully drawn to cover only a narrow category of speech to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." *HLP*, 561 U.S. at 26. The Court went out of its way to clarify that "independently advocating for a cause is different from providing a service [to a foreign terrorist organization] … any independent advocacy in which plaintiffs wish to engage is not prohibited." *Id*. at 24. Independent advocacy is the only reason Francesca was sanctioned.

11

Defendants attempt to muddle this fact, which they never directly dispute, by invoking an agreement under which the United Nations and ICC promise to "cooperate closely, whenever appropriate, with each other and consult each other on matters of mutual interest." Opp.10. The insinuation appears to be that Francesca's recommendations and advocacy were done to effectuate this agreement. But that misunderstands the structural and legal framework in which the United Nations and ICC operate. And Defendants do not offer a single piece of evidence pointing to actual coordination between Francesca and the ICC, imputed or otherwise. The most they claim is that Francesca's UN role gives her recommendations added "weight." Opp.10. But that simply highlights the fact that her advocacy is independent, non-binding, and constitutionally protected under even the broadest reading of *HLP*.

At bottom, Defendants' argument rests on the chilling claim that strict scrutiny is satisfied because "the Executive has determined that the sanctions imposed on [Francesca] are necessary to discourage her activities that are endangering the United States' interests," Opp.29, and that those determinations are effectively unreviewable because "the executive branch has made a judgment." Opp.34. Such declarations of the "United States' interests" are not *ipse dixit* compelling interests under the First Amendment. As the Supreme Court held over a half-century ago, "Implicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart. For almost two centuries, our country has taken singular pride in the democratic ideals enshrined in its Constitution, and the most cherished of those ideals have found expression in the First Amendment." *United States v. Robel*, 389 U.S. 258, 264 (1967). Naked invocations of "national security and foreign affairs," Opp.36, do not give Defendants the power to "to switch the Constitution on or off at will." *Boumediene v. Bush*, 553 U.S. 723, 765 (2008).

12

### C. EO 14203 generally, and Francesca's designation specifically, violate IEEPA's predicates for designation.

Defendants argue EO 14203 "does not conflict with any congressional statute and, in fact, effectuates the will of Congress." Opp.37. Both claims are false.

Defendants' first claim is false because EO 14203 squarely conflicts with IEEPA's textual limits on the creation of sanctions programs, which mandate that they address "new" threats that are "unusual and extraordinary," and preclude the use of its authority for "any other purpose." 50 U.S.C. § 1701. A threat is neither "new," "unusual," nor "extraordinary" if it has persisted for twenty-five years and has been the subject of specific legislative attention throughout that time.

Defendants at no point engage with the text of IEEPA. Instead, they suggest that EO 14203 is consistent with the historical understanding of IEEPA because "[i]n 2020 … the executive branch invoked IEEPA to address concerns regarding the ICC's asserted jurisdiction over U.S. personnel." Opp.6 (citing E.O. 13928, 85 Fed. Reg. 36,139 (June 11, 2020)). In a footnote, Defendants blandly report "Subsequent history omitted." *Id*. at 6 n.1. But the omitted "subsequent history" was the grant of a preliminary injunction because that executive order violated the First Amendment. *OSJI*, 510 F.Supp.3d at 198.

Defendants' second claim is false because, even if one ignores IEEPA's text, EO 14203 frustrates the clearly expressed will of Congress. Defendants agree that Congress enacted ASPA to "govern U.S. dealings with ICC proceedings involving protected persons." Opp.37. Addressing the precise threat that EO 14203 purports to target, Congress provided the Executive specific authorities to address when "protected persons" were subject to "investigation" and "prosecution" by the ICC. 22 U.S.C. § 7427(c). It did not authorize sanctions.

Defendants contend that because ASPA does not specifically abrogate "the President's authority under IEEPA," it should not be construed to preclude the use of IEEPA to supplant

13

ASPA's balanced legislative scheme. Opp.37. But this argument fails basic principles of statutory construction. The specific governs the general. *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974). Courts and the Executive alike must respect when "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quotations omitted).

