**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| L.C., et al., | Civil Action No. 1:26-688 |
| Plaintiffs, | |
| vs. | Washington, DC April 1, 2026 |
| DONALD J. TRUMP, | |
| Defendant. | 4:21 p.m. |

_____/

TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS
**BEFORE THE HONORABLE RICHARD J. LEON**
UNITED STATES SENIOR DISTRICT JUDGE

APPEARANCES:

**For the Plaintiffs:**     **Michel Paradis**
                            **Jason D. Wright**
                              STEPTOE LLP
                              1114 Avenue of the Americas
                              35th Fl
                              New York, NY 10036
                              Email:jwright@steptoe.com
                                    michel.paradis.esq@gmail.com

                            **Patrick Fields**
                              STEPTOE LLP
                              717 Texas Avenue, Ste. 2800
                              Houston, TX 77002
                              Email: pfields@steptoe.com

                            **Scott Johnston**
                              STEPTOE LLC
                              1330 Connecticut Avenue NW
                              Washington, DC 20036
                              Email: scjohnston@steptoe.com

APPEARANCES CONT'D.:

**For the Defendants:**         **Eric Hamilton**
                                **Elizabeth Themins Hedges**
                                  DOJ-Civ
                                  950 Pennsylvania Ave NW
                                  Washington, DC 20530
                                  Email: eric.hamilton@usdoj.gov
                                        elizabeth.t.hedges@usdoj.gov

                                **Stephen McCoy Elliott**
                                **Kian Kevin Azimpoor**
                                  U.S. DEPARTMENT OF JUSTICE
                                  1100 L Street, N.W.
                                  Washington, DC 20530
                                    stephen.m.elliott@usdoj.gov
                                    kian.k.azimpoor@usdoj.gov

**Reported By:**                **Lorraine T. Herman, RPR, CRC**
                                  Official Court Reporter
                                  U.S. District & Bankruptcy Courts
                                  333 Constitution Avenue NW
                                  Washington, DC 20001
                                  lorraine_herman@dcd.uscourts.gov

**\*\*\***    Proceedings recorded by stenotype shorthand;
       transcript produced by computer-aided transcription.

**P R O C E E D I N G S**

**DEPUTY CLERK:**  Your Honor, we are on the record in civil matter 26-688, *L.C., et al. versus Donald J. Trump, et al.*

Beginning with the plaintiffs' counsel, please approach the podium and identify yourselves for the record.

**MR. PARADIS:**  Good morning, Your Honor. Michel Paradis, from Steptoe, for plaintiffs L.C. and Max Cali.

**THE COURT:**  Welcome.  Who joins you today?

**MR. PARADIS:**  I'm joined today by my colleagues -- would you like me to introduce them?  I'm sorry, Your Honor.

**THE COURT:**  That's what I just said.

**MR. PARADIS:**  I'm joined today by my very able colleagues Patrick Fields, Jason Wright and Scott Johnston.

**THE COURT:**  Welcome.

**MR. PARADIS:**  Thank you.

**THE COURT:**  Thank you.

**MR. HAMILTON:**  Good afternoon, Your Honor.

Eric Hamilton for the defendants.  I'm joined by Elizabeth Hedges, Stephen Elliott --

**THE COURT:**  Where is she from?

**MR. HAMILTON:**  I beg your pardon?

**THE COURT:**  Where is she from?

MR. HAMILTON:  Ms. Hedges --

THE COURT:  Each person you name and where they are from.

MR. HAMILTON:  Sure.  My name is Eric Hamilton. I'm from the civil division.  Ms. Hedges is also --

THE COURT:  Where in the civil division?

MR. HAMILTON:  The Office of the Assistant Attorney General for both Ms. Hedges, as well as myself.

THE COURT:  You are at DAG?

MR. HAMILTON:  I am.

THE COURT:  Don't be afraid to say that.  I was there once myself.

MR. HAMILTON:  Oh, okay.

Yes, I am the deputy assistant attorney general for the federal programs branch.

THE COURT:  Okay.

MR. HAMILTON:  Ms. Hedges is a counsel to the assistant attorney general.

