# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 26-5172**                                  **September Term, 2025**

**1:26-cv-00688-RJL**

**Filed On:** June 15, 2026

Massimiliano Cali and L.C., a minor child, by
and through her father Massimilano Cali,

      Appellees

    v.

Donald J. Trump, President of the United
States, et al.,

      Appellants


    **BEFORE:**    Henderson*, Katsas*, and Childs, Circuit Judges

## O R D E R

Upon consideration of the emergency motion for a stay pending appeal, the opposition thereto, and the reply; the motion for leave to file a surreply, the opposition thereto, and the lodged surreply; and the motion for leave to participate as amicus curiae and the lodged amicus brief submitted by the American Center for Law and Justice, it is

**ORDERED** that the motion for leave to file a surreply be granted.  The Clerk is directed to file the lodged surreply.  It is

**FURTHER ORDERED** that the motion to participate as amicus curiae be granted.  The Clerk is directed to file the lodged amicus brief.  It is

**FURTHER ORDERED** that the partial administrative stay entered May 22, 2026, be dissolved.  It is

* A statement by Circuit Judge Katsas, joined by Circuit Judge Henderson, concurring in this order, is attached.

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

**No. 26-5172**                                    **September Term, 2025**

 

     **FURTHER ORDERED** that the district court's order entered May 13, 2026, be stayed in part pending appeal.  Appellants have satisfied the stringent requirements for a stay pending appeal.  See Nken v. Holder, 556 U.S. 418, 434 (2009); D.C. Circuit Handbook of Practice and Internal Procedures 33 (2025).  Pursuant to the stay, appellants may implement and enforce the designation of Francesca Albanese as a designated foreign national under Section 1(a)(ii)(A) of Executive Order 14203, except that appellants may not take any action that violates the licenses regarding Massimiliano Cali and L.C. issued by the Office of Foreign Assets Control.

### Per Curiam

 

                          **FOR THE COURT:**
                          Clifton B. Cislak, Clerk

               BY:   /s/
                          Selena R. Gancasz
                          Deputy Clerk

KATSAS, *Circuit Judge,* concurring: This case involves the President's imposition of economic sanctions on a non-resident alien based on her speech outside the United States. The district court preliminarily enjoined the sanctions as a likely violation of the First Amendment. Because that Amendment does not extend to the speech of aliens abroad, I vote to stay the injunction pending the government's appeal.

I

A

The International Emergency Economic Powers Act (IEEPA) empowers the President to respond to "any unusual or extraordinary threat" to United States national security or foreign policy if the threat substantially arises from abroad and the President declares a national emergency with respect to the threat. 50 U.S.C. § 1701(a). To address such a declared emergency, the President may regulate or prohibit transactions in United States property owned by a foreign national. *Id.* § 1702(a)(1)(B).

President Trump invoked IEEPA to issue Executive Order 14203, Imposing Sanctions on the International Criminal Court. 90 Fed. Reg. 9369 (Feb. 6, 2025). The President found that the International Criminal Court (ICC)—a tribunal headquartered in The Hague and not recognized by the United States—"has engaged in illegitimate and baseless actions targeting America and our close ally Israel." *Id.* at 9369. The President highlighted the ICC's issuance of arrest warrants against Israeli Prime Minister Benjamin Netanyahu and former Israeli Defense Minister Yoav Gallant, as well as its investigation of other Americans and Israelis. *Id.* The President found that the ICC's efforts "to investigate, arrest, detain, or prosecute" Americans, Israelis, and citizens of other allies that have not consented to ICC jurisdiction are an unusual and extraordinary threat to United States national security and

2

foreign policy. *Id.* at 9370–71. The President declared a national emergency with respect to this threat. *Id.* And to address it, he prohibited giving "funds, goods, or services" to any foreign national whom the Secretary of State has determined "to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute" Americans, Israelis, or citizens of other allies in the absence of consent by the targeted individual's country of nationality. *Id.*

B

Francesca Albanese and her husband, Massimiliano Cali, are Italian citizens. From 2012 to 2015, Albanese and Cali lived in the United States while Cali worked at the World Bank in Washington, D.C. During that time, Albanese gave birth to a daughter, L.C. The family moved to Indonesia in 2015 and then to Tunisia in 2021. They have not lived in the United States for over a decade.