Unable to ground its arguments in IEEPA's text, Defendants assert that relief should be denied because they are entitled to "substantial deference," Opp.36, and because this Court owes respect to the "considered judgment" of "the political branches" regarding which "particular restrictions are necessary to achieve foreign policy and national security goals," Opp.30. Defendants, however, only represent one political branch. And the very claim before this Court is that they are abrogating the considered legislative judgment of the other. Plaintiffs do not ask this Court to second guess Defendants' foreign policy judgments. They ask this Court to apply the law. Because even where a case touches on "foreign affairs," it remains the province of the judiciary to say what "IEEPA does not authorize." *Learning Resources v. Trump*, 146 S.Ct. 628, 646 (2026). And where, as here, a sanctions program "frustrates the policy that Congress sought to implement" with laws like ASPA, "no amount of deference can save it." *National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 171 (D.C. Cir. 1982) (cleaned up).

**II.     Plaintiffs continue to suffer concrete, particularized, and irreparable harms.**

EO 14203 states its purpose as to impose "tangible and significant consequences on those responsible for the ICC's transgressions … as well as their immediate family members." EO 14203, pmbl. That is what Defendants' designation of Francesca has done to her family. They are denied the use or value of their home. They live under a travel ban. And they are chilled in what they can say and do with one another for fear of felony prosecution. These injuries to legally

14

protected interests are undisputed. They are supported by the exhibits and declarations submitted to this Court. And they are directly traceable to Francesca's unlawful designation.

### A. L.C. continues to suffer irreparable Article III injuries.

Defendants ask this Court to dismiss L.C.'s injuries as speculative and not "concrete and particularized" because she has not identified "any actual transaction in which [she] wishes to engage," Opp.18, and because she failed to submit a declaration attesting to her suffering. Opp.23. Both contentions are unwarranted.

As an initial matter, Defendants fail to identify a single fact, or a factual allegation in the complaint or motion papers, that they dispute. *See Pantoja v. Martinez*, 567 F.Supp.3d 76, 78 n.1 (D.D.C. 2021) (because "Defendants do not contest [Plaintiffs] averments" in the complaint, this Court is free to "accept[] them as true."); *see also CREW v. DOJ*, No. 25-cv-4426 (CKK), 2026 WL 472589, at *3 (D.D.C. Feb. 19, 2026) (granting a preliminary injunction based upon complaint allegations that are "undisputed and unrebutted"). The concrete, particularized, and irreparable harms that form the basis of L.C.'s entitlement to relief are supported by the exhibits and declarations Plaintiffs have submitted to this Court, are matters of public record, or are per se harms for a U.S. citizen.

Because L.C. is a U.S. citizen, EO 14203 criminalizes nearly all her transactions with her mother involving anything of value. EO 14203 § 3. The specific license OFAC issued six weeks after Francesca's designation confirms that this is the intended and per se legal effect of the sanctions on her relationship with her mother, which is a fundamental, constitutionally protected interest that Defendants' challenged conduct directly invades. *Franz v. United States*, 707 F.2d 582, 594–95 (D.C. Cir. 1983).

EO 14203 also imposes a categorical bar on entry to the United States by the "immediate family members" of SDNs. EO 14203 § 4. That term is defined as "a spouse or child." *Id*. § 8(f).

15

The designation of L.C.'s mother and the ban on her father's entry, therefore, substantially burdens her own right to travel, "a constitutional liberty closely related to rights of free speech and association." *Aptheker v. Secretary of State*, 378 U.S. 500, 517 (1964). Being unable to return to the country of her birth without overcoming the strict, near universal regulatory restrictions on international travel by an unaccompanied minor is an injury in fact.[6]

These are per se invasions of L.C.'s fundamental rights as a U.S. citizen. Defendants offer this Court little in the way of a response beyond what they characterize as "a broad license" that OFAC issued authorizing "certain transactions between L.C. ... and [Francesca]," which they attempt to bolster with a declaration from OFAC to "resolve any perceived lack of clarity." Opp.18-19.

Contrary to Defendants' representations to this Court, there is nothing "broad" about this license. It extends only to U.S. persons, and therefore does not offer any protection to L.C.'s father or mother, who by virtue of being an SDN commits a criminal violation of IEEPA whenever she engages in transactions that have a U.S. nexus. *See*, *e.g.*, *United States v. Chichakli*, 651 F.App'x 62 (2d Cir. 2016) (affirming the conviction of an SDN for conspiring to violate IEEPA). L.C. is a per se "person … subject to the jurisdiction of the United States." 50 U.S.C. § 1702(a)(1). The fact that L.C. must watch what she says or does, lest she become the U.S. nexus of an IEEPA violation that could expose her parents to twenty years imprisonment, is an injury in fact.