Stephen Elliott is an assistant branch director in the federal programs branch.

THE COURT:  Okay.

MR. HAMILTON:  And Kevin Azimpoor is a trial attorney in the federal programs branch.

THE COURT:  That's the last fellow there?

MR. HAMILTON:  Yes.

THE COURT:  Okay.

MR. HAMILTON:  Thank you, Your Honor.

THE COURT:  All right.

We will hear the argument in the PI case.  You can have 15 minutes and five minutes for rebuttal.

MR. PARADIS:  Thank you, Your Honor.

THE COURT:  And you can have 15 minutes.

MR. PARADIS:  Good morning, Your Honor, and thank you.

THE COURT:  Good morning?

MR. PARADIS:  Good afternoon.

THE COURT:  It's not quite morning yet.

MR. PARADIS:  Almost morning.

Good afternoon and thank you.

I mainly want to make sure I answer any questions you have.  But if I could just say one thing really about what this case is about and --

THE COURT:  Don't say you are going to say one thing, because if you think it's only one, we'll be here five minutes.

MR. PARADIS:  I'll say three things as quickly as I can.

THE COURT:  But be as quick as you can.

MR. PARADIS:  I will need my 15 minutes.

THE COURT:  Give your best argument.

**MR. PARADIS:**  I will give you my best argument.

**THE COURT:**  Okay.

**MR. PARADIS:**  I will.

**THE COURT:**  Give me your best argument.

**MR. PARADIS:**  I think my best argument is that we had sought a preliminary injunction because the defendants in this case have sought to invade the most intimate and constitutionally protected relationship a 12-year-old girl can have; and that's really what's at issue in this case.

And the only reason they have done it is because L.C.'s mother signed an amicus brief that was joined by several other American scholars.  She wrote letters to American companies and wrote a report or several reports on issues that are divisive, but nevertheless constitutionally protected speech and, if nothing else, speech.

And I think a preliminary injunction is independently warranted because the same defendants have deprived Max of his home, the use of his home, almost all of its economic value, again, for the only reason that they don't like what his wife says.  And we are here because of those harms and because Max has a right to protect his family, to protect his wife.

The designation of Francesca is in violation of IEEPA, it's in violation of the Berman Amendments, and it's in violation of the First Amendment.  And all of those laws

say that the government may not target an individual -- and this is the language from Executive Order 14203 -- their close family members, because they disagree with what that individual says on a divisive matter of public importance.

And that's our best argument.  That's what this case is about.

I'm honestly happy to answer any questions you have about that.

**THE COURT:**  You don't have an argument for 15 minutes?

**MR. PARADIS:**  I mean, I can fill -- I sometimes teach law, so I can fill any time given to me, but I would say --

**THE COURT:**  This isn't a joking matter.  You are looking at me with a smirk on your face.

**MR. PARADIS:**  I'm sorry.

**THE COURT:**  Wait until I'm finished talking.

**MR. PARADIS:**  Sorry, Your Honor.

**THE COURT:**  You are not here to put on a show. You are here to make an argument on behalf of your client to the best of your ability.  And you can't assume whether or not this Court had any questions for you.

You have 15 minutes to make your best argument for your client.

**MR. PARADIS:**  Sure.  Yes, Your Honor.

THE COURT:  Don't give me that kind of attitude.

MR. PARADIS:  I do apologize if I --

THE COURT:  You ought to apologize.

MR. PARADIS:  I do.  I do apologize.

THE COURT:  Make your best argument.

MR. PARADIS:  My best argument is that this is illegal.  And if I can respond, I think part of that argument -- if I could respond to three points the government raised in its opposition brief, which I think deserve attention.

The first is with respect to the application of the First Amendment.  Now, we think that this does not need to be a constitutional case.  I think this case can be resolved on statutory grounds, but the First Amendment is how other district courts confronted with the identical issues have resolved this case, and we think it's a very straightforward --

THE COURT:  Identical issues?

MR. PARADIS:  Identical issues, yes.

The scope of Section 14203, whether or not that satisfies strict scrutiny, whether or not it --

THE COURT:  The plaintiffs in this case live in Italy.