In 2022, the United Nations Human Rights Council appointed Albanese as Special Rapporteur on the Palestinian Territory. In that role, Albanese repeatedly has "urge[d] the ICC" to "investigate the commission" of alleged "crimes of genocide and apartheid by Israel." Albanese, *Genocide as Colonial Erasure* 32, U.N. Doc. A/79/384 (Oct. 1, 2024), https://perma.cc/BF5P-WZ3M. After the ICC prosecutor filed applications for arrest warrants targeting Netanyahu and Gallant, Albanese filed an *amicus* brief urging the ICC to issue the warrants and allow these Israeli officials to be prosecuted. *Situation in the State of Palestine*, ICC-01/18-320, *Amicus Curiae* Submission by U.N. Mandate Holders (Aug. 6, 2024), https://perma.cc/5TRU-3JQH. In October 2024, she submitted a report to the United Nations urging the ICC to investigate various "prominent" Israeli government officials for genocide or apartheid. *Genocide as Colonial Erasure*, *supra*, at 32. And

3

in July 2025, she submitted another report urging the ICC "to investigate and prosecute" American companies and their executives for providing Israel with "heavy machinery in service of settler-colonial destruction" and with "weaponry and technical support" for its efforts "to perpetuate apartheid." Albanese, *From Economy of Occupation to Economy of Genocide* 7, 12, 27, U.N. Doc. A/HRC/59/23 (July 2, 2025), https://perma.cc/JM8R-SM5Y.

One week after the last report, the Secretary of State designated Albanese pursuant to the Executive Order. Rubio, *Sanctioning Lawfare that Targets U.S. and Israeli Persons*, U.S. Dep't of State (July 9, 2025), https://perma.cc/5D8WHN8H. The Secretary found that Albanese had "directly engaged with" the ICC "in efforts to investigate, arrest, detain, or prosecute nationals of the United States or Israel, without the consent of those two countries." *Id.* He highlighted her "recommending" that the ICC issue arrest warrants for Netanyahu and Gallant and prosecute Americans for providing goods to Israel. *Id.*

To implement the designation, the Treasury Department's Office of Foreign Assets Control (OFAC) added Albanese to its list of specifically designated nationals and blocked persons. *See* OFAC, *ICC-Related Designation*, U.S. Dep't of Treasury (July 9, 2025), https://perma.cc/U9H3-MAPM. However, OFAC issued two licenses permitting certain transactions with Albanese. One license allows transactions "ordinarily incident and necessary to" the maintenance and sale of a condominium that Albanese and Cali own in Washington, D.C. *L.C. by & through Cali v. Trump*, No. 26-cv-688 (D.D.C. May 13, 2026), ECF Doc. 1-11. The other license allows transactions that are "ordinarily incident and necessary to … Albanese's role" as the parent and legal guardian of L.C. ECF Doc. 1-12.

4

After the United Nations refused to permit Albanese to challenge her designation, Cali and L.C. sued to do so. As relevant here, their complaint alleges that the designation violates Albanese's First Amendment rights. Cali and L.C. moved for a preliminary injunction.

The district court granted the motion. It held that Cali and L.C. have standing to assert Albanese's First Amendment rights, that the designation likely violates those rights, and that equitable considerations favor Cali and L.C. ECF Doc. 48. The court preliminarily enjoined the government from "implementing or enforcing" the designation of Albanese pursuant to the Executive Order. ECF Doc. 49 at 1.

The government appealed and moved for a stay.

## II

In considering the stay motion, we must assess whether (1) the government is likely to succeed on the merits, (2) the government will be irreparably harmed absent a stay, and (3) a stay would serve the public interest. *Nken v. Holder*, 556 U.S. 418, 425–26, 435 (2009).

## A

On the First Amendment claim, the district court began with a premise that Albanese—who is not a United States citizen—was sanctioned for speech that occurred "outside the United States." ECF Doc. 48 at 18. The court recognized that "[f]oreign nationals outside the territory of the United States do not, as a general matter, 'possess rights under the U.S. Constitution.'" *Id.* at 15 (quoting *USAID v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020) (*AOSI*)). But, the court continued, aliens acquire constitutional rights when they develop "substantial connections" to the United States, even

5

for conduct that occurs outside the country. *Id.* (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990)). And it concluded that Albanese had such "substantial connections" because she had lived in the United States, owns property here, has a citizen daughter, and travels to the United States for professional and speaking engagements. *Id.* at 16–17.