The license OFAC issued is also limited to "transactions ... *ordinarily incident and necessary to* [Francesca's] role as the parent and legal guardian." Compl., Ex. D (emphasis added). The license provides an example of what it is describing: "This authorization includes ... goods,

---

[6] *See* https://consnewyork.esteri.it/en/servizi-consolari-e-visti/servizi-per-il-cittadino-italiano/passaporti-e-carte-didentita/travel-by-children-under-14-years-of-age-traveling-alone-or-with-persons-other-than-their-parents/.

services, and funds *essential to the maintenance* of [L.C.]." *Id.* (emphasis added). How an aggressive regulator or prosecutor would interpret those terms if L.C. drew the ire of her mother's ideological opponents remains anyone's guess. The very uncertainty of these parameters creates its own unlawful chilling effect that directly infringes L.C. First Amendment rights. *Davis v. Ichord*, 442 F.2d 1207, 1214 (D.C. Cir. 1970). The ideological opponents of her mother, including an amicus in this Court, have taken credit for persuading Defendant Rubio to impose sanctions on her mother,[7] and have leveraged those sanctions to ruin her father's career with the World Bank.[8] Would any rational pre-teen girl not fear similar reprisals?

The declaration Defendants submitted with their opposition does nothing to dispel Plaintiffs' well-founded fears. In relevant part, the declaration states: "OFAC would *generally* view the *types* of activities described ... in Plaintiff's brief [such as Christmas gifts] as authorized by the Parental License" and "OFAC would also *generally* view transactions *ordinarily* incident and necessary to facilitate *such* activities as authorized." Opp., Ex. A ¶ 9 (emphasis added). No rational compliance officer would accept such comprehensively hedged and discretionary assurances. And neither should this Court.

The imposition of a de facto monitorship by OFAC regulators over the "private realm of family life" is an injury in fact. *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). And living under the threat of felony prosecution if she exceeds what these regulators "would generally view" as "ordinarily incident and necessary" to her mother-daughter relationship is an injury in fact.

---

[7] U.S. Sanctions UN's Francesca Albanese in Unprecedented Move After UN Watch Campaign, UN Watch, July 9, 2025, https://unwatch.org/u-s-sanctions-uns-francesca-albanese-in-unprecedented-move-after-un-watch-campaign/.

[8] Letter from Hillel C. Neuer (UN Watch) to Ajay Banga (World Bank Group) (Aug. 12, 2025), https://unwatch.org/wp-content/uploads/2024/08/UNW-Complaint-to-World-Bank-on-Massimiliano-Cali-violations.pdf.

### B. Max continues to suffer irreparable Article III injuries.

Defendants trivialize the blocking of Max's real property in the United States and dismiss the restrictions on his family relationships as "vague and speculative." Opp.19-20. There is no dispute, however, that Max has been deprived of his ability to visit his family home in Washington D.C. or realize its economic value. The narrow license OFAC issued relating to that property guarantees this. It only permits "U.S. persons" to take care of the property and requires the proceeds of any sale of the property to be transferred into a blocked account. Compl., Ex. C. The deprivation of Max's property rights is an injury in fact.

There is also no dispute that, on its face, EO 14203 makes Max liable to felony prosecution for "*any* … provision of funds, goods, or services by, to, or for the benefit of [Francesca]" or "the rece[iving] of *any* contribution or provision of funds, goods, or services from [Francesca]." EO 14203 § 3 (emphasis added). Defendants dismiss Max's fear of felony prosecution as "hyperbolic[]" and "speculative." Opp.20. But that fear is rationally rooted in the fact that the very things a devoted husband routinely does for his wife are what EO 14203 expressly prohibits. Risking felony prosecution every time you share your life with your wife is an injury in fact.

Lastly, as noted above, EO 14203 specifically prohibits spouses of SDNs from "unrestricted immigrant and nonimmigrant entry into the United States." Not only is Max affected by EO 14203, but he is also targeted by it. As an Italian citizen with no criminal record, real property in the United States, and employment with the World Bank, Max would otherwise be free to enter the United States for up to 90 days under the Visa Waiver Program for purposes such as professional or business conventions and tourism.[9] Being singled out for a travel ban because you are the "spouse" of an SDN is an injury in fact.