MR. PARADIS:  That's not correct.  They presently live in Tunisia because --

**THE COURT:**  Okay.  They live outside the United States.  And those other cases that you say are identical, were the plaintiffs living outside of the United States?

**MR. PARADIS:**  No, they were not.

**THE COURT:**  They were not identical.

**MR. PARADIS:**  The facts of the case may be slightly different, but the plaintiffs in this case -- I think there are two facts that get to the constitutional question, as to why the First Amendment should apply.

The first --

**THE COURT:**  How about the standing question?

**MR. PARADIS:**  Sure.

With respect to whether or not they can assert the rights, their own rights, L.C. can assert the right that the government --

**THE COURT:**  While living in Tunisia.

**MR. PARADIS:**  Well, L.C. is an American citizen.  And whether or not she is in Tunisia or in the family home, just a few blocks from here, she has the protection of the Constitution.

Whether or not that's the First Amendment, whether or not that's the due process clause, she has -- the mother-daughter relationship is probably the most sacrosanct constitutional right that we have.  It implicates, as the

Supreme Court has held in a variety of cases, the freedom of association, due process rights, the core traditions of this country and the protection of the intimate space of the family.

And the designation of her mother comprises that. It makes every interaction she has with her mother a potential felony. And if you are concerned about whether or not you can give your mother a Christmas gift. If you are concerned about whether or not your mother can teach you to drive. If you are concerned about whether or not your mother can teach you her trade, how to be a human rights lawyer, how to advocate for what you believe in front of international organizations. If you are concerned about those things because you might be committing a felony, the government might -- indeed promises to retaliate against you.

Because that's exactly what EO 14203 says, that they are targeting the sanctions target. The designation runs to Francesca but the sanctions target the family. Excuse me. The sanctions target the close family members; that's the language of the EO.

And I, frankly, can't think of a more profound injury in fact than the worry that every interaction I have with my parent, as a 12-year-old girl, could throw my mother in prison, throw my father in prison, throw me in prison,

prevent me from ever returning to the place where I was born.

That is injury in fact; and that is certainly suitable for standing.  And all of those injuries are redressable, indeed exclusively redressable, by the relief we have sought in this preliminary injunction.

The same is true for Max.  And I understand he is an Italian citizen, but the fact that he is an Italian citizen, and the fact that he is presently living in Tunisia matters not for the application of the Constitution; that's not the rule.

The rule, as articulated for at least now 30 years by the D.C. Circuit applied in *Verdugo-Urquidez*, is whether or not the individual has presence or, presence or property in the United States.

Max owns a home in this District jointly with Francesca.  That property is frozen.  They have no ability to use that property because they are banned from entering the United States.  Max is directly targeted by the Executive Order, barred from entry to the United States by the Executive Order because he is a close family member of Francesca.

He can't use his home.  When they attempted to sell their home, urgently, after Francesca was designated, the government attempted to freeze the assets, and the sale

was ultimately blocked.  And then they were given a license saying, if you sell your home, you have to put all of the money, of your only home in the world, into a frozen bank account, where you cannot access it, so long as Francesca is designated.

That's an Article III injury.  That's an Article III injury to a core fundamental, constitutional right that Max has as a property owner in the United States; that is directly traceable to the defendants' conduct that's challenged; and that will be directly remedied, indeed, can only remedied, by the preliminary injunction we've sought.

And then I'll turn to third-party standing, because the government seems to make a big song and dance of whether or not the violation of Francesca's rights, as someone who also owns property in the United States and, in fact, has substantial connections to the United States, completely independent of the property interest, which I'm happy to discuss.  They make a big deal about whether or not Max can assert her rights.  He is her husband.

It is difficult to think of someone in a better position to assert the rights than a parent, when it comes to particularly the harms vested upon your children and your family home.

And this court -- the test for third-party standing is well-established.  This Court has applied it in

various cases and it's three factors.  And I candidly can't see how these three factors are not met in this case.

The first is, do the plaintiffs themselves suffer cognizable harm?  They clearly do.