1

In this Court, the plaintiffs seek to challenge the premise that Albanese was sanctioned for speech that occurred outside the United States. Neither the designation nor the complaint identifies the precise speech for which Albanese was sanctioned, or where it occurred. But in opposing the preliminary-injunction motion and in its subsequent stay motion below, the government stated unequivocally that the designation rested on "statements made *outside the United States*." ECF Doc. 26 at 25 (emphasis in original); *see* ECF Doc. 51 at 5 ("the expression for which [Albanese] was sanctioned occurred abroad"). In each of their responsive filings, the plaintiffs said nothing to the contrary. *See* ECF Doc. 32 at 2, 6–8; ECF Doc. 52 at 5–8. So, the district court quite properly resolved the preliminary-injunction motion on the premise that this case turns on speech by an alien outside the United States. We reject the plaintiffs' contrary contention, which "rests on a factual premise that was not developed before the District Court." *Mar. Int'l Nominees Establishment v. Republic of Guinea*, 693 F.2d 1094, 1102 n.12 (D.C. Cir. 1982).

There are other reasons to be skeptical of the newfound contention that Albanese was sanctioned in part for speech in the United States. The plaintiffs point to a press conference that Albanese gave at the United Nations in connection with her October 2024 report. But on the plaintiffs' own account

6

below, Albanese was sanctioned "for writing reports, sending letters, and signing an amicus brief"—not for any press conferences. ECF Doc. 32 at 5. The plaintiffs now assert that the report itself "was delivered in New York." Appellees' Stay Opp. at 16. But the report indicates only that it was transmitted from the Secretary-General to the General Assembly in New York. *See Situation of Human Rights in the Palestinian Territories Occupied Since 1967*, United Nations Digit. Libr. (Oct. 1, 2024), https://perma.cc/V2ZE-3MEE. The report does not say where Albanese—a resident of Tunisia—composed and submitted it to the Secretary-General.

At any rate, even if the designation rested in part on speech inside the United States, the record makes clear that Albanese's speech abroad more than sufficed to support the designation. The Executive Order targets persons determined "to have directly engaged in any effort by the ICC to investigate, arrest, detain, or prosecute" United States or Israeli citizens, 90 Fed. Reg. at 9370, and it specifically singles out the attempted prosecution of Prime Minister Netanyahu and former Defense Minister Gallant, *id.* at 9369. The Secretary's designation appropriately tracks the operative language in the Executive Order. Rubio, *supra*. The October 2024 report and press conference address alleged genocide in general, making only one brief reference to ICC investigation of "prominent individuals mentioned in the present report." *Genocide as Colonial Erasure*, *supra*, at 32. In contrast, Albanese filed her *amicus* brief directly with the ICC itself, and that brief argued at length for the arrest and prosecution of Israeli government officials after the ICC prosecutor had targeted Netanyahu and Gallant. *Situation in the State of Palestine*, *supra*. The plaintiffs give us no reason to think that this brief, filed in The Hague and signed by Albanese while a resident of Tunisia, involved any speech in the United States. And of all her provocative writings, the *amicus* brief most "directly engaged"

7

ICC efforts to arrest and prosecute Israeli government officials, including Netanyahu and Gallant.

2

On the merits, the government is correct that the First Amendment does not apply to the speech of non-resident aliens abroad. As the district court itself recognized, "it is long settled … that foreign citizens outside U.S. territory do not possess rights under the U.S. Constitution." *AOSI*, 591 U.S. at 433. For example, in *AOSI*, the Supreme Court held that foreign organizations "operating abroad" have no First Amendment right to challenge funding conditions that require explicit opposition to prostitution. *See id.* at 431–36. In *Verdugo-Urquidez*, the Court held that the Fourth Amendment does not apply to searches and seizures of the foreign property of non-resident aliens. 494 U.S. at 264–75. In *Johnson v. Eisentrager*, 339 U.S. 763 (1950), the Court held that neither the Fifth Amendment nor the Suspension Clause applies to the military detention of alien enemy combatants abroad. *Id.* at 777–85.[1] And just last Term, the Court again confirmed that "foreign organizations operating abroad have no First Amendment rights." *TikTok Inc. v. Garland*, 604 U.S. 56, 69 n.2 (2025) (per curiam) (cleaned up). These cases reflect the principle that "extraterritorial application of organic law" is presumptively disfavored, and nothing in our constitutional

---

[1] *Boumediene v. Bush*, 553 U.S. 723 (2008), qualified *Eisentrager* by extending the Suspension Clause to foreign territory subject to indefinite, complete, and total control by the United States, such as the United States naval base at Guantanamo Bay, Cuba. *See AOSI*, 591 U.S. at 434. There is no suggestion here that *Boumediene* extends to foreign countries such as Italy, the Netherlands, or Tunisia. Nor could there be. *See Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010) (*Boumediene* does not extend to United States military base in Afghanistan).