---

[9] https://travel.state.gov/content/travel/en/us-visas/tourism-visit/visa-waiver-program.html.

**C. Plaintiffs' motion for a preliminary injunction is timely.**

Defendants ask this Court to ignore Plaintiffs' undisputed harms because Plaintiffs failed to run immediately to Court. "Delay in seeking a preliminary injunction," however, only "undercuts [the] asserted harms." *Fla. EB5 Invs. v. Wolf*, 443 F.Supp.3d 7, 13 (D.D.C. 2020). It does not establish a shot clock. "[T]he D.C. Circuit has made clear that such a delay, standing alone, cannot provide a sufficient basis for denying a party's motion for a preliminary injunction." *FEA v. Trump*, 795 F.Supp.3d 74, 100 (D.D.C. 2025). Where "the government has not offered any credible reason why the delay in filing affects the particular types of irreparable harm at issue, … the court finds the delay does not detract from the harms shown." *Zaid v. Exec. Off. of President*, No. 25-cv-01365 (AHA), 2025 WL 3724884, at *13 (D.D.C. Dec. 23, 2025).

The only relevant question is whether the time that elapsed between when Plaintiffs first had standing to sue and when they brought suit is "unexcused delay" or delay without a "reasonable explanation." *Texas Children's Hospital v. Burwell*, 76 F.Supp.3d 224, 244 (D.D.C. 2014). Plaintiffs cannot be faulted for delaying litigation while they were in "diligent pursuit of a variety of avenues for reversing a policy," because any "delay" based on such efforts "does not give rise to an inference that the harm is not irreparable and imminent." *Id.* at 245. Additionally, delay does not imply a lack of irreparable harm where the full effect of unlawful government action takes time to crystallize. *Id.* ("[T]ardiness is not particularly probative in the context of ongoing, worsening injuries"; "waiting to file for preliminary relief until a credible case for irreparable harm can be made is prudent rather than dilatory"); *see also FEA*, 795 F.Supp.3d at 100.

Plaintiffs' decision to file this suit in February 2026, as opposed to last summer, is reasonably explained. As the Cali Declaration attests, Plaintiffs were completely caught off guard by the sanctions. Cali Decl. ¶ 4. Though Defendants emphasize that EO 14203 was promulgated in February 2025, Plaintiffs had no reason to believe it had anything to do with them. EO 14203

19

targets the ICC, an organization with which Francesca has no formal or informal role, *id*. ¶ 5, and the United States has never questioned its treaty obligations to respect the UN's privileges and immunities. When the sanctions against Francesca were imposed on July 9, 2025, Plaintiffs immediately sought assistance from the United Nations, which tightly regulates the involvement of its personnel in domestic proceedings. *Id.* at ¶ 4.

The United Nations, for its part, initially led the family to believe that it would assist in persuading Defendants to lift the sanctions, and the family met with the UN Office of Legal Advisor ("OLA") at least five times in the second half of 2025. Cali Decl. ¶¶ 6, 9, 16, 20, 22, 25. Only on January 14, 2026, did OLA formally advise Plaintiffs that the United Nations would not authorize Francesca to file suit in her own name. Compl., Ex E. Within a week after that, Plaintiffs authorized their counsel to prepare this lawsuit. Cali Decl. ¶ 30.

While Plaintiffs were engaged in frustrating, and ultimately fruitless efforts to obtain relief through the United Nations, the harms accumulated. As the Cali Declaration details, the economic, emotional, and physical costs of the sanctions have worsened over time, from the blocking of the family home, to the loss of bank access, to the pressure campaign against Max's employer, to the cancellation of university affiliations, to Francesca and Max both being prescribed medication for stress-induced medical conditions soon after OLA finally informed them that the United Nations could do nothing for them. Cali Decl. ¶¶ 7, 10, 11, 12, 17, 18, 19, 23, 24, 26, 29, 31, 32.

Defendants' claim that Francesca and Max "dragg[ed] their feet" in seeking judicial relief ignores the realities they confronted and the prudent diligence of their efforts. Opp.13. It also ignores the fact that the harms of the SDN designation are designed to grow more severe over time.