Second, are their interests aligned with the interest of the individual who is not presently before the Court?  Clearly it is.

In fact, the government seeks to argue at different times that the primary beneficiary of the relief we've requested is Francesca.  They can't have it both ways and say, oh, well, she is the real person who will benefit from this.  And then say, there is no alignment of interest between a wife and her husband.

And then third, is there a hindrance?  And in a First Amendment case that's not a high burden.  Your Honor has referred to it as a relaxed burden.  Others courts have held the same.  And to show a hindrance, all you have to show is that there is some reason that this person can't be in court themselves.

We've shown that.  We showed that in the exhibits attached to our complaint, that is made manifestly clear in the Cali declaration.

Francesca wishes she could be here.  She worked for many months to try to get the assistance of the United Nations, either in getting her designation removed or in

getting permission to appear in court to challenge her designation or appear in front of OFAC to seek delisting. And as laid out in the declaration. The United Nations did not move with anything remotely like alacrity.

They waited. They tried. They pushed. They met, I think, five times between September or -- sorry, August of 2025, when soon after she was first designated and they could get on the agenda with essentially the general counsel of the United Nations, which is called the OLA.

They met five times, basically monthly, trying to get some kind of action, which didn't come until January of this year. And when that action came, what did they do? They authorized this suit, which was filed a month later.

And so Francesca was hindered in coming here because, in order to appear herself in this case, she would have to defy a direct order from the United Nations, which holds her mandate as the special rapporteur. And to do so would, essentially, forfeit the very First Amendment right, the right to speak, that she is seeking to vindicate; and that her family are seeking to vindicate in this court. And I understand why the defendants would like that result.

They have been trying to get her mandate revoked for a year at this point. But someone does not have to give up their rights in order to assert and protect those rights. That's why third-party standing exists. That's the

hindrance that she confronted.  And that's why this case was brought when it was and by whom it was.

And so I understand the government's arguments.  I understand the importance of standing.  We take those very seriously.

But I don't see any ordinary application of the law in this circuit pointing in any direction other than Max has standing on his own because of his own independent connections, which are substantial in the United States, not the least being his home; that L.C., an American citizen, a child, has standing to challenge the invasion of her family rights; and that Francesca and her rights are properly before this Court.

Who, other than family members, could assert the kind of harms that she and they together confront, which have a single common source, which is what we are asking this Court to enjoin.

**THE COURT:**  Thank you.

**MR. PARADIS:**  Thank you, Your Honor.

**THE COURT:**  You can have five minutes on rebuttal.

**MR. PARADIS:**  Thank you, Your Honor.

**MR. HAMILTON:**  Good afternoon, Your Honor.  This Court should deny the motion for a preliminary injunction.

The International Criminal Court has wrongfully asserted jurisdiction over American persons, as well as

persons and countries that are American allies.

President Trump signed an Executive Order in February of last year recognizing that this wrongful assertion of jurisdiction threatens America's national security, as well as its foreign policy.

**THE COURT:** How does it threaten our national security?

**MR. PARADIS:** The threat to our national security is the harm to allies, like Israel, as well as the harm to American individuals who the International Criminal Court has been targeting. The International Criminal Court, as the President's Executive Order explicitly states, has issued warrants for Israel's prime minister, as well as a former defense minister for that country.

The plaintiffs have failed to carry their burden on each of the *Winter* factors for a preliminary injunction. And I'll start with irreparable harm. Plaintiffs have significantly delayed in bringing this lawsuit.

Ms. Albanese was designated on July 9th of last year, but the plaintiffs to this case didn't file a lawsuit for almost eight months later, until late February, February 25th of this year. As our brief explains on Page 14, courts in this circuit have oftentimes held that that sort of delay is inconsistent with claims of irreparable harm.

The plaintiffs' response is that they were working with the United Nations to try to get the United Nations' law firm to try to litigate a case for Ms. Albanese, but that response doesn't explain these plaintiffs' delay. These plaintiffs don't include Ms. Albanese.  Mr. Cali, as well as L.C., presumably would have been the co-plaintiffs in any lawsuit that Ms. Albanese would have brought.  And so it's no explanation for why they could not have and, in fact, did not bring their claim in the summer of last year after Ms. Albanese was designated.