8

text, history, or tradition suggests that the First, Second, Fourth, Fifth, or Sixth Amendments apply extraterritorially to protect the conduct of aliens abroad. *Eisentrager*, 339 U.S. at 784; *cf. Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (Congress must give "clear indication" to apply federal statutes extraterritorially).

To distinguish these cases, the district court cited *Verdugo-Urquidez* for the proposition that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." 494 U.S. at 271. But as the conjunctive formulation indicates, this means only that "foreign citizens *in the United States* may enjoy certain constitutional rights." *AOSI*, 591 U.S. at 434 (emphasis in original); *see, e.g.*, *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) (Fifth Amendment applies to lawful permanent resident who "remains physically present" in the United States); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (Fifth and Sixth Amendments apply to "all persons within the territory of the United States"); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (Fourteenth Amendment due-process and equal-protection clauses apply to "all persons within the territorial jurisdiction" of the United States). These precedents, about the extent of constitutional protection for aliens *inside* the United States, do not suggest that the First Amendment applies extraterritorially to protect the speech of aliens *outside* the United States.

The district court further reasoned that Albanese's ownership of property in the United States—a condominium located in the District—triggers some constitutional protection. ECF Doc. 48 at 18. The court was correct that aliens may invoke the Fifth Amendment to safeguard their property interests located in the United States. *See Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489, 492 (1931); *Nat'l*

9

*Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 204 (D.C. Cir. 2001) (*NCRI*). Under that principle, Albanese perhaps could have argued that the government failed to afford due process to support a designation encumbering her condominium in the District. *Cf. NCRI*, 251 F.3d at 201 (alien entity with "overt presence" in the United States may raise due-process challenge to designation that encumbered its "small bank account" here). Or perhaps Albanese could have argued that the designation rose to the level of an unconstitutional taking of the condominium. *Cf. Russian Volunteer Fleet*, 282 U.S. at 487–89 ("alien friend" in Russia may challenge alleged taking of its United States property). But claims such as these would involve no extraterritorial application of the Bill of Rights. They do not suggest that the First Amendment applies extraterritorially to protect the speech of aliens abroad.

B

Equitable considerations also favor granting a stay.

On the government's side of the balance are weighty foreign-policy and national-security interests. The Executive Order and ensuing designation seek to deter the criminal prosecution of a sitting Prime Minister of Israel and a former Defense Minister of Israel for official acts that Israel undertook in response to the October 7, 2023 terrorist attacks on that important American ally. The significance of this foreign-policy problem seems to me self-evident. And the President undertook executive action supported both by express congressional authorization in IEEPA, *see* 50 U.S.C. §§ 1701–02, and by his independent Article II powers regarding foreign policy and national security, *see, e.g., United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319–20 (1936). Faced with injunctions barring this kind of executive action, we have often found irreparable injury to the government. *See NTEU v.*

10

*Trump*, No. 25-5157, 2025 WL 1441563, at *2 (D.C. Cir. May 16, 2025) (per curiam); *Am. Foreign Serv. Ass'n v. Trump*, No. 25-5184, 2025 WL 1742853, at *3 (D.C. Cir. June 20, 2025) (per curiam). Likewise, the public interest strongly supports such executive action. *See Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 581 (2017) (per curiam) ("The interest in preserving national security is an urgent objective of the highest order." (cleaned up)).

On the other side of the balance, any interim harms to the plaintiffs and Albanese are modest. The designation effectively restricts the family's ability to travel to the United States and use their condominium in the District. But the family has lived outside the United States for over a decade, now lives in Tunisia, and has expressed no concrete plans or desire to travel to the United States during the time this appeal runs its course. As for L.C.'s interest in support from her mother, the government has largely accommodated that by licensing "all transactions … that are ordinarily incident and necessary" to Albanese's "role as the parent and legal guardian" of L.C., including the purchase, payment, and receipt of "goods, services, and funds essential to the maintenance" of L.C., "including, but not limited to, health and medical expenses, transportation, telecommunication costs, housing costs, food, clothing, insurance, and legal fees and expenses." ECF Doc. 1-12. We likewise accommodate that interest, in requiring the license to remain in effect while the appeal remains pending.

\* \* \* \*

In sum, the First Amendment claim that the plaintiffs seek to raise on Albanese's behalf lacks merit, and the equitable balance favors the government. Accordingly, I vote to grant the motion for a stay pending appeal.