Former OFAC Director Adam Szubin described IEEPA sanctions as imposing an "unrelenting pressure" so great that "being designated by OFAC is referred to as … civil death."[10]

As soon as OLA finally acted on Francesca's repeated requests for formal guidance in January 2026, Plaintiffs promptly brought this suit. None of the facts of this case reflect unreasonable or inexcusable delay.

### III.    Plaintiffs have standing.

An Article III injury must "be (1) concrete, (2) particularized, and (3) actual or imminent." *Public Citizen v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1292 (D.C. Cir. 2007). "Concrete" means an injury is "direct, real, and palpable—not abstract." *Id.* In evaluating this requirement, and the others, this Court is allowed to use its common sense. *Id.* "Particularized" simply means "personal, individual, distinct ... not generalized or undifferentiated". *Id.* And "Actual or imminent" means "impending and immediate … not remote, speculative, conjectural, or hypothetical." *Id.*

Defendants challenge the named Plaintiffs' standing on the ground that the harms the sanctions impose "fall principally on Albanese, who is not a plaintiff." Opp.43. Perhaps. But standing does not require a plaintiff to show they are "principally" harmed. It requires them to show some actual harm that will be redressed by the relief requested. For the reasons explained in § II, *supra*, Plaintiffs more than satisfy those requirements here.

Even if Article III limited standing to the party who was "principally harmed," the complaint explicitly invokes Max's third-party standing to assert the rights of his spouse in

---

[10] *See* Adam M. Smith, *Dissecting the Executive Order on ICC Sanctions Scope, Effectiveness, and Tradeoffs*, Just Security (June 15, 2020), https://www.justsecurity.org/70779/dissecting-theexecutive-order-on-intl-criminal-court-sanctions-scope-effectiveness-and-tradeoffs/.

addition to his own rights. Compl. ¶ 12 ("Plaintiff Massimiliano Cali … brings this lawsuit on his own behalf *as well as on behalf of his wife*") (emphasis added). "In assessing third-party standing, the Court weighs three 'prudential considerations': '(1) "[t]he litigant must have suffered an 'injury in fact,' thus giving him or her a 'sufficiently concrete interest' in the outcome of the issue in dispute," (2) "the litigant must have a close relation to the third party," and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Wilmer*, 784 F.Supp.3d at 145 (cleaned up). This case satisfies all three considerations.

*First*, as discussed above, Francesca's designation has caused Max his own injuries in fact. *Second*, Max has a sufficiently "close relation" to Francesca to "act as an effective advocate for the third party." *Lepelletier v. F.D.I.C.*, 164 F.3d 37, 43 (D.C. Cir. 1999) (citation omitted). The D.C. Circuit has found this alignment of interests based on connections as informal as a "potential vendor-vendee relationship," *id.* at 45, a tax services firm asserting the interests of taxpayers,[11] a newsroom supervisor and her reporters,[12] and attorneys and their clients.[13] The alignment of Max's and Francesca's interests goes far beyond any of these; a fact Defendants' implicitly concede when they admit that "*much* of the requested relief [Plaintiffs seek] would run directly to [Francesca]'s benefit." Opp.16.

*Third*, Francesca is hindered from joining this suit. Defendants attempt to narrow the "hindrance" condition to circumstances akin to when a third-party is afflicted with "mental capacity, lack of access to court, or other similar disability." Opp.21. But that is not the law. The controlling precedents, which Defendants neither acknowledge nor distinguish, hold that the

---

[11] *Ryan, LLC v. Lew*, 934 F. Supp. 2d 159, 167 (D.D.C. 2013).

[12] *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 362 (D.D.C. 2020).

[13] *Florence Immigrant & Refugee Rts. Project v. U.S. Dep't of Homeland Sec.*, No. CV 22-3118 (CKK), 2025 WL 2844538, at *4 (D.D.C. Oct. 6, 2025).