In addition, the supplemental declaration that the plaintiffs filed reveals that the United Nations told Ms. Albanese it would not assist her in December of last year.  That's Paragraph 4 of the declaration.  And yet the plaintiffs still delayed two months before filing their complaint and filing the motion for a preliminary injunction.

Beyond that, there are other flaws with their irreparable harm claim.  The most central of them is the puzzling choice to not file any sort of declaration with their motion for a preliminary injunction articulating irreparable harms for these particular plaintiffs.

The plaintiffs instead filed with their motion for a preliminary injunction the declaration of a foreign lawyer who testified in his declaration about immunities applicable

to the United Nations, but the plaintiffs didn't articulate anything with evidence about harms that would befall them from Ms. Albanese's declaration.

**THE COURT:**  What's the connection between Ms. Albanese's conduct and the actions of the ICC with American citizens?

**MR. HAMILTON:**  Ms. Albanese is a special rapporteur for the United Nations.  And as plaintiffs explain, as a special rapporteur, she has a mandate from the United Nations; and that mandates has three parts.

First, she can conduct investigations; she can receive testimony from witnesses; and, third, she can report on her investigations.

**THE COURT:**  A report is basically recommendations that she's made?

**MR. HAMILTON:**  Yes, those reports can include recommendations.

But beyond that, there is a special relationship between the International Criminal Court and the United Nations.  That special relationship is formalized in a relationship agreement, and that agreement states that the International Criminal Court and the United Nations will, among other things, cooperate closely.

On top of that, Ms. Albanese has acted pursuant to her mandate in seeking investigations by the International

Criminal Court of American companies like Chevron, Caterpillar and Lockheed Martin.

In fact, she completed a report identifying those companies shortly before the Secretary of State designated Ms. Albanese as someone covered by the President's February 2000 --

**THE COURT:**  The report is her opinion, basically, based on her investigation.  Right?  She doesn't have any authority to institute any kind of an action at the International Criminal Court.  She is not part of the International Criminal Court.

**MR. HAMILTON:**  She isn't part of the International Criminal Court, but she was acting pursuant and under the authority of that mandate that the United Nations has bestowed on her, and there is a special relationship between the International Criminal Court as well as the United Nations.

**THE COURT:**  They are free to do whatever they want to do in the ICC.

**MR. HAMILTON:**  They are.

But she still has a far different status than other individuals who might engage in advocacy or make recommendations to the International Criminal Court.  She acts pursuant to an investigatory mandate, a mandate that includes authority to complete reports directly from the

United Nations.

But there is a more fundamental problem with the plaintiffs' First Amendment claim, and that is that Ms. Albanese does not have rights under the First Amendment. Ms. Albanese is a non-citizen, Italian national, living in Tunisia, whose conduct was in her capacity as a United Nations' special rapporteur. And the plaintiffs don't dispute that she was sanctioned for activities taking place outside the jurisdiction of the United States.

Our brief discusses a long line of authority recognizing that foreigners outside the United States do not have constitutional rights. The plaintiffs' response is their claim that she has substantial connections to the United States that do give her constitutional rights.

This argument, though, rests on a misreading of precedent. I'll start with the People's Mojahedin against State case, as well as the Kadi against Geithner case. The portions of those cases that the plaintiffs cite both simply characterize an earlier D.C. Circuit case called *NCOR*. And, in fact, in the People's Mojahedin against State case, the plaintiffs quote from the background section of that case, not the analysis section.

And the *NCOR* case is not an especially helpful case for the plaintiffs. There, the D.C. Circuit held that a party that had an overt presence in the United States, a

bank account, as well as relying on facts in a classified record, all of that combined, the D.C. Circuit held, to find a substantial connection that triggered constitutional rights for the plaintiff.

We, of course, don't know what was in the classified report, and so we don't know exactly what facts the D.C. Circuit found as rising to the level of a substantial connection and, in any event, the *NCOR* case talks about that party having an overt presence in the United States.