"hindrance" factor "presents a relatively low threshold." *SPLC v. DHS*, No. 18-cv-760 (CKK), 2020 WL 3265533, at *14 (D.D.C. June 17, 2020) (cleaned up); *see also Turner v. U.S. Agency for Glob. Media*, 502 F.Supp.3d 333, 362 (D.D.C. 2020) (referring to the standard as "lenient"). The Supreme Court has allowed third-party standing under a variety of "hindrances," including "a third party's financial disincentive to litigate," "a [third] party's desire to protect her personal privacy," and "the 'imminent mootness' of a [third] party's claims." *See Al-Aulaqi v. Obama*, 727 F.Supp.2d 1, 31 (D.D.C. 2010) (collecting cases). The Court has also recognized "systemic practical challenges to pursuing one's own rights" as sufficient. *Florence Immigrant & Refugee Rts. Project v. DHS*, No. 22-cv-3118 (CKK), 2025 WL 2844538, at *4 (D.D.C. Oct. 6, 2025).

Defendants also fail to acknowledge or distinguish the authority holding that the "hindrance" standard is even more "relaxed" in the First Amendment context. *See Wilmer*, 784 F.Supp.3d at 146; *see also Ryan v. Lew*, 934 F.Supp.2d 159, 167 (D.D.C. 2013) (finding third-party standing in First Amendment context where plaintiff did "not even attempt to argue that any such impediment, or 'hindrance,' exists"). Under this "relaxed" standard, this Court has found fears of employment retaliation, risks to career and professional lives, and potential noncitizen visa revocation to be sufficient hindrances. *Turner*, 502 F.Supp.3d at 362.

As the record before this Court makes clear, the United Nations tightly regulates how UN personnel engage with national courts. Compl., Ex. E; Cali Decl. ¶ 16. Under UN regulations, the Secretary-General "alone may decide whether ... privileges and immunities exist and whether they shall be waived" in individual matters, and all UN personnel must obtain explicit permission before appearing before national courts and tribunals in their own name. Regulations Governing the Status, Basic Rights and Duties of Officials other than Secretariat Officials, and Experts on Mission, ST/SGB/2002/9, Reg. 1(e). Francesca duly applied for permission to appear in the case,

23

but the United Nations forbade it, telling her that it had asserted her immunity with the U.S. Government and "is not in a position to authorize [her] to file suit in a United Staes court contesting the imposition of ... sanctions." Compl., Ex. E.

To appear as a named Plaintiff, Francesca would have to disobey a direct order from the United Nations and risk the termination of her mandate as Special Rapporteur. If potential "employment retaliation" and "serious risk" to "career[s] and professional li[ves]" are "enough to demonstrate a hindrance," *Turner*, 502 F.Supp.3d at 362, the hindrances Francesca faces are more than sufficient to satisfy the relaxed standard applied in the First Amendment context.

### IV.    The balance of equities favors injunctive relief.

Against Plaintiffs concrete, particularized, and actual harms, Defendants warn that enjoining their designation of Francesca would present a "grave separation-of-powers issue." Opp.45. The opposite is true. The precedents Defendants invoke all involve courts' reluctance to enjoin acts of Congress. Plaintiffs, however, are asking this Court to enforce statutory limits that Congress has imposed on Defendants. This Court owes no deference to Defendants, when their legal authority is at its "lowest ebb." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring); *El-Shifa Pharmaceuticals v. United States*, 607 F.3d 836, 857 (D.C. Cir. 2010) (Kavanaugh, J., concurring).

In addition, the balance of equities always tips in favor of fidelity to the First Amendment. *PETA*, 215 F.Supp.2d at 134. Granting relief "serves the public interest by, for example, eliminating an obstacle to free speech and preserving the independent and adversarial nature of our judicial system. The balance of the equities and public interest thus strongly favor injunctive relief." *Wilmer*, 784 F.Supp.3d at 172–73.

## CONCLUSION

Neither IEEPA nor the First Amendment permit Defendants to sanction Francesca for what she "advocates," "writes," and "recommends." The preliminary injunction should be GRANTED.

Respectfully submitted,

Dated: March 25, 2026
Washington, D.C.

*/s/Michel Paradis*
Michel Paradis (D.C. Bar No. 499690)
Jason Wright (D.C. Bar No. 1029983)
Patrick Fields (Texas Bar No. 24146721)*
Scott Johnston (D.C. Bar No. 90019285)*
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
mparadis@steptoe.com
jwright@steptoe.com
pfields@steptoe.com
scjohnston@steptoe.com
Telephone: (212) 506-3900
Facsimile: (202) 429-3902

*Attorneys for Plaintiffs*

*admitted pro hac vice

25