THE COURT:  Well, she had a house here.

MR. HAMILTON:  She has a --

THE COURT:  Here in D.C.

MR. HAMILTON:  She does have a real property asset in the United States.

THE COURT:  And she has a daughter who is a citizen.

MR. HAMILTON:  Correct.

THE COURT:  So that's two connections.

MR. HAMILTON:  Yes, but having a citizen child and having a real property asset in the United States don't come close to becoming a license for our First Amendment rights.

And in addition --

THE COURT:  Has any court ever said that?

MR. HAMILTON:  No.

The D.C. Circuit and the plaintiffs agree that there isn't really a bright-line test that the D.C. Circuit has articulated. They say on Page 7 of their reply brief that the test is fact-dependent and case-by-case and we agree.

And here the facts are that Ms. Albanese is a non-citizen, who hasn't lived in the United States for 10 years, who has real property in the United States, as well as a citizen daughter, but engaged in all relevant conduct overseas and pursuant to a mandate of the United Nations to conduct investigations.

It would be quite surprising if a foreign national could change how the sanctions regime applied to them by simply holding real property in the United States of America.

I also want to touch on the Kadi against Geithner case. Again, this is a case that the plaintiffs say help them, but it actually cuts in the opposite direction. That case suggests that a plaintiff needs a connection between their constitutional claims and their property. It talks about a party's, quote, ability to raise constitutional claims, at least with respect to that property. That isn't the case here with Ms. Albanese's real property asset in the United States. As I explained, her relevant conduct was pursuant to the United Nations' mandate and all occurred

overseas.

In addition, Footnote 14 in the *Kadi* case is very important.  Footnote 14 suggests that, even if a plaintiff could raise a due process claim, based on their contacts with the United States, that might not necessarily extend to the First Amendment.

And the First Amendment, of course, is the constitutional right that the plaintiffs to this case are wrongly asserting that Ms. Albanese had when she was acting overseas, pursuant to a mandate of the United Nations as a special rapporteur.

If, however, the Court found that Ms. Albanese does have some level of First Amendment rights, satisfies either strict scrutiny or intermediate scrutiny, the national security and foreign policy issues at work are very important, and the order is appropriately scoped and tailored.

Beyond the First Amendment, the plaintiffs make some claims under the IEEPA, some statutory claims. Notably, they don't make any statutory claims about the Executive Order's employment of Title VIII authority.  They don't challenge the statutory use of 8 U.S.C. 1182(f) authority.  And their IEEPA claims fail.  The national emergency declaration is valid.  The statute gives the President substantial discretion in determining what is an

unusual and extraordinary threat.

Plaintiffs' contrary argument rests on a misreading of 1701(b).  They claim that this statute means that emergencies have to be new.  Actually, what the sentence they quote says is that, new emergencies need to be supported by new declarations.

All the statute says about the nature of the emergency is that it has to be unusual and extraordinary.  As our brief explains on Pages 36 and 38, the President has substantial deference in his determination of what is an unusual and extraordinary threat.

The plaintiffs also misread the American Service-Members' Protection Act.  That statute does not supersede IEEPA.  There isn't anything about that statute that suggests Congress, in recognizing a similar policy problem, intended to hamstring what the President could do for problematic situations like this situation involving the International Criminal Court.

The Berman Amendment is also inapplicable here. Plaintiffs misunderstand how that portion of IEEPA applies. It's an exception to the types of transactions that can be regulated.  And what this Executive Order regulates is transactions with Ms. Albanese.  It does not control the sorts of matters that the President can determine to be an unusual and extraordinary threat.

Our brief explains why, in addition, the balance of the equities disfavor injunctive relief.  That's especially true given the foreign policy issues and national security issues at play.

And I would just finally argue that, if the Court does enter a preliminary injunction, it should not enter the proposed order that the plaintiffs filed, which is grossly overbroad and inconsistent with *Trump against CASA*'s limitation on injunctive relief to apply only to plaintiffs.

**THE COURT:**  Why isn't this just a case of viewpoint discrimination?

**MR. HAMILTON:**  Well, this isn't a case of viewpoint discrimination because the Executive Order regulates the transactions with Ms. Albanese.  It doesn't regulate speech.  It's instead regulating transactions that individuals may have with Ms. Albanese.

**THE COURT:**  Well, it's because of her report that the Executive Order was entered into in the first place.

**MR. HAMILTON:**  It is because of her conduct and her capacity as someone who has a mandate from the United Nations.  But that goes to --

**THE COURT:**  Wouldn't that have chilling effect on future rapporteurs?

**MR. HAMILTON:**  Yeah, perhaps.  But she doesn't have First Amendment rights.  United Nations officials, of

course, generally do not have First Amendment rights.  And that is really more a question of what is an unusual and extraordinary effect.

This Executive Order, though, is regulating transactions with Ms. Albanese.  And the Title VIII sections of the order are regulating travel to the United States by Ms. Albanese as well as Mr. Cali.

So plaintiffs are wrong to argue that the fact that this order is a response to her conduct, as someone with a mandate from the United Nations --

**THE COURT:**  Let's assume that that's all it was about, for sake of discussion.  Okay?  Why wouldn't you let her and her family sell their house?

**MR. HAMILTON:**  They are able to sell their house. They have a license that allows them to sell the house.  It does not allow them to transfer the proceeds of that sale outside the United States, but that is also --

**THE COURT:**  But they are living outside of the United States.  If they're going to sell their house in the United States, they have to gain access to the funds that they obtain from selling the house, don't they?

**MR. HAMILTON:**  Well, a few points.

I don't think they've put forward record evidence that adequately establishes that their need for access to whatever proceeds from that sale might materialize actually

imposes an irreparable harm.

**THE COURT:**  It's the only house they own.  I'm sure that the value of the house here in Washington, D.C. would go a long way in Tunisia.

**MR. HAMILTON:**  I don't know, Your Honor.  There was no declaration filed with the motion for a preliminary injunction.  They filed a supplemental declaration.

The Court certainly should not consider the portions of that declaration that go beyond the issues of the discussions with the United Nations that we argued in our opposition brief.

They've forfeited their arguments on irreparable harm in choosing to not file declarations and evidence with their motion for a preliminary injunction.  They, of course, bear the burden, under *Winter*, for establishing entitlement to a preliminary injunction.

But our final point, again, is just that any preliminary injunction should be appropriately scoped. Plaintiffs would have the Court actually require the Treasury Department to de-designate non-party Ms. Albanese.

The Court should, at most, enter an injunction that enjoins enforcement of Ms. Albanese's designation only for the plaintiffs for this case, and only with respect to concrete injuries that plaintiffs have identified through evidence presented to the Court.

Thank you, Your Honor.

**THE COURT:** Thank you.

You have five minutes.

**MR. PARADIS:** Thank you, Your Honor.

I think the first point I'd like to address, with Your Honor's permission, is their entitlement to constitutional rights.

They seem to suggest -- and I didn't fully understand the argument, to be candid -- that the law cited about presence or property in the United States is somehow obsolete. Obviously, that's not true. This Court and the D.C. Circuit have reiterated that in a variety of cases, probably most consistently in the Guantanamo cases where this issue gets litigated or has gotten litigated ad nauseam.

But if we needed an updated or recent authority, *Lopez Bello* -- which is a case we cite in our reply brief, District Court, from this court -- identified the following factors: Having a U.S. citizen child, a visa, traveling to the United States, owning property in the United States and working at a company based in the United States. All of those apply fully to both Francesca, as well as Max.

And so I don't think the government has offered you any good reason to distinguish that case.

**THE COURT:** Does Max still work for World Bank?

**MR. PARADIS:**  Yes, he does.

**THE COURT:**  He works for them from Tunisia?

**MR. PARADIS:**  That's correct.  The World Bank operates much like the U.S. military in that you get assigned to different field offices on a rotational basis.

And so, after the District of Columbia, our operative headquarters, they were assigned to two different countries, but his ability to return to headquarters is obviously prohibited by the travel ban that directly targets him under the Executive Order.

**THE COURT:**  But the rapporteur at the U.N. doesn't have to live and work in New York City?

**MR. PARADIS:**  Oh, that's correct.  She can live and work anywhere, a special rapporteur ...

**THE COURT:**  She can live and work outside the United States.

**MR. PARADIS:**  She could, yes.  But she had substantial connections to the United States as the special rapporteur, not the least being a visiting faculty member of Georgetown, which she has been for the past 10 years from which she only learned that they terminated that relationship, I believe, in December, which is also a matter of public record.

**THE COURT:**  Of '25.

**MR. PARADIS:**  Of '25; that's correct.  Soon before

we filed this case.

With respect to, you know, some of the questions about the interests served by the Executive Order, no court has upheld this Executive Order, and no court upheld the prior Executive Order, which was closely modeled on it.

So this Executive Order, I think, at least comes, should come to this Court with a certain disagree of suspicion as to its basic constitutionality.  And the reason all of those other courts have struck down the Executive Order or enjoined the application of the Executive Order in those particular cases is because on its face, it is viewpoint discriminatory.

It targets speech.  It targets individuals who advocate in favor of ICC prosecutions but not against.  And so the former candidate for Mayor in New York City, under Cuomo, represents an Israeli defendant, who has never been brought to the ICC, but he is perfectly free to do that under this ICC Executive Order.

But advocating for the other side, for the viewpoint that the government disagrees with, that's what's prohibited; that's a classic violation of the First Amendment.  I struggle to think of a better example of a violation of the First Amendment than targeting an individual because they oppose the position of the United States.

I know I'm running a little short on time, but I did want to address the national security question.

**THE COURT:**  You have two minutes.

**MR. PARADIS:**  I did want to address the national security question Your Honor posed.

What is the national security threat?  A national security threat apparently, as we have been understood to believe, is the investigation of protected persons before the International Criminal Court.  That is a national security threat Congress has addressed.  Congress has addressed that for 25 years.

And, in fact, if you go to the American Service-Members' Protection Act, specifically Section 4727 sub (c), Congress has specified what remedies are available and should be available to the government when protected persons are, quote, investigated and prosecuted.  And it has a separate subsection that provides additional authorities in situations where protected persons are actually taken into the custody of the International Criminal Court.

Congress has very carefully analyzed this question, has prescribed limits and authorities to the executive branch that this Executive Order completely disregards and overrides.

And that is exactly what was going on in *Learning Resources*, the tariffs case.  And that's also why, from the

standpoint of strict scrutiny, whether or not the government has articulated a compelling interest.  That belies the compelling interest.  Because, to the extent there is a compelling interest to be identified, it has been identified by Congress.  And Congress has identified what means are appropriate to that interest, not the blunder-bust approach that the President of the United States has taken in targeting -- and I know I am returning to this point, but I do think it's incredibly important -- the rights to property and the rights to family are probably the two most deeply embedded rights under the Constitution in the United States. And those implicate speech.  Those implicate association.

And if the government can take your house because it doesn't like what you say, that is a fundamental breach of the deepest constitutional norms that our society has rested upon for hundreds of years.

And if the government can criminalize your relationship with your mother because they don't think that they like what your mother has to say, it is, again, one of the deepest attacks on one of the deepest constitutional norms of our society.

And whether or not that's viewed as a statutory violation, we think that the law on that is clear, or a constitutional violation, we think the law on that is also clear, we ask this Court to enter the preliminary injunction

as requested.

THE COURT:  Thank you very much.

MR. PARADIS:  Thank you, Your Honor.

THE COURT:  Well, I can't give you an exact prediction when you will get an opinion.  We have been doing a lot of opinions in my chambers recently on the P.I. cases.  So we'll do our best to get you in, in the not-too-distant future.

Thank you for your arguments, Counsel.

We stand adjourned.

(Proceedings concluded at 5:00.)

C E R T I F I C A T E

I, *Lorraine T. Herman, Official Court Reporter,*

certify that the foregoing is a true and correct transcript

of the record of proceedings in the above-entitled matter.

     April 3, 2026                /s/ Lorraine T. Herman

        DATE                            REPORTED BY